UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the State of
New York,

<div align="center">Plaintiff,</div>

       -against-                               Case No. <u>25-cv-1445</u>

PUFF BAR, EVO BRANDS, LLC, PVG2, LLC D/B/A
PUFF BAR, ECTO WORLD LLC D/B/A DEMAND
VAPE, MAGELLAN TECHNOLOGY INC., YLSN
DISTRIBUTION INC. D/B/A HAPPY DISTRO,
MIDWEST GOODS INC. D/B/A MIDWEST
DISTRIBUTION ILLINOIS, 10 DAYS, INC. D/B/A POD
JUICE, SAFA GOODS LLC, SV3, LLC D/B/A MI-ONE
BRANDS, MYLÉ VAPE INC., MVH I, INC., PRICE
POINT DISTRIBUTORS INC. D/B/A PRICE POINT NY
D/B/A PRICEPOINTNY.COM, WEIS KHWAJA,
HAMZA JALILI, and MOHAMMAD JALILI,

<div align="center">Defendants.</div>

--------------------------------------------------------------------X

<div align="center"><u>**COMPLAINT**</u></div>

PRELIMINARY STATEMENT ............................................................................ 1

JURISDICTION AND VENUE .......................................................................... 6

PARTIES ........................................................................................................... 6

    I.  Corporate Defendants .............................................................................. 7

    II.  Individual Defendants .............................................................................. 8

FACTUAL ALLEGATIONS .............................................................................. 9

    I.  Old Tactics, New Products, Same Problems:  Defendants Have
        Openly Marketed and Sold Illegal and Dangerous Flavored
        Vapor Products.......................................................................................... 9

        A.  Defendants Make the Tobacco Industry's Strategies Their Own. ............................ 11

            1.  E-Cigarettes Rise After the Tobacco Industry's Heyday....................................15

            2.  Puff Bar Emerges After JUUL's Heyday and Creates the
               Market for Disposable Vapes....................................................................19

        B.  Today's Disposable Vapes, which Defendants Control in New York, are Dangerous
           and Designed to Be Irresistible to Youth................................................... 22

    II.  Ignoring the Safeguards: With Nearly Every Sale of Flavored E-Cigarettes,
        Defendants Have Violated the Law and Created, Maintained, or Contributed
        to an Avoidable Crisis That New York Now Struggles to Contain.................................. 32

        A.  Defendants Actively Subvert Evidence-Based Federal, State, and Local Laws......... 33

            1.  Defendants Violate the Federal Prevent All Cigarette
               Trafficking ("PACT") Act. ..................................................................34

            2.  Defendants Violate Multiple Provisions of New York's Public Health Law
               Regarding the Marketing and Sale of E-Cigarettes. ...............................................39

                 a.     Each Defendant Has Violated New York's Flavor Ban
                     (N.Y. Pub. Health L. § 1399-mm-1)......................................................... 42

                 b.     Each Defendant Has Violated New York's Ban on Shipping
                     (N.Y. Pub. Health L. § 1399-ll). ................................................................ 43

      c.     Certain Defendants Have Violated New York's
Required Ingredient Disclosures
(N.Y. Pub. Health L. § 1701)...................................................... 45

      d.     Each Defendant Has Violated Pertinent Local Laws............................... 49

   3.  Each Defendant Has Violated the Federal Food, Drug, and
Cosmetic Act ("FD&C Act") and FDA Regulations............................................51

B. The Flavored Vapor Product Supply Chain Involves International and Interstate
Commerce and Defendants Substantially Control New York's Supply...................... 53

III. Each Defendant Has Persistently and Illegally Marketed, Sold, and Shipped Flavored
Vapor Products into New York........................................................................ 57

A. The PUFF Defendants –
*The First Mega-Popular Disposable Vape* ................................................. 60

B. The DEMAND Defendants –
*The Biggest Flavored E-Cigarette Importer and Master Distributor* ...................... 78

C. Happy Distro –
*The Master Distributor Who Exerts Control Upstream and Downstream* ................. 94

D. Midwest Goods –
*A Leading Distributor with a Big Media Focus* ....................................... 103

E. Pod Juice –
*A Manufacturer and Distributor of Highly Potent Flavored E-Cigarettes* .............. 120

F. Safa Goods –
*A One-Stop Shop for Vape Sellers with a Nationwide Distribution Network*........... 130

G. Mi-One –
*A Brand, Distributor, and Conspiracist*................................................... 135

H. Mylé –
*A Favored Brand and Distributor with Swag* ........................................... 144

I. Price Point –
*New York's Least Discreet Distributor and Retailer* ................................. 154

J. The Relationship Between Defendants .................................................. 162

IV. The Price Paid by the State:  Defendants' Flavored Vapor Products Have Harmed New York and Will Continue To Do So If Unabated. ........................................................... 163

    A.  Too Many New York Teens Are Vaping Today Because of the Defendants-Controlled Market for Disposable Vapes, Despite a Steep Decline in the Use of Tobacco Products. ........................................ 164

    B.  Defendants' Disposable Vapes Are Negatively Affecting New York Adolescents' Health and Wellbeing .......................................................... 168

    C.  Defendants Must Abate the Harm They Have Caused, Contributed to, or Maintained. ................................................................. 170

CLAIMS FOR RELIEF ......................................................................................... 175

AS AND FOR A FIRST CAUSE OF ACTION
Repeated and Persistent Illegality in Violation of N.Y. Executive Law § 63(12)
*(Against All Defendants)* ...................................................................... 175

AS AND FOR A SECOND CAUSE OF ACTION
Repeated and Persistent Fraudulent Conduct in Violation of
N.Y. Executive Law § 63(12)
*(Against All Defendants)* ...................................................................... 177

AS AND FOR A THIRD CAUSE OF ACTION
Common-Law Public Nuisance
*(Against All Defendants)* ...................................................................... 179

AS AND FOR A FOURTH CAUSE OF ACTION
Violations of the PACT Act, 15 U.S.C. § 376a
*Delivery Sales*
*(Against All Defendants Except EVO Brands,*
*MVH I, and the Individual Defendants)* ................................................. 180

AS AND FOR A FIFTH CAUSE OF ACTION
Violations of the PACT Act, 15 U.S.C. § 376
*Registration & Reporting*
*(Against All Defendants Except EVO Brands, MVH I,*
*and the Price Point Defendants)* ........................................................... 185

AS AND FOR A SIXTH CAUSE OF ACTION
Violations Of The PACT Act, 18 U.S.C. § 1716e
*Nonmailable Deliveries*
*(Against All Defendants Except EVO Brands,*
*MVH I, and the Individual Defendants)* ........................................................ 186

AS AND FOR A SEVENTH CAUSE OF ACTION
Common-Law Gross Negligence
*(Against All Defendants)* ............................................................................ 188

AS AND FOR AN EIGHTH CAUSE OF ACTION
Common-Law Willful Misconduct
*(Against All Defendants)* ............................................................................ 189

AS AND FOR A NINTH CAUSE OF ACTION
Unjust Enrichment
*(Against All Defendants)* ............................................................................ 189

DEMAND FOR JURY TRIAL ................................................................................ 190

PRAYER FOR RELIEF ......................................................................................... 190

Plaintiff, the People of the State of New York ("Plaintiff" or "the State"), through its attorney

Letitia James, Attorney General of the State of New York, alleges the following, with personal

knowledge of the actions of the Office of the Attorney General and upon information and belief as

to the actions of others:

## PRELIMINARY STATEMENT

1.     New York State is grappling with a public health crisis among its youth, caused by

Flavored E-Cigarettes,[1] particularly ready-to-use Disposable Vapes.[2]  In 2018, HHS Secretary

Alex Azar warned that e-cigarettes "threaten[ed] to engulf a new generation in nicotine

addiction,"[3] and Surgeon General Jerome Adams declared e-cigarette use among youth an

"epidemic" and "an unprecedented challenge."[4]  Since then, too many children, as young as middle

schoolers, have reported being exposed to e-cigarettes.  Nationally, about 9.6% of eighth graders,

15.4% of tenth graders, and 21.0% of twelfth graders report vaping nicotine in the past 12 months.[5]

2.     More than 85% of American underage users who pick up an e-cigarette have opted

---

[1] Defined *infra* n.8.

[2] Defined *infra* n.10.

[3] *Results from 2018 National Youth Tobacco Survey* (Nov. 15, 2018), *available at* https://www.fda.gov/news-events/press-announcements/results-2018-national-youth-tobacco-survey-show-dramatic-increase-e-cigarette-use-among-youth-over (last visited Feb. 15, 2025).

[4] Alicia Ault, *Youth Vaping an Epidemic, US Surgeon General Declares* (Dec. 18, 2018), *available at* https://www.medscape.com/viewarticle/906733?form=fpf (last visited Feb. 15, 2025).

[5] Miech, R. A., Johnston, L. D., Patrick, M. E., & O'Malley, P. M., *National Survey Results on Drug Use, 1975–2024: Overview and key findings for secondary school students* (Dec. 2024) Ann Arbor, MI: Institute for Social Research, University of Michigan, *available at* https://monitoringthefuture.org/wp-content/uploads/2024/12/mtf2025.pdf (last visited Feb. 11, 2025) (Monitoring the Future national survey results on drug use, 1975–2024: Overview and detailed results for secondary school students, Monitoring the Future Monograph Series.).

for Flavored E-Cigarettes. More than half of them now use easy, cheap Disposable Vapes. They start vaping and then cannot stop, even when most of them want to: 67.4% of students who were still vaping in 2020 reported trying to quit in the preceding year.[6] New York youth have unfortunately followed this national trend, and the epidemic continues to harm our communities. E-cigarettes have become the most used nicotine product among New York high schoolers, with 18.7% of high school students using them in 2022.[7]

3.    A significant part of this crisis is attributable to each Defendant's illegal and/or fraudulent commercial and marketing conduct, which, among other things, has targeted underage users and created broad misapprehensions about the legality and safety of the Flavored E-Cigarettes they distribute in massive quantities within New York. They have convinced the public that Flavored E-Cigarettes are casual fun and deliberately develop their distinctive products to lure impressionable adolescents with flavors, like "Strawberry Donut," "Tropical Rainbow Blast," "Cotton Candy," "Cake," "Orange Soda," "Banana Taffy," "Baja Slushie," "Iced Watermelon," "Pink Lemonade," and "OMG Blow Pop." They sanction viral trends like vape "tricks" that involve inhaling 15 Disposable Vapes simultaneously and publish e-magazines and blogs that falsely report, among other things, that vaping offers a path to "Healthier Lifestyles." They race against each other to develop the most potent products and add the latest technological gimmicks, like Bluetooth connectivity, speakers, and games, to make sure that once a child picks up that

---

[6] https://www.cdc.gov/tobacco/e-cigarettes/youth.html (last visited Feb. 11, 2025).

[7] https://www.health.ny.gov/prevention/tobacco_control/reports/statshots/volume15/n1_youth_tobacco_use.pdf. (last visited Feb. 11, 2025). Current use is defined as having used an e-cigarette at least once in the past 30 days. *See id.*

2

device, it is extraordinarily difficult to put it down.  In these ways, and as further described below, each Defendant has created and exploited misapprehensions around the safety and legality of Flavored E-Cigarettes for their own financial benefit.

4.      Together, Defendants have established an industry for Flavored E-Cigarettes, particularly Disposable Vapes, and staked out their own lucrative shares in the soaring market for low-cost, easily concealable, and ubiquitously available products which contain varying concentrations of nicotine, all while concealing or understating the known dangers of such products.  Certain Defendants manufacture excessively potent and toxic Flavored E-Cigarettes without disclosing what is in them as required, others have sold these illegal products directly to consumers' doorsteps, despite applicable federal, state, and local laws that prohibit those sales. Some Defendants hold trademarks on brands that were once incredibly popular and have since gone out of style, and others hold trademarks on brands that are just emerging.  All are major distributors of Flavored E-Cigarettes in New York and other states. All have engaged in reprehensible, illegal conduct and aim to addict youth to their products.  All are liable.

5.      New York has developed one of the most comprehensive statutory, regulatory, and policy tobacco and nicotine-related control frameworks in the country.  It has banned Flavored E-Cigarettes, vape-branded swag, social events promoting the products, and discounts. New York invests heavily in initiatives, like Drop the Vape and Reality Check, anti-vape media, and surveys and assessments to continuously and meaningfully address the crisis.  But at every turn, each Defendant's New York-touching commercial conduct in the Flavored E-Cigarette industry undercuts New York's efforts and law—which must be now enforced to protect the public.

6.     Among other things, for instance, Defendants use illegal shipping methods to supply retailers, which are concentrated around public middle and high schools.  Certain data available to Plaintiff at this time demonstrate that over 80% of certain Defendants' retail customers, for whom GPS coordinates could be identified, are located within 1.5 miles of a school, and the median distance from a middle or high school was just 0.75 miles.  By first dodging all of New York's regulatory safeguards, then making these products as cheap as possible and as abundantly available as possible in our communities, each Defendant cashes in without regard to the lasting harm they cause.

7.     Defendants' strategies have paid off at the cost of our middle and high schoolers' health.  The consequences of Defendants' success include avoidable and substantial increased risk for New York's youth to experience, among other things, interference with cognitive development, executive functioning, inhibitory control, disturbances in working memory and attention, and serious health complications, like seizures due to nicotine toxicity, as well as the development of mental and behavioral problems, such as major depressive disorder, agoraphobia, panic disorder, addiction to other substances, antisocial personality disorder, or academic problems.

8.     The purpose of this lawsuit is to stop Defendants' illegal and fraudulent business practices, abate the continuing harm for which they are responsible, and hold Defendants accountable in law and equity for the crisis they have inflicted on the State.  Each Defendant has engaged in three categories of misconduct giving rise to the State's claims:

   a. Each Defendant has followed the old tobacco industry's textbook marketing strategies to attract New York's youth and influence them to buy the products that have made each Defendant enormous profits, by (i) marketing their

Disposable Vapes, in flavors, colors, and themes that are designed to attract children, including fruity and candy flavors and/or animated themes, and/or (ii) utilizing engagements with social media influencers and other social media or marketing campaigns that are far more likely to reach underage customers than mature, informed consumers with their false premise—that Flavored E-Cigarettes are harmless fun when in fact they are dangerous and illegal.

b. Each Defendant has repeatedly violated at least one provision of the federal Prevent All Cigarette Trafficking Act of 2009 ("PACT Act"), such as (i) conducting illegal delivery sales, (ii) illegally using the United States Postal Service ("USPS") to ship their Flavored E-Cigarette products, and/or (iii) failing to maintain detailed records and submit reporting to New York State and other regulators.

c. Each Defendant has repeatedly violated New York's Public Health Law, by (i) ignoring New York's complete retail ban on Flavored E-Cigarette products, (ii) failing to make any of the legally required disclosures concerning their products' harmful ingredients, (iii) routinely and illegally shipping their Flavored E-Cigarette products to their New York customers, and/or (iv) using illegal discounts to maximize their reach and sales.

Accordingly, Defendants are liable to the State pursuant to (i) New York Executive Law § 63(12) for their persistent illegal and fraudulent conduct, (ii) common-law public nuisance; (iii) violations of the federal PACT Act, (iv) gross negligence, (v) willful misconduct, and (vi) unjust enrichment.

9.     The State seeks a permanent injunction prohibiting Defendants from selling Flavored E-Cigarettes to any New York individuals, retailers, or entities, including a lifetime industry ban on Individual Defendants Weis Khwaja, Hamza Jalili, Mohammad Jalili, requiring Defendants to issue public corrective statements regarding their false and misleading public statements and omissions, as well as disgorgement, damages, civil penalties, punitive damages, costs, and the joint and several endowment of an abatement fund that will allow the State to eliminate the public nuisance which Defendants contributed to, created, and/or maintained.

10.     Although each Defendant's conduct has uniquely contributed to the State's crisis,

5

as detailed herein, the common thread among all Defendants is that they have controlled the supply chain, availability, brands, price, and promotion of the vast majority of Flavored E-Cigarettes, especially Disposable Vapes, illegally sold throughout the State for at least five years. That reign must end.

## JURISDICTION AND VENUE

11.     Subject-matter jurisdiction over this action exists pursuant to 15 U.S.C. § 375 *et seq.*, and 28 U.S.C. §§ 1331, 1367.

12.     This Court has personal jurisdiction over each Defendant because each Defendant transacts business within this District, contracts to supply goods in this District, has committed and continues to commit tortious acts within this District, and/or has committed and continues to commit tortious acts outside New York causing injury to persons or property within the State.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims asserted occurred in this District, including Defendants' shipments and/or sales of Flavored E-Cigarettes to retail and/or individual consumers within this District.

## PARTIES

14.     Plaintiff, the People of the State of New York by New York State Attorney General Letitia James, brings this action in a sovereign capacity to protect the interests of the State and its citizens. This action is brought pursuant to the Attorney General's common law and statutory authority including, *inter alia*, New York Executive Law § 63, New York Public Health Law ("N.Y. Pub. Health L.") § 1399-ll, and the PACT Act, 15 U.S.C. § 375 *et seq.*

6

## I.    CORPORATE DEFENDANTS

15.    Defendant PUFF BAR [Inc.] is a corporation formed under the laws of the State of California with its principal place of business in Glendale, California.

16.    Defendant EVO BRANDS, LLC ("EVO Brands") is a Delaware limited liability company with its principal place of business in Los Angeles, California.

17.    Defendant PVG2, LLC ("PVG2") is a Delaware limited liability company with its principal place of business in Los Angeles, California, and does business as Puff Bar.

18.    Defendant ECTO WORLD LLC D/B/A DEMAND VAPE ("Demand Vape") is a New York limited liability company with its principal place of business in Buffalo, New York.

19.    Defendant MAGELLAN TECHNOLOGY INC. ("Magellan") is a New York corporation with its principal place of business in Buffalo, New York.

20.    Defendant YLSN DISTRIBUTION INC D/B/A HAPPY DISTRO ("Happy Distro"), formerly YLSN Distribution LLC, is an Arizona Corporation with its principal place of business in Tucson, Arizona.

21.    Defendant MIDWEST GOODS INC. D/B/A MIDWEST DISTRIBUTION ILLINOIS ("Midwest Goods") is a corporation formed under the laws of the State of Illinois with a principal place of business in Bensenville, Illinois. Midwest Goods also operates as Midwest Distribution.

22.    Defendant 10 DAYS, INC. D/B/A POD JUICE ("Pod Juice") is a California corporation with its principal place of business in Agoura Hills, California.  It has used the fictitious name "Pod Juice" in doing business.  Pod Juice was incorporated in 2017.

7

23.     Defendant SAFA GOODS LLC ("Safa Goods") is a Florida limited liability company with its principal place of business in Port Charlotte, Florida.  Safa Goods was founded in April 2018 by Haitham Shriteh and Ahmed Shriteh.

24.     Defendant SV3, LLC D/B/A MI-ONE BRANDS ("Mi-One") is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.  It has used the fictitious names "Mi-Pod" and "Mi-One Brands" in doing business.

25.     Defendant MYLÉ VAPE INC. ("Mylé") is an active New York domestic corporation that is also registered in New Jersey and Florida with its principal place of business in Ridgefield, New Jersey, or Jamaica, New York, during the Relevant Time Period.  Mylé was incorporated in New York in 2017, and its Chief Executive Officer is Ariel Gorelik.

26.     Defendant MVH I, Inc. ("MVH I") is an active New York domestic corporation with its principal place of business in Ridgefield, New Jersey. MVH I was incorporated in 2018, and its Chief Executive Officer is Ariel Gorelik.

27.     Defendant PRICE POINT DISTRIBUTORS INC. D/B/A PRICE POINT NY D/B/A PRICEPOINTNY.COM ("Price Point") is a corporation formed under the laws of the State of New York with a principal place of business at 500 Smith Street, Farmingdale, New York, and does business as Price Point NY, and also does business as pricepointny.com, which also has a principal place of business at 176 Central Avenue, #17, Farmingdale, New York.

## II.     INDIVIDUAL DEFENDANTS

28.     Defendant WEIS KHWAJA is a resident of the State of New York and the president of Price Point.

8

29.     Defendant HAMZA JALILI is a resident of the State of New York and is the corporate secretary of Price Point.

30.     Defendant MOHAMMAD JALILI is a resident of the State of New York and is a shareholder of Price Point.

## FACTUAL ALLEGATIONS

I.     **OLD TACTICS, NEW PRODUCTS, SAME PROBLEMS:  DEFENDANTS HAVE OPENLY MARKETED AND SOLD ILLEGAL AND DANGEROUS FLAVORED VAPOR PRODUCTS.**

31.     Defendants have marketed and sold Flavored E-Cigarettes[8] into New York State at least from January 1, 2020, through today (the "Relevant Time Period"), and they did so in ways that violate applicable federal and state statutes, including New York's flavor ban and ban on shipping vapor products.  *See, e.g.*, N.Y. Pub. Health L. §§ 1399-mm-1(3), 1399-ll(1-a).

32.     Each Defendant markets and distributes some of the most popular Flavored E-Cigarettes in the country and New York, and each exerts control over certain popular brands' advertising, marketing, social media presence, price, product trends, and/or availability.  Indeed, Defendants collectively dictate nearly every detail of a substantial segment of the Flavored E-Cigarettes' market in New York.   For example, Demand Vape maintains close ties with

---

[8] Herein defined as "any electronic device that, through an aerosolized solution, is intended or reasonably expected to be used with or for the consumption of nicotine to the user inhaling from the device, with a distinguishable taste or aroma, other than the taste or aroma of tobacco, imparted either prior to or during consumption of such product or a component part thereof, including but not limited to tastes or aromas relating to any fruit, chocolate, vanilla, honey, candy, cocoa, dessert, alcoholic beverage, mint, wintergreen, menthol, herb or spice, or any concept flavor that imparts a taste or aroma that is distinguishable from tobacco flavor but may not be related to any particular known flavor, and any component, liquid, part, or accessory of a device, without regard to whether the component, liquid, part, or accessory is sold separately from the device." The definition of Flavored E-Cigarettes excludes any Flavored E-Cigarette that the U.S. Food and Drug Administration has authorized to legally market as defined under 21 U.S.C. § 387j and that has received a premarket review approval order under 21 U.S.C. § 387j(c), *et seq*.

9

international manufacturers, such that its co-founder routinely travels to China where Demand Vape's products originate to direct flavor development and marketing. As a result of these close, exclusive ties, Demand Vape enjoys the privilege of custom designed and manufactured products and specialized packaging, as well as heavily discounted pricing, which gives Demand Vape control from the inception of certain of its products all the way through to the packaging that entices a customer and the price that a consumer ultimately pays for the product. *See infra* ¶¶ 231-287. Similarly, several other Defendants who identify as master distributors of certain products enjoy and employ the same control over their product lines, from manufacture to retail sale, such as Happy Distro who employs at least one "Geek Bar Flavor Tester (Vape)," tasked with "ensuring the successful development of new flavors through effective communication with relevant personnel."[9] *See infra* ¶¶ 288-319. The other Defendants who own and distribute their own branded products, like Mi-One, not only control their own supply, but also manipulate the price of Disposable Vapes more broadly through tactics like "Daily Deals," and with offers like, "Save $10+ on Disposable 10 Packs" and "Save $30 on Orders over $200," *see infra* ¶¶ 410-436.

33.     As described in more detail below, most Defendants import their products from manufacturers in China, though at least one Defendant manufactures these illegal products domestically, such as Pod Juice, *see infra* ¶¶ 359-390. Regardless of where their products originate, however, each Defendant primarily functions in the most critical step in the supply chain, essentially routing certain products, flavors, and prices to certain regions of the country by way of

---

[9] https://www.simplyhired.com/job/73Kxu1hbRCT7aY5nbFa7ER939tCOZmU_GBK6A0Kn6HEMIGvfJufLZw
(last visited Feb. 11, 2025).

outsized online presence, as well as their local customer and retailer networks, relationships, and reach. Consequently, Defendants' products—all of which at issue are not authorized to be marketed and sold in the U.S. by the Food and Drug Administration ("FDA")—would not be readily available in stores, behind store counters, or in hidden back rooms, or discreetly shipped to residences in New York if not for their flagrant disregard for the federal and state laws applying to the shipment, delivery, and sale of Flavored E-Cigarettes.

34.     Moreover, as further established below, each Defendant's individual contributions to the Flavored E-Cigarettes market in New York by way of their respective social media posts, branding schemes, marketing partnerships, and sales tactics have accumulated into a level of saturation that is impossible to miss or ignore (particularly to young and impressionable minds). The wide range of brands, media outlets (including social media), swag, and promotional events have made the brands synonymous with each Defendant's identity familiar and approachable to New York's youth.   Indeed, this collective exposure is what has led New York's youth to wrongly believe that Flavored E-Cigarettes are legitimate and safe, and it is what has drawn them to seek out Disposable Vapes[10]  in particular from friends, to venture into vape retailers' doors even though they are underage, and even to emulate dangerous vape tricks.

### A. Defendants Make the Tobacco Industry's Strategies Their Own.

35.     For decades, the tobacco industry made billions of dollars through aggressive

---

[10] Herein defined as, "a variety of Flavored E-Cigarette which comes with a fully charged battery and is pre-filled with e-liquid, and which is used to the depletion of the e-liquid, whereupon the entire device is discarded, and therefore intended for single-use." However, the State notes that these purportedly disposable products contain batteries for which there is no environmentally safe method for disposal.

marketing campaigns in film, television, and print that failed to properly warn of cigarettes' noxious effects. These campaigns created the false impression that cigarettes were safe and fun, only to leave millions of Americans unwittingly addicted to nicotine and cause millions of deaths and illnesses due to lung cancer, lung disease, and cardiovascular issues.

36.     In its relentless pursuit of profits for decades, the tobacco industry failed to relay the harmful effects of combustible cigarettes and inflated the casual and delightful benefits of the smoking experience instead.  Eventually, the tobacco industry constricted under increased federal regulation requiring health warnings in cigarette advertising and marketing.

37.     Beginning in the 1980s, however, the tobacco industry developed new, fruity flavors with matching bright advertisements to attract young, impressionable consumers, who were unaware of the addictive, poisonous effects of cigarettes.

38.     When the true dangers of nicotine and smoking cigarettes came to light, the tobacco industry faced decades of litigation over its advertising practices. Much of this litigation culminated in 1998, when 52 States and U.S. territories, including New York, entered into the Master Settlement Agreement ("MSA"). The MSA prohibits the major cigarette companies from marketing and advertising their products to adolescents, setting forth specific acts prohibited with the goal of combatting and preventing youth smoking, such as banning the use of cartoon characters and billboards near school grounds. It also requires the tobacco companies to make annual payments to the States in perpetuity, for health care costs associated with treating smoking-related illnesses that are incurred by the States.

39.     Following the lawsuits, regulators enacted additional restrictions, municipalities

12

prohibited smoking in many public areas, and public health advocates engaged in widespread campaigns to re-educate the public—youth in particular—about the dangers of smoking. This work was intended to abate the crisis the tobacco industry caused.

40.    As a result of these industry changes and effective public health education and efforts over decades, cigarette usage among teenagers and adults fell dramatically. In the U.S., 28% of young people smoked cigarettes in 1996.[11] By 2014, only 2.5% of middle school students and 9.2% of high school students reported current (past 30-days) cigarette use.[12]  In 2024, rates sank even lower to 1.1% of middle school students and only 1.7% of high school students reporting current combustible cigarette use.[13]

41.    Defendants' ongoing conduct is unraveling this progress in the State's public health and wellbeing; each Defendant is engaged in the very same reprehensible conduct engaged in by the tobacco industry and is causing the same type of harm, but with newer, modern products. Specifically, Defendants push advertising campaigns clearly intended to appeal to adolescents in places they can see them most readily, primarily social media and the internet.  For instance, Geek Bar, for which several Defendants, including Demand Vape and Happy Distro, serve as master distributors and exert direct control of Geek Bar's flavor development and operate as the brand's

---

[11] Adolescents and Tobacco: Trends (Sept. 23, 2016) (previously visited Oct. 9, 2019), *formerly at* https://www.hhs.gov/ash/oah/adolescent-development/substance-use/drugs/tobacco/trends/index.html.

[12] Arrazola R, Singh T, Corey C, *et al.*, *Tobacco Use Among Middle and High School Students – United States, 2011-2014*, MMWR Morb Mortal Wkly Rep 2015, *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6414a3.htm (last visited Feb. 4, 2025).

[13] Jamal A, Park-Lee E, Birdsey J, et al., Tobacco Product Use Among Middle and High School Students — National Youth Tobacco Survey, United States, 2024. MMWR Morb Mortal Wkly Rep, DOI: http://dx.doi.org/10.15585/mmwr.mm7341a2 [hereinafter "2024 E-Cigarette Use Among Middle and High School Students"].

U.S. marketing representatives, utilizes Instagram to market its product using trendy filter effects, interactive avatar engagement, a very young-looking model, bright, saturated colors, and a QR code to a promotion that involves a contest:



42.     Defendants also systematically develop new, fruity, and sweet flavors to go with these matching bright advertisements to attract young, impressionable consumers, who are unaware of the addictive, poisonous effects of vapor products. Rather, they create the false impression that vapor products are safe and fun, only to eventually leave many unwittingly exposed to high concentrations of nicotine and potential addiction, with all of its attendant

complications and poor health outcomes.

43.     Defendants are illegally perpetuating a cycle of harm from the old tobacco industry's playbook: hide the harm and use appealing colors and flavors to hook kids for life.  As a result, the youth vaping epidemic is unwinding the decades of work combatting youth cigarette use, which successfully resulted in a dramatic reduction in youth smoking rates.

44.     But unlike the tobacco industry, which operated unabated for decades, our youth are better protected by our laws today, *see generally infra* Part II, and Defendants must be held accountable before they can cause any more harm than they already have.

    1.   <u>E-Cigarettes Rise After the Tobacco Industry's Heyday.</u>

45.     The illegal products at issue are designed to dupe the public into believing that combustible cigarettes are a bad thing of the past, but modern, evolved e-cigarettes are safe and superior substitutes.  This is contrary to the science behind these new nicotine products.

46.     An e-cigarette is a battery-powered device that heats a nicotine solution, or "e-liquid," which converts the solution into an aerosol or "vapor" that the user inhales. E-cigarettes are commonly known as "vapes", and also sometimes referred to as electronic nicotine delivery systems ("ENDS"). E-liquid is commonly referred to as "e-juice", "vape juice," or "vape liquid."

47.     E-liquids are either natural nicotine, i.e., extracted from tobacco, or more commonly synthetic nicotine, in different concentrations mixed with water, propylene glycol ("PG"), vegetable glycerin ("VG"), usually some flavorings, and other chemicals.[14] PG and VG

---

[14] https://www.ncbi.nlm.nih.gov/books/NBK507184/ (last visited Feb. 4, 2025); https://www.lung.org/quit-smoking/e-cigarettes-vaping/whats-in-an-e-cigarette (last visited Feb. 4, 2025).

are humectants used in e-liquid to produce aerosols that simulate the combustion-generated tobacco smoke of a conventional cigarette. E-liquids can be formulated to produce a vapor tasting like tobacco, but the vast majority (and those at issue in this action) are artificially flavored to impart candy, fruit, or dessert flavors.

48.     There are three main categories of e-cigarette devices, all of which generally operate in the same manner:

      a.   Pre-filled e-cigarettes use a disposable pod or cartridge that is pre-filled with e-liquid, which is inserted into a rechargeable battery unit. They are rechargeable and are intended for reuse. Once the pod or cartridge is empty, the user replaces only that disposable piece with a new one. Replacement cartridges and pods are packaged and sold separately.

      b.   Refillable e-cigarettes have an empty tank, chamber, or pod that the user manually fills with e-liquid. They are rechargeable, customizable, and intended for reuse. The e-liquid is packaged and sold separately. These devices have a higher upfront cost.

      c.   Disposable e-cigarettes, or Disposable Vapes, come with a fully charged battery and are pre-filled with e-liquid. They require no set up and are ready to use straight out of the box. They may be rechargeable but are intended to be discarded after the e-liquid is used up. These devices are the cheapest and sometimes smallest of the e-cigarette varieties.  Popular brands include Hyde, Puff Bar, Elf Bar, and Geek Bar, all of which are sold by certain Defendants.

49.     The third category of e-cigarettes described above, *see supra* ¶ 48(c), i.e., Disposable Vapes, are the products primarily responsible for the post-JUUL-era harms described below. *See generally infra* Part IV.  However, every type of e-cigarette and all e-juice which are not authorized by the FDA and/or which impart fruity, candy, or delectable flavors are the subject of this action.

16

50.     The various e-cigarette devices vary in the amount of maintenance required, customizability, and the volume of e-liquid. However, all e-cigarettes generally operate in the same general way. They all have a heating element and the user's puffing on the device activates the battery which heats the metal coil, vaporizing the e-liquid and producing a nicotine-infused vapor that the user inhales.

51.     Although some e-cigarettes or e-liquids are advertised as "zero" nicotine, objective studies of this industry demonstrate that the majority of e-cigarettes contain nicotine, and, upon information and belief, a large percentage of products that purport to be nicotine-free may contain at least trace amounts of nicotine.

52.     Nicotine is a dangerous and highly addictive chemical with known adverse health effects for vulnerable populations, such as pregnant people, developing fetuses, and youth.[15]

53.     Though some form of e-cigarette has been available in the U.S. since around 2007, the widespread introduction of nicotine salts (which reduces the alkalinity or pH levels of nicotine-containing e-liquids, leading to less irritation thus, allowing users to vape higher doses comfortably) through the popularity of the JUUL device exploded e-cigarette products into the mainstream.

54.     Unbridled by pre-existing tobacco regulations, JUUL launched in 2015 and seized upon an opportunity to use the tobacco industry's strategy of marketing to youth with a sleek and pervasive ad campaign that included bright and colorful images of attractive young people, while

---

[15] Moreover, Flavored E-Cigarettes are not only dangerous because of the nicotine they contain, although the addictive qualities and health impact of nicotine itself should not be understated. Flavored E-Cigarettes, even those that purport to be "nicotine-free," contain many compounds that are plainly unsafe to be inhaled. *See infra* ¶¶ 71-74.

creating the false impression that its products were harmless, thereby addicting a new generation of consumers to nicotine.

55.    The most prevalent JUUL product was a pre-filled e-cigarette with disposable pods, *see supra* ¶ 48(a). JUUL developed bright, colorful ads and fruity, sweet-tasting JUUL pods that came in non-traditional flavors, such as mango and mint, which attracted young users. Their strategy was highly successful, and by 2017, it was the bestselling e-cigarette on the market. However, the popularity of JUUL soon fell. Hundreds of lawsuits across the country were filed against JUUL, claiming that it marketed its products to youth, promoted nicotine use, and failed to warn users that nicotine was addictive. In 2019, New York sued JUUL for deceptive and misleading marketing of its e-cigarettes, which contributed to the rise of youth vaping in the State. In April 2023, New York helped negotiate a $462 million settlement as part of a multistate agreement with JUUL. New York will receive $112.7 million of the settlement amount.

56.    The popularity of JUUL among youth nationwide also prompted the FDA into action.  On January 2, 2020, the FDA issued guidance prohibiting **all** sales of unauthorized non-menthol or tobacco flavored cartridge-based e-cigarettes after a 30-day sell-off period, becoming effective on February 6, 2020.[16] At the time the guidance was issued, no vapor product had been authorized by the FDA.  In other words, all vapor products then on the market, including the

---

[16] FDA finalizes enforcement policy on unauthorized flavored cartridge-based e-cigarettes that appeal to children, including fruit and mint, *available at* https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children (last visited Feb. 4, 2025).

Flavored E-Cigarettes sold by Defendants at that time, were expressly deemed illegally marketed and subject to FDA enforcement. [17]

57.     Thus, from January 2, 2020, and onwards, there was no ambiguity about the illegality of Flavored E-Cigarettes at large in the U.S., under the federal FDA framework. [18]

58.     Lawsuits and the FDA's actions forced JUUL to remove all but its tobacco and menthol-flavored products from the market and halt its marketing strategies, leaving a void in the e-cigarette market that certain Defendants recognized and exploited.

2.     Puff Bar Emerges After JUUL's Heyday and Creates the Market for Disposable Vapes.

59.     In particular, Defendants Puff Bar, Evo Brands, and PVG2 (together, the "PUFF Defendants"), *see infra* ¶¶ 174-230, moved swiftly to fill the void left by JUUL and the tobacco industry.  While JUUL was a relatively expensive, pre-filled e-cigarette with disposable pods, Puff Bar was a non-refillable disposable e-cigarette meant to be discarded after the nicotine solution was consumed. Unlike JUUL, there was no pod to replace. Puff Bar shared several of the same features that made JUUL so popular with youth, such as its non-traditional flavors and similar

---

[17] To search ENDS products that received an FDA marketing authorization order, *see* https://www.accessdata.fda.gov/scripts/searchtobacco/ (last visited Feb. 4, 2025).

[18] Although the main focus of FDA's guidance, effective on February 6, 2020, was on large cartridge-based e-cigarette manufacturers, such as JUUL, it also stressed that producers of non-cartridge-based ENDS (or fully disposable products) also have an obligation to take adequate measures to prevent youth access. Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization Guidance for Industry, (Revised Apr. 2020) USDHHS, FDA, & CTP, *available at* https://www.fda.gov/media/133880/download (last visited Feb. 4, 2025); https://www.federalregister.gov/documents/2020/04/30/2020-09164/enforcement-priorities-for-electronic-nicotine-delivery-systems-and-other-deemed-products-on-the (last visited Feb. 4, 2025).

sleek shape and design. However, Puff Bars were significantly cheaper than JUUL. This development meant that there was no barrier to immediate and frequent use.

60.    Puff Bar launched in 2019 with a design that looked similar to a JUUL device, and, like JUUL, came in a variety of kid-friendly flavors, such as pina colada, pink lemonade, watermelon, and a blend called "O.M.G." Youth predictably switched in droves from JUUL to Puff Bar. By spring 2020, Puff Bar sales reached over $3 million a week,[19] and by 2021, it was the most popular brand of e-cigarette among middle school and high school students.[20]

61.    By Puff Bar's own admission through its leadership in an interview, its success was so swift and comprehensive that all Disposable Vapes came to be dubbed "Puff Bars," much as Xerox or Kleenex are brand names that are so widely used and recognized that they supplant generic references and define the entire product category.

62.    Lawmakers and public health advocates took notice of Puff Bar's targeted marketing to youth, kid-friendly flavors, and unauthorized, deceptive claims that their products helped people quit smoking and were a healthier alternative to conventional cigarettes, and urged the FDA to take action.

---

[19] Sheila Kaplan, *Lawmakers Say Puff Bar Used Pandemic to Market to Teens*, N.Y. TIMES (June 2, 2022), *available at* https://www.nytimes.com/2020/06/02/health/puff-bar-teens.html (last visited Feb. 19, 2025).

[20] Park-Lee E, Ren C, Sawdey MD, *et al.*, *Notes from the Field:* E-Cigarette Use Among Middle and High School Students — National Youth Tobacco Survey, United States, 2021. MMWR Morb Mortal Wkly Rep 2021, DOI: http://dx.doi.org/10.15585/mmwr.mm7039a4 [hereinafter "2021 E-Cigarette Use Among Middle and High School Students"] (last visited Feb. 4, 2025).

63.    The FDA issued a warning letter to Puff Bar to remove its products from the market.[21] Puff Bar briefly halted its sales in July 2020 as a result of the public scrutiny.

64.    However, Puff Bar was not deterred for long.  It quickly acted to circumvent the FDA and relaunched in February 2021, this time introducing a line of products that used synthetic nicotine, based on the flawed reasoning that the FDA's jurisdiction was limited to products with nicotine derived from tobacco. In 2022, Puff Bar continued to be the most popular e-cigarette brand among middle school and high school students.[22]

65.    Puff Bar remained a focus for Congressional and FDA action. On March 15, 2022, President Biden signed the Consolidated Appropriations Act, which expressly authorized the FDA to regulate synthetic nicotine products, ending all ambiguity around the purported loophole that Puff Bar exploited.[23] Puff Bar chose not to obtain premarket authorization of its nicotine products but stayed in business nonetheless.

---

[21] Letter from Ann Simoneau, Dir., Off. of Compliance & Enf't, Ctr. for Tobacco Prods., U.S. Food & Drug Admin., to Umais Abubaker, Puff Bar (July 20, 2020), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/cool-clouds-distribution-inc-dba-puff-bar-608526-07202020 (last visited Feb. 4, 2025).

[22] Cooper M, Park-Lee E, Ren C, Cornelius M, Jamal A, Cullen KA., *Notes from the Field*: E-cigarette Use Among Middle and High School Students — United States, 2022. MMWR Morb Mortal Wkly Rep 2022, DOI: http://dx.doi.org/10.15585/mmwr.mm7140a3 [hereinafter "2022 E-cigarette Use Among Middle and High School Students"] (last visited Feb. 4, 2025).

[23] Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. P, tit. 1, subtitle B, § 111, 136 Stat. 49, 789–90 (2022); Press Release, Ctr. for Tobacco Prods., U.S. Food & Drug Admin., New Law Clarifies FDA Authority to Regulate Synthetic Nicotine (Mar. 18, 2022), https://www.fda.gov/tobacco-products/ctp-newsroom/new-law-clarifies-fda-authority-regulate-synthetic-nicotine#:~:text=As%20a%20result%2C%20the%20Federal,source%2C%20which%20includes%20synthetic%20nicotine (last visited Feb. 4, 2025).

66.     Since then, others have spun off Puff Bar's success and created competing, similarly fully disposable Flavored E-Cigarettes, i.e., Disposable Vapes.  Indeed, each other Defendant has built and maintains a business derived from Puff Bar's harmful innovation, and they continue to develop Disposable Vapes with increasingly higher concentrations of nicotine, as well as more and more kid-friendly flavors and vibrant colorful brand campaigns, packaging, and marketing.  *See, generally, infra* ¶¶ 231-496.

### B. Today's Disposable Vapes, which Defendants Control in New York, are Dangerous and Designed to Be Irresistible to Youth.

67.     The Disposable Vapes at the heart of this dispute are a subcategory of Flavored E-Cigarettes, *see supra* ¶ 48(c).  In step with the increasingly growing market, e-cigarettes have become bigger, cheaper, more concentrated and more dangerous than ever before, and this is especially true of Disposable Vapes.

68.     The technology in the vapor process itself has grown to dangerous new heights. Unfettered increases in nicotine strength and e-liquid volume have led to a significant increase in nicotine content in e-cigarettes. For context, an average pack of combustible cigarettes contains approximately 22-36 mg of nicotine.  The average nicotine concentration in e-cigarette products in the U.S. increased from slightly over 20 mg of nicotine, or 2.10%, in 2013, to over 40 mg of nicotine, or 4.34%, by 2018.[24]  By March 2022, 80.9% of e-cigarettes sold contained greater than or equal to 50 mg or 5% nicotine strength, including 90% of disposable e-cigarettes and 96.1% of

---

[24] https://truthinitiative.org/research-resources/emerging-tobacco-products/high-nicotine-e-cigarettes-dominate-market-sales#:~:text=Sales%20of%20e%2Dcigarettes%20with,a%20nearly%2015%2Dfold%20increase (last visited Feb. 4, 2025).

e-cigarettes in flavors other than tobacco, mint, or menthol.[25]  Sales of e-cigarettes with *greater than* 5% nicotine increased from 5% in 2017 to 81% in 2022.[26]  Sales of disposable e-cigarettes with over 5% nicotine rose from 0% in 2017 to over 90% in 2022.[27]  In contrast, e-cigarette products with less than 1% nicotine, including zero-nicotine products, account for less than 0.1% of sales.[28]  Accordingly, the new norm in terms of nicotine concentration for a single e-cigarette product, 50 mgs or more, is roughly double that of an entire pack of combustible cigarettes.

69.    The increase in market share and sales of high nicotine e-cigarettes have corresponded with maintained or lower prices, whereas prices on lower nicotine e-cigarettes products have increased. This cost pattern drives people towards higher nicotine products because they are simply the much cheaper option.  Between 2017 and 2022, the price of e-cigarette products with nicotine strengths from 1-2% increased from $10.40 to $29.20, while those with much higher nicotine strengths of 4-5% dropped in price from $20 to $12.80.[29]  So, for every product with 1-2% nicotine, one could purchase two of the far more concentrated 4-5% strength products.  Each Defendant's offerings follow this recent disturbing preference for highly concentrated nicotine in their Flavored E-Cigarettes marketed and/or sold into New York.  Naturally, the cheapest products are the most accessible to youth.

---

[25] *Monitoring E-Cigarette Trends in the United States* (Truth Initiative & CDC Foundation), *available at* https://tobaccomonitoring.org/wp-content/uploads/2024/11/2024MonitoringE-CigaretteTrendsUS-1.pdf, 25 (last visited Feb. 4, 2025).

[26] *Supra* n.24.

[27] *Id.*

[28] *Id.*

[29] *Id.*

70.    The increase in nicotine strength has risen in tandem with the increase in volume of e-liquid. Comparatively, JUUL pods sold in the U.S. in 2018 contained less than 1 mL of e-liquid at 5% nicotine strength.[30] A Disposable Vape today has the staggering capacity of 10 mL of e-liquid at the same 5% nicotine strength and is the nicotine equivalent of more than ***10 packs*** of cigarettes.[31] A disposable Geek Bar Pulse contains 16 mL at the same 5% nicotine strength, and boasts 15,000 puffs in "Regular" mode. E-cigarettes are advertised and priced according to the approximate number of "puffs" it takes to deplete the e-liquid. The bigger the volume of e-liquid, the greater number of "puffs." For example, one of the products marketed and sold by the Price Point Defendants—the Greek Bar Pulse Strawberry Banana—illustrates the extremely troubling amounts of nicotine that are packed into a single Disposable Vape:[32]

---

[30] Jessica L. Barrington-Trimis, Ph.D., and Adam M. Leventhal, Ph.D., *Adolescents' Use of "Pod Mod" E-Cigarettes - Urgent Concerns*, 379(12) NEW ENGLAND J. MED. 1099, 1100 (2018), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC7489756/ (last visited Feb. 19, 2025).

[31] Jonathan P. Winickoff, *et al.*, *Vaping in Youth*, Published online Aug. 7, 2024, *available at* https://jamanetwork.com/journals/jama/article-abstract/2822166 (citing Prochaska JJ, Vogel EA, Benowitz N, Nicotine delivery and cigarette equivalents from vaping a JUULpod. *Tobacco Control*. 2022;31:e88-e93, *available at* https://doi.org/10.1136/tobaccocontrol-2020-056367) (last visited Feb. 19, 2025).

[32] https://www.pricepointny.com/products/geek-bar-pulse-strawberry-banana/ (last visited Feb. 4, 2025).



71. Even the simplest Flavored E-Cigarettes on the market are comparatively more dangerous than what preceded them. In this respect, Puff Bar is a very troubling industry standard. *See supra* ¶¶ 59-66. A study of the chemical composition and toxicity of Puff Bar Disposable Vapes revealed that the chemicals inhaled through a Puff Bar are toxic to a degree that is not yet fully understood:[33]

> Product manufacturers are increasing the youth-attracting synthetic coolant content of [e-cigarettes], while the inhalation risks remain unknown. This practice, in effect, represents a large, uncontrolled experiment in the lungs of youth and other consumers and highlights the need for regulation to protect public health.

---

[33] Omaiye EE, Luo W, McWhirter KJ, Pankow JF, Talbot P. *Disposable Puff Bar Electronic Cigarettes: Chemical Composition and Toxicity of E-liquids and a Synthetic Coolant,* CHEM RES TOXICOL. 2022 Aug. 15;35(8):1344-1358. doi: 10.1021/acs.chemrestox.1c00423 (July 18, 2022), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC9382667/#sec2 (last visited Feb. 19, 2025).

25

72.    Specifically, certain total chemical concentrations within Puff Bar's e-juice exceed levels that have been shown to "adversely affect[] cell growth and morphology,"[34] resulting in negative health outcomes over time.  Some of the flavor chemicals in the Puff Bar vapor fluid also exist in other consumer products but are present in Puff Bar's products at levels that exceed concentrations in those other consumer products.  Moreover, while certain flavor chemicals may be deemed generally safe for ingestion, they are not endorsed for inhalation, which has a very different effect on the human body.

73.    This 2022 study of Puff Bar's chemical composition and toxicology concluded that its Flavored E-Cigarettes—and all those styled like it and competing with it—are more dangerous than JUUL products:[35]

> These new disposable ECs, exemplified by the Puff brand studied here, have much higher concentrations of synthetic coolants than those found in JUUL. The high levels of nicotine, flavor chemicals, and synthetic coolants, which exceeded those used in other consumer products, raise a concern about the safety of Puff products.

74.    This study is particularly elucidating because, while Defendants consistently offer "ice," fruit, candy, and similarly sweet flavors, such that there is likely some overlap in their formulas, each Defendant has failed to make the required ingredient disclosures or otherwise markets and sells products for which no disclosure has been made, in violation of New York law. *See infra* ¶¶ 124-140.

---

[34] *Id.*

[35] *Id.*

26

75.    Moreover, the explosive increase in the use of e-cigarettes among youth within the past ten years is attributable to many factors that Defendants' conduct epitomizes.  For example, *see generally infra* Part III, each Defendant has employed the principal marketing strategies used decades ago by cigarette manufacturers, honing them to be even more effective and destructive: (i) pervasive advertising campaigns that include bright and colorful images of attractive young people, creating the false impression that their products are harmless fun; (ii) promising the ability to use the devices without detection or interruption by adults, like parents or school officials; and (iii) offering a wide variety of kid-friendly fruit and candy flavors, such as Iced Grape Bomb and Lemon Mint.

76.    E-cigarettes have now evolved to use innovative new technologies, deliver nicotine more efficiently and at potently higher levels, and continue to use flavors to dominate sales and entice young users. For example, the currently available brand Geek Bar Pulse, sold into New York during the Relevant Time Period by the DEMAND Defendants, Price Point Defendants, Happy Distro, Mi-One, and Midwest Goods, includes product models that are smart vapes, which incorporate technologies such as digital screens, interactive notifications, and power level/usage indicators. The Geek Bar Pulse boasts "a space capsule-inspired full-screen design with captivating LED lighting effects . . . [whereby] users can effortlessly access . . . battery status, remaining e-liquid, and the active mode, enhancing the vaping journey."  The North Connect Pro Disposable Vape marketed and promoted by Defendant Midwest Goods features Bluetooth connectivity, a

27

built-in speaker, 5% nicotine strength, three games, and over 15 downloadable apps, and a staggering 40,000 puffs:[36]



77.    Accordingly, Disposable Vapes carry all the hallmarks of a nicotine-containing product that is a risk to youth.  In fact, each of Defendants' products and conduct at issue meet all of the factors articulated by the FDA and supported by scientific studies that signal promotion to minors:[37]

    a.   Products marketed with labeling and/or advertising that resemble kid-friendly foods and drinks, or resemble other non-ENDS products that are often marketed and/or appealing to youth. This includes, for example, labeling and/or advertising that results in the product resembling juice boxes, candy, or kid-friendly cereal;

    b.   Products marketed directly to minors by promoting ease of concealing the

---

[36] *Formerly at* https://www.midwestgoods.com/north-connect-pro-40k-puffs-20ml-disposable-device-with-bluetooth-connections-engraved-grip-texture-display-of-5-msrp-25-00-each/.

[37] USDHSS, FDA, & CTP, *supra* n.18.

product or the nature of the product as a tobacco product from parents, teachers, or other adults;

c.   Products marketed with youth-appealing cartoon or animated characters, such as those that depict or resemble popular children's characters; and/or

d.   Products marketed, including through paid social media influencers, with popular children's characters and titles (e.g., popular children's YouTube channels, television shows, or characters). This includes, for example, the use of minors or people who portray minors on such shows and their associated show titles.

78.    It is beyond dispute that nicotine use by youth in any form is unsafe. Nicotine poses unique dangers to youth because their brains are still developing; nicotine can harm brain development which continues until about age 25. Youth can start showing signs of nicotine addiction before the start of regular or daily use. Using nicotine during adolescence can harm parts of the brain that control attention, cognition, learning, mood, and impulse control. These harms, discussed in more detail below, are exacerbated by the increased concentrations of nicotine in the ever-evolving Flavored E-Cigarettes industry, *see infra* Part IV.

79.    Indeed, notwithstanding increasing scrutiny by the FDA and other federal and state efforts to curb this wave of the crisis, *see generally infra* Part II, some Defendants have been unapologetic in implementing aggressive marketing strategies that conspicuously target adolescents.  For example, Defendant Price Point, offered "discreet orders" or "discreet shipping." *See infra* ¶ 486.  That messaging is echoed by at least 12 popular TikTok accounts that likewise offered or promoted "discreet shipping" that use packaging and shipping that hides the e-cigarette

products inside.[38]  These strategies make it even more possible for youth to evade detection of e-cigarette use.

80.    As a result of these successful efforts and campaigns, there are alarming signs of nicotine use and addiction among youth, *see generally infra* Part IV.

81.    In 2024, 14% or 3,870,000 middle and high school students reported ever using e-cigarettes, and 3.5% or 410,000 of middle school and 7.8% or 1,210,000 of high school students reported using e-cigarettes within the past 30 days.[39] More than 1 in 4 (26.3%) of current youth e-cigarette users reported using an e-cigarette product daily.[40] More than 1 in 3 (38.4%) youth e-cigarette users reported using e-cigarettes at least 20 of the last 30 days.[41] More than half (55.6%) of youth who are current e-cigarette users reported using Disposable Vapes, followed by prefilled or refillable pods or cartridges (15.6%) and tanks or mod systems (7.0%).[42]

82.    Of greatest concern here, more than 8 out of 10 current e-cigarette users (87.6%) used Flavored E-Cigarettes, with fruit flavors being the most popular, followed by candy, desserts, or other sweets, mint, and menthol.[43] Over half (54.6%) of students currently using e-cigarettes

---

[38] Pearson G, Davidson DL, Schillo B, *et al.* 'Discreet shipping' on TikTok enables selling of e-cigarettes to youth, Tobacco Control Published Online First: January 8, 2024, *available at* https://doi.org/10.1136/tc-2023-058315 (last visited Feb. 19, 2025).

[39] 2024 E-Cigarette Use Among Middle and High School Students, *supra* n.13.

[40] Park-Lee, Jamal, Cowan, et al. *Notes from the Field:* E-Cigarette and Nicotine Pouch Use Among Middle and High School Students — United States, 2024, MMWR Morb Mortal Wkly Rep 2024;73:774–778; *see also* https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-tobacco-survey (last visited Feb. 14, 2025) (summarizing *Notes from the Field*).

[41] *Id.*

[42] *Id.* A tank or mod system is a vape device where the tank holds the e-liquid and heating coil, and the mod powers the coil. These systems are highly customizable and involve a higher upfront cost.

[43] *Id.*

reported using flavors with "ice" or "iced" in the name (such as "blueberry ice" or "strawberry ice," sold by each Defendant, *see generally infra* Part II)I.[44]  The use of fruity and sweet flavors is undeniably attractive to youth: "[A]mong youth age 12 to 17 who reported using an ENDS product, 93.2 percent reported that their first ENDS use was with a flavored ENDS product."[45]

83.    The Centers for Disease Control and Prevention ("CDC") monitors e-cigarette sale trends based on scanner sales data from convenience stores, gas stations, and other retail store chains, and reports that during the six month period ending on June 16, 2024, there were 6,287 e-cigarette products sold in the U.S., of which 92.8% were Disposable Vapes.[46] E-cigarettes with pre-filled cartridges or pods made up 41.8% of sales in traditional retail outlets, while Disposable Vapes made up the majority at 58.1%.[47] Upon information and belief, these numbers likely understate the proportion of Disposable Vape sales, given that the CDC report does not include online and vape shop sales data, but an estimated 20% of e-cigarette sales occur online.[48]

84.    The Disposable Vapes market that Puff Bar brought mainstream, *see supra* ¶¶ 59-66; *infra* ¶¶ 174-230, continues to grow, evolve, and innovate. Defendants named herein sell a

---

[44] *Id.*

[45] USDHSS, FDA, & CTP, *supra* n.18.

[46] https://assets.tobaccofreekids.org/factsheets/0379.pdf (last visited Feb. 4, 2025) (citing CDC Foundation & Information Resources, Inc., "Monitoring U.S. E-Cigarette Sales: National Trends," https://www.cdcfoundation.org/programs/monitoring-e-cigarette-use-among-youth. Data from Information Resources, Inc. (IRI) (which includes e-cigarette sales data from convenience stores, gas stations and other retail store chains; sales from the internet and tobacco-specialty stores, including vape shops, are not included)).

[47] *Id.*

[48] Fatma Romeh M Ali, Elizabeth L Seaman, Elisha Crane, Barbara Schillo, Brian A King, *Trends in US E-cigarette Sales and Prices by Nicotine Strength, Overall and by Product and Flavor Type, 2017–2022*, Nicotine & Tobacco Research, Volume 25, Issue 5, May 2023, 1052–1056, *available at* https://academic.oup.com/ntr/article/25/5/1052/6965257 (last visited Feb. 4, 2025).

significant majority of the now-leading brands into New York, which has significantly interfered with public health.

**II.    IGNORING THE SAFEGUARDS: WITH NEARLY EVERY SALE OF FLAVORED E-CIGARETTES, DEFENDANTS HAVE VIOLATED THE LAW AND CREATED, MAINTAINED, OR CONTRIBUTED TO AN AVOIDABLE CRISIS THAT NEW YORK NOW STRUGGLES TO CONTAIN.**

85.    According to New York State Department of Health ("NYSDOH") data available to date, youth and young adults are the primary users of e-cigarettes, and e-cigarettes are the most commonly used nicotine product by high school students in New York State.[49]

86.    Among other strategies, New York's flavor ban, codified at N.Y. Pub. Health L. § 1399-mm-1, has proven essential to preventing further proliferation of these dangerous, high-nicotine products. Indeed, Flavored E-Cigarette sales decreased by 79.1% following implementation of New York's statewide flavored vapor products ban in May 2020.[50] This cause-and-effect relationship between the ban and decreased sales is also visible through California's similar drop of 67.7% a year in sales after its corresponding statewide flavored vapor products ban likewise went into effect.[51]

87.    In other words, New York has been affirmatively acting to protect the public from Defendants' self-serving conduct, but they continue to operate unabated and undermine the State's laws and policies.

---

[49] *See* https://www.health.ny.gov/prevention/tobacco_control/campaign/e-cigarettes/ (last visited Feb. 10, 2025).

[50] https://tobaccomonitoring.org/wp-content/uploads/2024/11/2024MonitoringE-CigaretteTrendsUS-1.pdf (last visited Feb. 11, 2025).

[51] *Id.*

88.    New York's position on the dangers of Flavored E-Cigarettes has been confirmed by others. In 2018, former-HHS Secretary Alex Azar and former Surgeon General Jerome Adams recognized the dangers of e-cigarette use among youth and the urgency of the issue.[52] The CDC has also advised that youth use of nicotine products in any form is unsafe, and that preventing youth use of such products is "critical to reducing tobacco use" among that group.[53]

89.    There is no doubt that Disposable Vapes are the foundation of the current illicit market.  E-cigarettes in non-tobacco flavors, including flavors named with attractive fruit or candy names, as well as mint and dessert flavors, made up to 80.6% of all e-cigarette sales in 2023.[54]  By their collective efforts, each Defendant has contributed significantly to reciprocally high sales rates of Flavored E-Cigarettes in New York, particularly Disposable Vapes.

90.    Each Defendant's conduct has been repeated, ongoing, and continuous through the Relevant Time Period, and the harm and public nuisance caused, maintained, or contributed to by each Defendant through their sales of Disposable Vapes, in particular, persists.

### A.  Defendants Actively Subvert Evidence-Based Federal, State, and Local Laws.

91.    On a federal, state, and local level, New York and its communities have relied on evidence-based public health laws, including those long-proven to reduce nicotine addiction as a

---

[52] Alicia Ault, *Youth Vaping an Epidemic, US Surgeon General Declares*, (Dec. 18, 2018) *available at* https://www.medscape.com/viewarticle/906733?form=fpf. (last visited Feb. 11, 2025).

[53] https://www.cdc.gov/tobacco/php/data-statistics/youth-data-tobacco/?CDC_AAref_Val=https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (last visited Feb. 10, 2025).

[54] *See supra* n.50.

matter of public health.  As described below, each Defendant has sidestepped these measures for profit.

92.    As a threshold matter, New York became a leader among the many states who revised their state tobacco laws to include e-cigarettes among their regulated tobacco products in 2013.

### 1.  Defendants Violate the Federal Prevent All Cigarette Trafficking ("PACT") Act.

93.    The Prevent All Cigarette Trafficking  ("PACT") Act was enacted by Congress in 2010 to, *inter alia*, prevent and reduce children and teen access to online sales of cigarettes, require internet and remote sellers of cigarettes to comply with the same laws that apply to law-abiding tobacco retailers, and to make it more difficult for cigarette traffickers to profit from their illegal sales.[55] Congress passed the Preventing Online Sales of E-Cigarettes to Children Act ("POSECA") in December 2020, extending the same online sales requirements in place for cigarettes to ENDS.[56] Effective March 27, 2021, POSECA amended the PACT Act definition of cigarettes to include ENDS.[57]

---

[55] Prevent All Cigarette Trafficking Act of 2009, 156 Cong. Rec. H1526-01, Congressional Record, House of Representatives, Proceedings and Debates of the 111th Congress, Second Session, March 17, 2010, 2010 WL 956208, at *H1526.

[56] Preventing Online Sales of E-Cigarettes to Children Act, Pub. L. 116-260, Div. FF, Title VI, § 601, Dec. 27, 2020, 134 Stat. 3136.

[57] The PACT Act's references to "cigarette" includes "electronic nicotine delivery systems" ("ENDS"), which is defined as "any electronic device that, through an aerosolized solution, delivers nicotine, flavor, or any other substance to the user inhaling from the device," and includes e-cigarettes, vape pens, advanced refillable personal vaporizers, and "any component, liquid, part, or accessory of a device . . . without regard to whether the component, liquid, part, or accessory is sold separately from the device." 15 U.S.C. §§ 375(2) and 375(7). The term ENDS under the PACT Act does not include any product approved by the FDA for sale as a "tobacco cessation product" or for "any other therapeutic purpose." 15 U.S.C. § 375(7)(C). The definition of Flavored E-Cigarettes is incorporated

34

94.     During the Relevant Time Period, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) directly sold and shipped Flavored E-Cigarettes into and/or within New York that fall within the PACT Act's definition of ENDS, and was required to comply with the PACT Act.

95.     Consistent with its goals of reducing children and teen's access to online sales of Flavored E-Cigarettes, and preventing certain commercial actors from profiting off of the illegal sales of Flavored E-Cigarettes, the PACT Act makes all e-cigarettes nonmailable and prohibits them from being deposited in or carried through the USPS mails, except for sales between "legally operating businesses that have all applicable State and Federal Government licenses or permits and are engaged in tobacco product manufacturing, distribution, wholesale, export, import, testing, investigation, or research."[58]

96.     As discussed below, Defendants' sales of Flavored E-Cigarettes to distributors, wholesalers, and retailers in New York were not sales between "legally operating businesses." Each Defendant (except EVO Brands, MVH I, Mylé, and the Individual Defendants) failed to comply with the PACT Act prohibition on shipping Flavored E-Cigarettes through the USPS mails. *See, e.g., infra* ¶¶ 270, 313, 329, 383, 406, 433, 488.

97.     Each Defendant (except EVO Brands, MVH I, and the Individual Defendants) is a "person" under the PACT Act engaged in the sale, transfer, and shipment for profit of Flavored E-

---

within the PACT Act definition of ENDS. *See also supra* n.8.

[58] 18 U.S.C. § 1716E(a); 15 U.S.C. § 375(2)(A)(ii)(II).

Cigarettes in interstate commerce.

98.    During the Relevant Time Period, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) directly advertised and/or offered the sale, transfer, and shipment of Flavored E-Cigarettes in interstate commerce.

99.    During the Relevant Time Period, each Defendant (except EVO Brands, MVH I, and the Price Point Defendants) have sold, transferred, and shipped for profit Flavored E-Cigarettes into New York through interstate commerce.

100.    Each Defendant (except EVO Brands, MVH I, and the Individual Defendants) is a "delivery seller" under the PACT Act, 15 U.S.C. § 375(6), and has completed many "delivery sales," 15 U.S.C. § 375(5)(A)-(B).

101.    As discussed below, each Defendant's (except EVO Brands, MVH I, and the Individual Defendants) sales and shipments of Flavored E-Cigarettes have been to consumers, as defined under the PACT Act, because the sales and shipments were to individual consumers and/or unlawfully operating distributors, wholesalers, or retailers located in New York.[59] *See generally infra* Part III.

102.    For a substantial portion of the Relevant Time Period, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) maintained at least one website accessible to New Yorkers through which they directly advertised, sold, and offered for sale and delivery Flavored E-Cigarettes to consumers. These sales to consumers are "delivery sales" within the meaning of

---

[59] 15 U.S.C. § 375(4).

the PACT Act because prospective consumers place orders for Flavored E-Cigarettes remotely, whether through a Defendant's website, by phone, messaging service, email, or other remote means, which are then delivered to the consumers who complete a purchase. Neither the Defendant nor the consumer are in the physical presence of each other at the time the order is placed and/or at the time the Flavored E-Cigarettes are delivered.

103.    As a delivery seller, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) must comply with specific shipping, packaging, age verification, recordkeeping, tax collection, and State, local, and tribal laws generally applicable to sales of vapor products "as if the delivery sales occurred entirely within the specific State and place."[60] Specifically, for example:

    a.  For every shipping package containing Flavored E-Cigarettes, the delivery seller shall include on the bill of lading, if any, and on the outside of the shipping package, on the same surface of the delivery address, the following statement: "CIGARETTES/NICOTINE/ SMOKELESS TOBACCO: FEDERAL LAW REQUIRES THE PAYMENT OF ALL APPLICABLE EXCISE TAXES, AND COMPLIANCE WITH APPLICABLE LICENSING AND TAX-STAMPING OBLIGATIONS."[61]

    b.  No delivery seller may sell, offer for sale, deliver, or cause to be delivered in any single sale or single delivery any Flavored E-Cigarette "weighing more than 10 pounds."[62]

    c.  No delivery seller may sell, deliver, or cause to be delivered Flavored E-Cigarettes to a person under the minimum age required for the legal sale or purchase of such products, as determined by the applicable law at the place of delivery.[63] The minimum legal age in New York for the purchase of vapor

---

[60] 15 U.S.C. § 376a(a).

[61] 15 U.S.C. § 376a(b)(1).

[62] 15 U.S.C. § 376a(b)(3).

[63] 15 U.S.C. § 376a(b)(4)(A)(i)-(ii).

products is 21 years-of-age.[64] Moreover, every delivery seller is required to use a mailing or shipping method that requires the purchaser or an adult who is at least 21 years-of-age to sign to accept delivery of the shipping container at the delivery address, and provide proof in the form of a valid, government-issued identification bearing a photograph of the individual, of the person's legal age.[65]

d.   No delivery seller shall accept a delivery sale order without obtaining the person's full name, birth date, and residential address, and independently verifying the information provided and that the person is at least 21 years-of-age.[66]

e.   Every delivery seller must maintain a detailed record of every delivery sale.[67]

f.   Every delivery seller must comply with all State, local, tribal, and other laws applicable to the sale of ENDS.[68]

104.   While Defendants are delivery sellers under the PACT Act, and as such, were required during the Relevant Time Period to comply with the aforementioned PACT Act requirements, Defendants betrayed those obligations.  Specifically, for example:

a.   As described more fully below, each Defendant (except EVO Brands, MVH I, Mylé, and the Individual Defendants) shipped Flavored E-Cigarettes into or within New York using the USPS in violation of the PACT Act § 1716E(a). *See, e.g., infra* ¶¶ 270, 313, 329, 383, 406, 433, 488.

b.   Within the Relevant Time Period, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) sold Flavored E-Cigarettes to unlicensed or illegally operating distributors and/or retailers in New York, which are "consumers" under the PACT Act, and shipped said products to those consumers in New York. At no time during the purchase or delivery were Defendants in the physical presence of the consumers. *See, generally, infra* Part

---

[64] N.Y. Pub. Health L. § 1399-cc.

[65] 15 U.S.C. § 376a(b)(4).

[66] 15 U.S.C. § 376a(b)(4)(A)(iii).

[67] 15 U.S.C. § 376a(c)(1).

[68] 15 U.S.C. § 376a(a)(3).

III.

    c.   Each Defendant (except EVO Brands, MVH I, and the Price Point Defendants) has either failed entirely or has substantially failed to submit required PACT Act reports to the tobacco tax administrator for New York State, the Department of Taxation and Finance ("DTF"). *See generally, infra* Part III.

    d.   Commercial conduct that violates any other of the provisions of the N.Y. Pub. Health L. summarized below, *see infra* ¶¶ 106-140, also serves as an independent basis for a PACT Act violation.  For example, as delivery sellers, Defendants were required but failed to comply with the N.Y. Pub. Health L. § 1399-ll prohibition against shipping or causing to be shipped in New York vapor products to any person who is not a licensed vapor products retailer, an export warehouse proprietor or customs bonded warehouse operator, or the U.S. government.

105.    Accordingly, as "delivery sellers," each Defendant (except EVO Brands, MVH I, and the Individual Defendants) was required but failed, in part or in whole, to comply with the PACT Act's specific mandates, including those concerning using the USPS, shipping, packaging, age verification, and recordkeeping, as well as New York laws governing the sale and shipment of vapor products, and has violated the PACT Act on one or more of these bases. *See also infra* Part III.

        2.  <u>Defendants Violate Multiple Provisions of New York's Public Health Law Regarding the Marketing and Sale of E-Cigarettes.</u>

106.    Defendants' conduct in shipping or causing to be shipped vapor products, including into and within New York is unquestionably illegal on a state and local level.

107.    New York's Public Health Law provides a critical regulatory framework for the sale of vapor products in New York State, and thereby protects youth from the dangers of nicotine

addiction and reduces access to e-cigarettes.[69] Indeed, several provisions of the Public Health Law

operate to protect New York's youth in particular, including those described in more detail below,

*see infra* ¶¶ 112-140, as well as:

    a.  *Age Restriction, N.Y. Pub. Health L. § 1399-cc* – New York law restricts youth access to tobacco products, liquid nicotine, and e-cigarettes. Since November 2019, New York law has prohibited these products to individuals under the age of 21.[70] These age restrictions apply to all vapor products, including Flavored E-Cigarettes, sold by each Defendant;

    b.  *Ban on Swag and Event Promotions, N.Y. Pub. Health L. § 1399-bb-1* – New York law restricts e-cigarette branded swag. Effective January 1, 2024, New York prohibits any manufacturer or distributor of e-cigarettes from marketing, licensing, distributing, selling, or causing to be marketed, licensed, distributed, or sold any item (other than electronic cigarettes and its component parts) or service which bears the brand name or other indicia of product identification of the brand. Moreover, no manufacturer, distributor, or retailer may sponsor any athletic, musical, or other social or cultural event, using any e-cigarette branding; and

    c.  *Ban on Discounts, N.Y. Pub. Health L. § 1399-bb* – New York law restricts the giveaway of vapor products, and with limited exceptions not relevant here, New York law prohibits any retail dealer from selling or offering for sale vapor products at a discounted price, including but not limited to barring the acceptance of coupons, vouchers, or rebates. For instance, two-for-one promotions and rewards programs in which consumers earn points for purchases which can be redeemed for discounts or free items are prohibited under New York law.[71]

---

[69] The term "Flavored E-Cigarette" as defined in n.8, is slightly more expansive than the definition of "vapor products" under New York's Public Health Law. Most notably, "vapor products" does not include any device that does not contain pre-filled flavored e-juice or e-liquid. N.Y. Pub. Health L. § 1399-aa(17). However, this limitation under the Public Health Law pertains to a fraction of the products at issue.

[70] New York defines "liquid nicotine", "electronic liquid", or "e-liquid" as "a liquid composed of nicotine and other chemicals, and which is sold as a product that may be used in an electronic cigarette." N.Y. Pub. Health L. § 1399-cc(1)(e). New York's definition of "electronic cigarette" or "e-cigarette" is broadly defined as "an electronic device that delivers vapor which is inhaled by an individual user, and shall include any refill, cartridge and any other component of such device" and encompasses the PACT Act definition of ENDS. N.Y. Pub. Health L. § 1399-aa(13).

[71] The NYSDOH has issued guidance relating to N.Y. Pub. Health L. § 1399-bb, directed to "Tobacco and Vapor

108.    New York requires all persons who want to sell or offer for sale vapor products in New York to be a "retail dealer."[72]

109.    For a substantial segment of the Relevant Time Period, Defendants have engaged in commercial conduct that directly violates three pertinent provisions of the N.Y. Pub. Health L.:

    a.    Flavor Ban, N.Y. Pub. Health L. § 1399-mm-1, *infra* ¶¶ 112-116 (all Defendants);

    b.    Shipping Ban, N.Y. Pub. Health L. § 1399-ll, *infra* ¶¶ 117-123 (all Defendants, except EVO Brands, MVH I, and the Individual Defendants); and

    c.    Required Ingredient Disclosures, N.Y. Pub. Health L. § 1701, *infra* ¶¶ 124-140 (all Defendants, except the Price Point Defendants).

110.    Moreover, Defendants Price Point, Midwest Goods, the DEMAND Defendants, Happy Distro, POD Juice, Safa Goods, and Mi-One also violate a fourth pertinent provision, namely the ban on discounted and/or free vapor products, N.Y. Pub. Health L. § 1399-bb, *supra* ¶ 107(c).

111.    Each of these provisions and Defendants' corresponding violations are detailed below.

---

Product Manufacturers, Wholesalers, Distributors, and Retailers Regarding New Price Reduction Instrument Restrictions," thereby including each Defendant.  The NYSDOH explained that the intent of the new restrictions was "to limit measures that ease the accessibility of tobacco and vapor products, particularly to vulnerable populations including younger individuals and others who have not developed an addiction to nicotine."

[72] N.Y. Pub. Health L. § 1399 *et seq*.; N.Y. Tax L. § 1183. A "retail dealer" is a person licensed by the Commissioner of the DTF to sell cigarettes, tobacco products, or vapor products. N.Y. Pub. Health L. § 1399-aa(16). Related, a "vapor products dealer" is a person licensed by the Commissioner of DTF to sell vapor products in New York State. N.Y. Pub. Health L. § 1399-aa(18).

a. *Each Defendant Has Violated New York's*
*Flavor Ban (N.Y. Pub. Health L. § 1399-mm-1).*

112.    Effective May 18, 2020, New York prohibits the sale at retail of any non-tobacco flavored vapor product.[73]

113.    To ensure the industry had notice of New York's flavor ban, NYSDOH issued a guidance document directed to "Vapor Product Manufacturers, Wholesalers, Distributors, and Retailers," thereby including each Defendant.  In that guidance, the NYSDOH explained this development in New York law came out of the growing necessity to protect our vulnerable communities, including youth:[74]

> The availability of flavors is largely responsible for the dramatic increase in the use of vapor products by youth and is a principal reason that youth initiate and maintain e-cigarette use. The intent of this amendment is to stem this increase and prevent a potentially life-long addiction to nicotine in young people and other vulnerable populations.

114.    Each Defendant has flagrantly disregarded N.Y. Pub. Health L. § 1399-mm-1 by the very nature of their business, such that each and every sale to a New York retailer is illegal by operation of New York's flavor ban, together with Defendants' obligations under the PACT Act. *See generally supra* ¶¶ 93-105.  Specifically, the PACT Act limits Defendants' ability to remotely sell Flavored E-Cigarettes to consumers.  In order for such a sale to be legal, it must also comply with all state and local laws applicable to the sale of flavored vapor products. This includes, but is

---

[73] N.Y. Pub. Health L. § 1399-mm-1. The retail flavor ban does not apply to any flavored vapor product that the FDA has authorized to be marketed under 21 U.S.C. § 387j(c) *et seq*.

[74] https://www.health.ny.gov/prevention/tobacco_control/docs/flavored_vape_product_restrictions_guidance.pdf (last visited Feb. 10, 2025).

not limited to, state and/or local bans on remote or delivery sales and prohibitions on flavored vapor products.

115.    In other words, in New York, a retailer can be licensed and operate lawfully only with regard to the sales of FDA-authorized flavored vapor products. Therefore, each and every sale of FDA unauthorized flavored vapor products made by each Defendant to any retailer is necessarily outside the scope of that licensing scheme and illegal.

116.    Furthermore, as set forth below, the PUFF Defendants, Pod Juice, Happy Distro, and the Price Point Defendants violated New York's flavor ban by directly operating as a retailer who completed substantial direct retail sales of vapor products, including Flavored E-Cigarettes, to individuals.

> b. *Each Defendant Has Violated New York's Ban on Shipping (N.Y. Pub. Health L. § 1399-ll).*

117.    The shipment of vapor products, including Flavored E-Cigarettes, is generally illegal in New York, except if such shipment is made to a licensed vapor products dealer, an export warehouse proprietor or customs bonded warehouse operator, or an officer, employee or agent of the government. [75]

118.    Moreover, New York law requires that anyone shipping vapor products, including Flavored E-Cigarettes, to any New York recipient, must ship those products in the manufacturer's original container or wrapping, or in a container or wrapping plainly and visibly marked with the

---

[75] N.Y. Pub. Health L. § 1399-ll(1-a).

words "vapor products."[76]

119.    The NYSDOH issued a corresponding guidance document, directed to "Vapor Product Manufacturers, Wholesalers, Distributors, and Retailers Regarding New Shipping Restrictions," thereby including each Defendant.[77]

120.    In its guidance, the NYSDOH elucidated that "[t]he intent of these amendments is to prevent consumers, and particularly individuals under the age of 21, circumventing restrictions on vapor product sales by purchasing products online and via telephone."[78]

121.    During the Relevant Time Period, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) has shipped or caused to be shipped flavored vapor products to one or more New York retailers who either failed to have a valid certificate of registration at the time of the sale or were acting outside the scope of their registration by purchasing illegal flavored vapor products, and as such were not licensed vapor products dealers to whom such shipments could be made.

122.    During the Relevant Time Period, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) has shipped or caused to be shipped flavored vapor products to persons, including distributors and wholesalers, who were not licensed retailers, export warehouse proprietors or operators of a customs bonded warehouse, or the U.S. government.

123.    Because each such shipment violates New York's ban on the shipping of flavored

---

[76] N.Y. Pub. Health L. § 1399-ll(3).

[77] https://www.health.ny.gov/prevention/tobacco_control/docs/vape_product_shipping_ban_guidance.pdf (last visited Feb. 13, 2025).

[78] Id.

vapor products, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) violated N.Y. Pub. Health L. § 1399-ll.

> c. *Certain Defendants Have Violated New York's Required Ingredient Disclosures (N.Y. Pub. Health L. § 1701).*

124.    New York law requires manufacturers of vapor products distributed, sold, or offered for sale in New York, whether at retail or wholesale, to furnish to the Commissioner of Health, for public record, and post on such manufacturer's website, detailed information regarding the vapor products. [79]

125.    The law defines "manufacturer" in this context very broadly as: "any person, firm, association, partnership, limited liability company, or corporation which produces, prepares, formulates, or compounds a vapor product or e-cigarette, or whose brand name is affixed to such product"; or if such product is imported into the U.S., "the importer or first domestic distributor of such product if the entity that manufacturers such product or whose brand name is affixed to such product does not have a presence in the United States." [80]

126.    Effective on July 1, 2020, for each vapor product (including e-juice or e-liquid), the information to be disclosed must include, among other things, a list naming each ingredient of such vapor product and the nature and extent of investigations and research performed by or for the manufacturer concerning the effects on human health of such product or its ingredients.

127.    Similarly, for each e-cigarette, the information to be disclosed must include, among

---

[79] N.Y. Pub. Health L. § 1701; N.Y. COMP. CODES R. & REGS. tit. 10, §§ 1006.1(a)-(b), 1006.2(a) (2022).

[80] N.Y. Pub. Health L. § 1700(7);  N.Y. COMP. CODES R. & REGS. tit. 10, § 1006.1(g) (2022).

other things, a list naming any toxic metal, including but not limited to lead, manganese, nickel, chromium, or zinc, as a constituent of any heating element included in such e-cigarette; a list naming each byproduct that may be introduced into vapor produced during the normal use of such e-cigarette; and the nature and extent of investigations and research performed by or for the manufacturer, or that the manufacturer is aware of, concerning the effects on human health of such product or such ingredients.

128.    Manufacturers have been required to furnish the required information on or before January 1, 2021, and every two years thereafter.[81]  Moreover, manufacturers are required to furnish the required information prior to the sale of any new vapor product or e-cigarette or when such a product's formulation has been changed meaningfully.

129.    The NYSDOH issued a corresponding and detailed guidance that spelled out the law's requirements, including this chart for ease of reference:[82]

---

[81] N.Y. Pub. Health L. § 1701(2); N.Y. Comp. Codes R. & Regs. tit. 10, § 1006.4 (2022).

[82]  https://www.healt h.ny.gov/prevention/tobacco_control/docs/vape%20_product_disclosure_guidance.pdf (last visited Feb. 13, 2025).

| Vaping Products | | |
|---|---|---|
| **Ingredients** | **Chemicals of Concern** | **Health-related Research** |
| For each product: <br>• All intentionally added ingredients, <br>• Known by-products or contaminants that are ≥0.5% by weight, and <br>• Known by-products or contaminants that have been identified as chemicals of concern, regardless of content by weight. | For each product that contains a chemical of concern: <br>• A statement that the ingredient is a chemical of concern. <br>• An evaluation of the availability of potential alternatives and potential hazards of the alternatives. | A summary of the nature and extent of investigations and research on human health effects of the product or its ingredients. |
| **E-Cigarette Devices** | | |
| **Toxic Metals** | **Alternatives Evaluation** | **Health-related Research** |
| For each product: <br>• Identify if the heating element contains a toxic metal such as aluminum, antimony, arsenic, cadmium, cobalt, chromium, copper, iron, lead, manganese, nickel, selenium, tin, or zinc. | For each product that contains a toxic metal: <br>• An evaluation of the availability of potential alternatives and potential hazards of the alternatives for the toxic metal. | A summary of the nature and extent of investigations and research on human health effects of the product or its ingredients or components. |
| **Vapor Produced During Normal Use of Products** | | |
| **By-products** | **Chemicals of Concern** | **Health-related Research** |
| For each product: <br>• A list of by-products, including metals, known by the manufacturer to be in the vapor produced during consumption of the vapor product. | For each product that produces a chemical of concern in the vapor: <br>• A statement that the by-product is a chemical of concern. <br>• An evaluation of the availability of potential alternatives and potential hazards of the alternatives. | A summary of the nature and extent of investigations and research on human health effects of the vapor produced by the product. |

130.    The NYSDOH guidance not only clarified which ingredient disclosures were required and in what order, but also specified an NYSDOH email address created for purposes of receiving such disclosures.

131.    Defendants Pod Juice, Mi-One, and Mylé, by virtue that they "produce[], prepare[], formulate[], or compound[] a vapor product or e-cigarette" are explicitly required to make these disclosures.  Each has failed to meet that obligation.

132.    Defendant Magellan, by virtue that it is the trademark holder for the Hyde and Raz brand names, and for other brands is the importer, is explicitly required to make these disclosures. Magellan has failed to meet that obligation.

133.    Defendant Demand Vape, by virtue that it is the "first domestic distributor" of many

products, is likewise explicitly required to make these disclosures, and has also failed to meet that obligation.

134.    Defendants Happy Distro and Midwest Goods, by virtue that they are "the importer or first domestic distributor" of many products, are likewise explicitly required to make these disclosures, but have failed to meet that obligation.

135.    The PUFF Defendants, by virtue that EVO Brands is the trademark holder of PUFF brand names, PVG2 and Puff Bar are affiliates of EVO Brands and as such operate along with EVO Brands a common enterprise to sell and distribute PUFF brand Disposable Vapes, and PVG2, is the "first domestic distributor" of PUFF brand products, are explicitly required to make these disclosures.  The PUFF Defendants have failed to meet that obligation.

136.    The MYLÉ Defendants, by virtue that MVH I is the trademark holder of the Mylé brand, Mylé Vape and MVH I are affiliates and as such operate as a common enterprise to sell and distribute Mylé brand products, and because Mylé Vape is the "first domestic distributor" of its branded products, each is explicitly required to make these disclosures.  However, the MYLÉ Defendants have failed to meet that obligation.

137.    Defendant Safa Goods, by virtue that at times during the Relevant Time Period, it was the trademark holder of the Raz brand name, the "first distributor" of Raz brand products, and the "importer or first domestic distributor" of other products, is explicitly required to make these disclosures.  Safa Goods has failed to meet that obligation.

138.    Thus, each Defendant (except Price Point) has failed to make the required ingredient disclosures concerning any vapor product or e-cigarette they have distributed, sold, or

offered for sale in New York during the Relevant Time Period.

139.    Indeed, to date, none of the above Defendants has ever submitted such a disclosure to the NYSDOH, or any other correspondence to the NYSDOH email address established for those purposes.

140.    Moreover, each non-manufacturing Defendant, including the Price Point Defendants, knowingly and deliberately distributed, sold, and offered for sale vapor products and e-cigarettes for which no disclosure was made. These Defendants engaged in the distribution, sale and offer for sale of vapor products and e-cigarettes that were in violation of N.Y. Public Health Law § 1701, and engaged in that business because each sought to, and did in fact, conceal the harmful effects of the products that they distributed, sold and offered for sale, and received financial gain for their conduct.

> d.   Each Defendant Has Violated Pertinent Local
>      Laws.

141.    Several localities within New York State have their own pertinent laws regarding Flavored E-Cigarettes.

142.    New York City prohibits all sales, offers to sell, and possession with intent to sell or offer for sale of all Flavored E-Cigarettes.[83]  Each Defendant's sale and delivery of Flavored E-Cigarettes to a purchaser in New York City violates New York City's flavor ban.

143.    Nassau County prohibits all sales of Flavored E-Cigarettes in flavors other than

---

[83] N.Y.C. Admin. Code § 17-715.

49

tobacco, mint, or menthol.[84] Each Defendant's sale and delivery of Flavored E-Cigarettes in flavors other than tobacco, mint, or menthol to a purchaser in Nassau County violates Nassau County's flavor ban.

144.    Suffolk County prohibits the sale or offer for sale of e-cigarettes, including their component parts, and e-liquid, with or without flavor, within the county that "look like or resemble school supplies or common personal items such as but not limited to highlighters, USB drives, ballpoint pens, smartphone cases, smartwatches and backpacks to persons of any age."[85] Each Defendant's sale and delivery of vapor products that look like or resemble the aforementioned items to a purchaser in Suffolk County violates Suffolk County's sale restrictions.

145.    The City of Yonkers prohibits the sale, offer for sale, or distribution of any e-liquid or e-cigarette containing e-liquid in a flavor other than tobacco.[86] Each Defendant's sale, offer for sale, and/or distribution of e-cigarettes or e-liquid in a flavor other than tobacco to a purchaser in Yonkers violates Yonkers' flavored e-liquid ban.

146.    The relevant provisions summarized above come together to create a safety net of objectively proven protection from the harms associated with vapor products and e-cigarettes. These laws, together with New York's Clean Indoor Air Act, the ban on sales of tobacco or vapor products in any retail establishment with a pharmacy, and among the highest tax on cigarettes and the retail sale of vapor products, New York has established itself as a national leader in tobacco

---

[84] Nassau Cty. Admin. Code § 9-25.13.

[85] Suffolk Cty Admin. Code § 792-9.

[86] City of Yonkers Code, Ch. 31 Art. XVII § 31-157.

and nicotine related statutes and policy.

147.    As described more fully below, each Defendant engaged in marketing, sales, and business practices that violated these many layers of federal, state, and local laws.

3.    Each Defendant Has Violated the Federal Food, Drug, and Cosmetic Act ("FD&C Act") and FDA Regulations.

148.    In 2016, the FDA issued its "Deeming Rule," exercising authority under the Tobacco Control Act to declare e-cigarettes "tobacco products" requiring marketing authorization by the Agency.[87]

149.    In its exercise of authority under the Deeming Rule, the FDA requires all e-cigarette manufacturers and importers to seek marketing authorization for their products. And under federal law, no new tobacco product—including e-cigarettes containing synthetic nicotine or natural nicotine derived from tobacco—can be legally marketed or sold in the U.S. without first having received a premarket authorization order by the FDA.[88]

150.    Some e-cigarette manufacturers have complied, submitting detailed scientific and other product information to the FDA and have received a premarketing authorization order. As Brian King, Director of FDA's Center for Tobacco Products explained in a recent approval announcement, such actions provide "further reinforcement that authorization of an e-cigarette product is possible when sufficient scientific evidence has been submitted to the agency to justify

---

[87] Deeming Tobacco Products to be Subject to the Federal Food, Drug and Cosmetic Act, as amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products, 81 Fed. Reg. 28,974, 28,976 (May 10, 2016).

[88] *See* 21 U.S.C. § 387j.

it."[89]  The FDA now maintains a web page listing all e-cigarette products that have applied for and been granted a premarket authorization order.[90] As the agency explains, and has repeatedly stated, "these [listed products] are the *only* e-cigarette products that currently may be lawfully marketed and sold in the United States, and those manufacturing, importing, selling, or distributing e-cigarettes without the required premarket authorization risk enforcement."[91]

151.    To date, the FDA has authorized 34 e-cigarettes to be sold in the U.S.[92] The FDA has not granted a premarket authorization order to any manufacturer or importer for an e-cigarette product in any flavor other than tobacco or menthol.[93]  And more specifically, the vast majority of the Flavored E-Cigarettes marketed and sold by each Defendant have not been granted the required premarket authorization order from the FDA.

152.    Certain Defendants attempt to get around the premarketing authorization order requirement by marketing their Flavored E-Cigarettes as ostensibly authorized products with confusing and purposefully misleading statements, such as "FDA-compliant[.]" *See infra* ¶ 388.

---

[89] U.S. Food & Drug Administration, Press Release, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review*, *available at* https://www.fda.gov/news-events/press-announcements/fda-authorizes-marketing-four-menthol-flavored-e-cigarette-products-after-extensive-scientific#:~:text=Following%20an%20extensive%20scientific%20review%2C%20the%20U.S.%20Food,through%20the%20premarket%20tobacco%20product%20application%20%28PMTA%29%20pathway (last visited Feb. 14, 2025).

[90] U.S. Food & Drug Administration, *Searchable Tobacco Products Database*, product category "e-cigarette," *available at* https://www.accessdata.fda.gov/scripts/searchtobacco/ (last visited Feb. 10, 2025).

[91] https://www.fda.gov/tobacco-products/ctp-newsroom/fda-authorizes-marketing-vuse-alto-tobacco-flavored-e-cigarette-pods-and-accompanying-power-unit (last visited Feb. 14, 2025) (emphasis added).

[92]  https://digitalmedia.hhs.gov/tobacco/hosted/E-Cigarettes-Authorized-FDA-JAN2025.pdf (last visited Feb. 14, 2025).

[93] *Id*.

This is just one of the ways Defendant Pod Juice, for example, misleads the public.

153.    Moreover, the FDA has sent warning letters to dozens of manufacturers, distributors, and retailers for selling and/or distributing Flavored E-Cigarettes that have not been granted the required premarket authorization order, including Flavored E-Cigarettes packaged to look like youth-appealing toys, cartoon characters, drink containers, school supplies, and gaming devices. In relevant part here, Defendants Midwest Goods, the PUFF Defendants, Magellan, Pod Juice, Safa Goods, Mi-One, Mylé, and Price Point have received FDA warning letters. *See infra* ¶¶ 320-358, 174-230, 231-287, 359-390, 391-409, 410-436, 437-465, 466-496.  And many of the Flavored E-Cigarettes sold and offered for sale by each of these Defendants have been addressed in FDA warning letters as illegal products.

154.    But Defendants have not heeded the FDA's warnings and changed course.  Rather, they continue to flood New York with Flavored E-Cigarettes, and Disposable Vapes in particular, despite the fact that, to date, there are only 34 e-cigarettes authorized to be legally sold in the U.S., and none are in a flavor other than tobacco or menthol.

155.    While New York does not seek relief directly flowing from the violation of the FD&C Act or FDA regulation, they nonetheless serve New York as a separate avenue of protection and provide notice to each Defendant that their commercial conduct is illegal and harmful.

### B.  The Flavored Vapor Product Supply Chain Involves International and Interstate Commerce and Defendants Substantially Control New York's Supply.

156.    According to industry sales data, there are now over 5,800 unique Disposable

Vapes currently being sold in the U.S.[94]  Defendants collectively control which of these products appear in New York's vape shops, smoke shops, and at the doorstep of New York residences.

157.    The major manufacturers of Flavored E-Cigarettes are principally located in China. These manufacturers ship their products directly or through freight-forwarding agencies to distributors in the U.S., including to Defendants, as described more fully below.

158.    These international e-cigarette manufacturers are known to frequently evade duties and federal import restrictions on the devices by intentionally falsely declaring the products, their quantity, and value as items with no connection to vapor products. Several recent joint actions between the FDA and U.S. Customs and Border Protection ("CBP") have resulted in the seizure of approximately over 3 million units of unauthorized e-cigarette products, with an estimated retail value of $77 million. Those seized vapor products all originated from China and were being sent to wholesalers or distributors for wider distribution throughout the U.S.[95]

159.    Accordingly, Flavored E-Cigarettes manufactured abroad arrive in New York through U.S. importers and distributors who contract directly with the manufacturer and arrange for the products to be shipped to the U.S. Once in the U.S., these products enter the domestic supply chain by distributors, including each Defendant, who then sell and ship the products to sub-

---

[94] U.S. Senate, Permanent Subcommittee on Investigations, *The Youth Vaping Epidemic: Federal Regulation of E-cigarettes and the Rise of JUUL and Puff Bar* (Feb. 29, 2024), 2, *available at* https://permanent.fdlp.gov/websites/www.senate.gov/pdf-archive/2024-02-29-PSI-E-cig-Report-Final.pdf [hereinafter "2024 Senate Report on the Rise of JUUL and Puff Bar"] (last visited Feb. 4, 2025).

[95] https://www.cbp.gov/newsroom/local-media-release/53700-electronic-nicotine-delivery-systems-seized-chicago-cbp (seizure of 53,700 ENDS devices with a manufacturer's suggested retail price of over $1.08 million) (last visited Feb. 10, 2025); https://www.fda.gov/news-events/press-announcements/76-million-illegal-e-cigarettes-seized-joint-federal-operation (seizure of approximately 3 million e-cigarette products with an estimated retail value of $76 million) (last visited Feb. 10, 2025).

distributors, wholesalers, and retailers in New York, and ultimately into the hands of New York consumers, including New York's youth.

160.    For instance, Defendant Magellan, contracts with Chinese companies to manufacture certain e-cigarette brands in China, import them into the U.S., and then transfers the products to its corporate affiliate Defendant Demand Vape, who then sells and ships the products to other distributors, including Defendants Midwest Goods, Safa Goods, Price Point, and Mi-One, who then again sell and ship the products further to sub-distributors, wholesalers, retailers, and individual consumers in New York.

161.    Defendants Midwest Goods, Demand Vape, and Safa Goods are U.S. partners of the popular e-cigarette brand Geekvape, for instance, which is headquartered and manufactured in Shenzhen, China. Defendants Midwest Goods and Magellan have purchased Geekvapes directly from China for distribution in the U.S. No Geekvape product has been granted a premarket authorization order from the FDA allowing it to be marketed and sold in the U.S.

162.    Defendants become "master distributors" of certain Flavored E-Cigarettes and receive preferential and exclusive rights to market and distribute the products. They then sell the products to smaller sub-distributors, wholesalers and/or retailers operating brick and mortar or online stores who in turn sell the products to New York consumers.

163.    Defendant Safa Goods boasts on its website that it is a Master Distributor of several e-cigarette brands, including popular brands such as Lost Mary, Off-Stamp, and Raz.

164.    Defendant Happy Distro declares on its website that it is a "trusted partner of renowned brands" Geek Bar, Lost Mary, Off- Stamp, and RabBeats.

165.    Defendant Midwest Goods entered into a Master Distribution Agreement with Pastel Cartel and American Vape Company, companies that own and/or sell the popular e-cigarette brand Esco Bar, which was later the subject of an import alert issued by the FDA on May 15, 2023, for not having the required FDA marketing authorization, and as such was not authorized to be marketed or sold in the U.S.  The import alert placed Esco Bar products on the red list, which allows the FDA to detain the products without physical examination at the time of entry, thus preventing the distribution of the illegal products in the U.S. Despite the fact that Esco Bars were never authorized to be sold in the U.S., before or after the import alert, Midwest Goods nevertheless entered into an agreement to promote the illegal Esco Bar products, stimulate demand for the products, and maximize their sales in the U.S., including New York State.

166.    Thus, based on these supply chain arrangements and where each Defendant lies within that broader industry context, each Defendant sits in a critical place to prevent the widespread illegal sales of Flavored E-Cigarettes in New York.  They carry all the obligations and responsibilities summarized above under federal, state, and local laws, but do not live up to any of those obligations and responsibilities.

167.    Defendants are deliberately operating outside the law. A simple internet search reveals the remarkably small number of Flavored E-Cigarettes that the FDA has authorized to be marketed and sold.  Indeed, several Defendants have been the subject of litigation and/or investigations regarding the import and distribution of these illegal products. For example, the

PUFF Defendants, [96] the DEMAND Defendants, Price Point, and Mi-One were embroiled in recent litigation before the United States District Court of the Southern District of California and/or International Trade Commission investigations stemming from complaints filed by manufacturers NJOY and R.J. Reynolds arising out of the manufacture, import, marketing, distribution, and sale of unlawful e-cigarettes, and the impact of those actions on the sale of lawful vapor products legally manufactured, marketed and sold by NJOY and R.J. Reynolds. [97] Nonetheless, the PUFF Defendants, Magellan, Demand Vape, Price Point, and Mi-One maintain their illicit position in the market.

### III.    EACH DEFENDANT HAS PERSISTENTLY AND ILLEGALLY MARKETED, SOLD, AND SHIPPED FLAVORED VAPOR PRODUCTS INTO NEW YORK.

168.    Despite the illegality of their conduct, each Defendant has intentionally and repeatedly marketed, sold, and shipped Flavored E-Cigarettes into New York throughout the Relevant Time Period.

169.    In so doing, as described more fully below and by operation of the interrelated laws summarized above, *see supra* Part II, New York has effectuated a near complete ban on Flavored

---

[96] In April 2024, the Puff Bar Defendants entered into a stipulation resolving the ITC investigation in which they agreed to forever cease and desist from manufacturing, advertising, marketing, distributing, selling, offering to sell, importing, and exporting Puff Bar brand products not authorized for market or sale in the U.S. *See In the Matter of Certain Disposable Vaporizer Devices and Components and Packaging Thereof*, United States International Trade Commission Investigation No. 337-TA-1381, Documents 817799-2153214 (Agreement with PVG2) and 817800-2153276 (Agreement with EVO Brands).

[97] *NJOY, LLC v. Imiracle (HK) Limited, et al.*, Docket No. 24-cv-397 in the United States District Court for the Southern District of California (SV3 LLC d/b/a Mi-One Brands is a defendant); *In the Matter of Certain Disposable Vaporizer Devices and Components and Packaging Thereof*, United States International Trade Commission Investigation No. 337-TA-1381 (investigation commenced against, *inter alia*, EVO Brands, PVG2, Magellan, Ecto World d/b/a Demand Vape, Price Point, and Mi-One); *In the Matter of Certain Disposable Vaporizer Devices and Components Thereof*, United States International Trade Commission Investigation No. 337-TA-1410 (investigation commenced against, *inter alia*, SV3, LLC d/b/a/ Mi-One and Price Point Distributors Inc. d/b/a Price Point NY).

E-Cigarettes. Many, if not all, sales completed by each Defendant are illegal:

   a.  *Sales to Individual Consumers or Unlicensed Parties*:  Each sale made by each Defendant of a Flavored E-Cigarette directly to a New York individual consumer or unlicensed retailer is in violation of the Public Health Law and the PACT Act. Each such sale constitutes a "delivery sale" under the PACT Act. Several Defendants have made such sales, specifically, the Price Point Defendants, the PUFF Defendants, Pod Juice, and Happy Distro.

   b.  *Sales to New York Retailers Acting Outside the Scope of their License*: Each sale made by each Defendant of a Flavored E-Cigarette directly to a New York licensed retailer is in violation of the PACT Act. Each such purchasing retailer is not lawfully operating such that each sale constitutes a "delivery sale" under the PACT Act.  Each Defendant has made many such sales.

   c.  *Sales to New York Distributors or Wholesalers*:  Each sale made by each Defendant of a Flavored E-Cigarette to a New York-located distributor or wholesaler and which was shipped to that New York entity is in violation of the Public Health Law and the PACT Act.  Each Defendant has made many such sales.

   170.  Accordingly, each Defendant has engaged in conduct prohibited by federal and New York State law.

   171.  Moreover, together, Defendants' common marketing strategies have misled New York customers into believing that Flavored E-Cigarettes are legal and harmless.  As described in more detail below, during the Relevant Time Period, each Defendant not only maximized their individual market share, but also put the overall market for Flavored E-Cigarettes into overdrive in New York, including by:

   a.  publishing statements on their respective websites (including product-specific statements or blog or other postings concerning Flavored E-Cigarettes generally) that represented to anyone accessing the website that such products were legal, safe, and fun;

   b.  engaging influencers for promotional purposes to reach the broadest audiences

possible on social media;[98]

    c.  utilizing bright, vibrant color schemes, and/or animation or cartoon themes for brand development and packaging;[99]

    d.  advertising their products on social media;[100] and/or

    e.  supporting vape tricks and other alternative e-cigarette use behaviors among adolescents.[101]

172.    Each Defendant has boldly operated with a false immunity from New York laws. For instance, in a WhatsApp conversation, dated March 28, 2023, between hundreds of stakeholders in the industry, including Defendants Safa, Mylé, and Mi-One, New York's flavor ban was top of mind.  The text writer informed the recipients that New York prohibits the sales of the very products Defendants continue to push in massive quantities for profit, but explicitly theorized that the risk was passed on fully to the retailers, encouraging these stakeholders to continue business as usual.  And they did just that.  Thus, Defendants Safa, Mylé, and Mi-One, like the rest of the Defendants, have consciously chosen to ignore the illegality of their own

---

[98] *See* https://www.cdc.gov/tobacco/e-cigarettes/why-youth-vape.html (last visited Feb. 10, 2025) ("[A]bout three in four (74%) students who used social media had seen e-cigarette–related posts or content.").

[99] Lauren I. Labrecque & George R. Milne, *Exciting red and competent blue: the importance of color in marketing*, Received: 17 June 2010 / Accepted: 14 December 2010 # Academy of Marketing Science 2011.

[100] Yang Q, Clendennen SL, Marti CN, Loukas A., *Associations between social media engagement and young adults' subsequent onset of ENDS dependence symptoms one year later*, Addict Behav. 2024 Oct, Epub 2024 Jun 18, *available at* https://pubmed.ncbi.nlm.nih.gov/38908051/ (last visited Feb. 15, 2025) ("Findings suggest that engaging with tobacco information on SM [social media], regardless of its valence, serves as a risk factor for the development of subsequent dependence symptoms among young adult ever ENDS users.").

[101] Kong G, Morean ME, Bold KW, Wu R, Bhatti H, Simon P, Krishnan-Sarin S., *Dripping and vape tricks: Alternative e-cigarette use behaviors among adolescents*, Addict Behav. 2020 Aug, Epub 2020 Mar 21, *available at* https://pubmed.ncbi.nlm.nih.gov/32222561/ (last visited Feb. 15, 2025).

conduct in the hopes that New York law would be enforced only at the individual retailer level. But that is not the law in New York and each Defendant is culpable.

173.    In these ways, and all the ways described more fully throughout this Complaint, each Defendant has caused, contributed to, or maintained the massive influx of Flavored E-Cigarettes, particularly Disposable Vapes, in New York.

### A.  The PUFF Defendants – *The First Mega-Popular Disposable Vape*

174.    EVO Brands is the trademark holder of the PUFF brand Disposable Vapes, and a family of marks consisting of or incorporating the term "PUFF" and/or its distinctive cloud design, including the brands PUFF BAR, PUFF PLUS, PUFF GLOW, and PUFF FLOW. It has pending trademark applications for the brands PUFF MAX, PUFF XXL, and PUFF ULTRA.

175.    EVO Brands licenses the PUFF brands to PVG2.

176.    PVG2 is the operating entity that distributes Disposable Vapes bearing the PUFF brands.

177.    Puff Bar has owned and operated the Puff Bar main website, https://puffbar.com/, for a substantial segment of the Relevant Time Period.  Upon information and belief, starting in or around February 21, 2021, PVG2 has also maintained https://puffbar.com/, through which both Puff Bar and PVG2 advertised, sold, and offered for sale PUFF brand Disposable Vapes.

178.    Accordingly, EVO Brands, PVG2, and Puff Bar (together, the "PUFF Defendants") are affiliates that operate a common enterprise to sell PUFF brand Disposable Vapes to distributors, wholesalers, retailers, and/or individual consumers in New York.

179.    Together, the PUFF Defendants have been a major distributor of their branded

60

Flavored E-Cigarettes, including Disposable Vapes, and marketed, sold, and shipped a substantial number of products into New York during the Relevant Time Period.

180.    The PUFF Defendants' substantial sales into New York include sales and shipments to e-cigarette distributors, wholesalers, retailers, and individual consumers throughout the Relevant Time Period.

181.    Some examples of the PUFF brands' enticing flavors are:

    a.  Watermelon Slush

    b.  Black Cherry Ice

    c.  Pink Lemonade

    d.  O.M.G

    e.  Strawberry Donut

182.    The PUFF Defendants, including through their predecessor corporate forms, have offered for sale PUFF brand Disposable Vapes since at least August 2019.

183.    The PUFF Defendants have advertised and promoted PUFF brand Disposable Vapes in various media, including through social media, various websites, and industry-leading trade shows to maximize their reach.

184.    The PUFF brand and its distinguishable Cloud logo were and continue to be widely recognized, and in 2020-2021, Puff Bar was the most popular Flavored E-Cigarette in the U.S.[102]

185.    As described above, the PUFF Defendants moved swiftly to fill the void left by JUUL. Puff Bar quickly became the first mainstream non-cartridge based disposable Flavored E-

---

[102] *See supra* n.2020, 22.

Cigarette widely used and recognized by youth. *See supra* ¶¶ 59-66.

186.    Puff Bar launched in 2019 with a design that looked similar to a sleek JUUL device, which could fit easily in one's pocket, and like JUUL, came in a variety of kid friendly flavors such as strawberry, pink lemonade, watermelon, and a blend called "O.M.G."[103]



187.    In the words of Puff Bar co-CEO and co-Founder Patrick Beltran, Puff Bar was even easier to use than JUUL because "you can't get any simpler than just you taking this product out of the packaging, putting it to your mouth and just using it."[104]

188.    The PUFF Defendants marketed the ease of use of their then-novel Disposable

---

[103] Image obtained from Stanford Research into the Impact of Tobacco Advertising Database ("SRITA Database"), https://tobacco.stanford.edu/disposable/img41371/ (last visited Feb. 14, 2025).

[104] The Forked Road, *Interview with Puff Bar's Patrick Beltran*, at 09:53 (Nov. 29, 2021), *available at* https://www.youtube.com/watch?v=H3bOPTBG0rI (last visited Feb. 4, 2025).

Vapes and boasted that the Puff Bar was the equivalent of 20 cigarettes:[105]



189.    Youth predictably switched in droves from the outdated and disfavored JUUL products to Puff Bar.  By Spring 2020, Puff Bar sales reached over $3 million a week, and by 2021, it was the most popular brand of Flavored E-Cigarette among middle school and high school

---

[105] Image obtained from SRITA Database, https://tobacco.stanford.edu/disposable/img41405/ (last visited Feb. 4, 2025); *see also Lara v. Puff Bar, Nick Minas, Patrick Beltran, Cool Clouds Distribution, et al.*, Docket No. 20-cv-8030, District Court for District of New Jersey, Doc. 59, Puff Bar Defendants' Answer to Second Amended Complaint, ¶ 114.

students.[106]

190.    At all times, the PUFF Defendants were aware of the rise in youth vaping, and the popularity of PUFF brand Disposable Vape among youth.[107]

191.    On July 20, 2020, the FDA issued a warning letter concerning Puff Bar Disposable Vapes, identifying that those on the website https://puffbar.com had not received the required FDA marketing authorization and therefore could not be marketed or sold in the U.S.[108] The FDA directed that PUFF brand Disposable Vapes be removed from the market. Indeed, all PUFF Disposable Vapes that did not comply with the FD&C Act and the FDA implementing regulations could not be marketed or sold in the U.S. This included PUFF brand Disposable Vapes advertised "on any other websites (including e-commerce, social networking, or search engine websites), in any other media. . . and in any retail establishments."[109]

192.    To date, no PUFF brand Disposable Vape has received FDA authorization to be marketed or sold in the U.S.

193.    The PUFF Defendants, including through their predecessor corporate forms, halted U.S. sales temporarily in late 2020 after the FDA warning letter. However, after a brief hiatus, they

---

[106] Kaplan, *supra* n.19; 2021 E-Cigarette Use Among Middle and High School Students, *supra* n.20.

[107] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.94, at 107.

[108] Letter from Ann Simoneau, *supra* n.21. ; U.S. Food & Drug Administration, Press Release (July 20, 2020), *FDA Notifies Companies, Including Puff Bar, to Remove Flavored Disposable E-Cigarettes and Youth-Appealing E-Liquids from Market for Not Having Required Authorization*, https://www.fda.gov/news-events/press-announcements/fda-notifies-companies-including-puff-bar-remove-flavored-disposable-e-cigarettes-and-youth (last visited Feb. 4, 2025).  Cool Clouds Distribution, Inc. d/b/a Puff Bar, was a predecessor corporate form of the PUFF Defendants.

[109] *Id*.

circumvented FDA regulation and reemerged in the U.S. market in early 2021, then using a synthetic nicotine formulation in their PUFF brand Disposable Vapes. This reformulation did nothing to remedy the PUFF Defendants' illegal conduct or their popularity among youth.

194.    Puff Bar Disposable Vapes were the most popular e-cigarette used by youth in 2021. The 2021 National Youth Tobacco Survey found that 26.1% high school current e-cigarette users reported using Puff Bar, and that 30.3% of middle school current e-cigarette users reported using Puff Bar.[110]

195.    Puff Bar remained the most popular e-cigarette used by youth in 2022. The 2022 National Youth Tobacco Survey found that "[a]mong current e-cigarette users, Puff Bar was the most commonly reported brand used in the past 30 days by both middle and high school students (29.7%), followed by Vuse (23.6%). Among current e-cigarette users, 14.5% reported that the brand they usually used was Puff Bar, followed by Vuse (12.5%)."[111]

196.    The PUFF Defendants continued to advertise, market, sell and offer for sale PUFF brand Disposable Vapes in a variety of youth-appealing flavors, including non-traditional flavors such as Banana Ice, Lychee Ice, and Cool Mint even after the FDA expressly applied its authority to regulate synthetic nicotine, therefore explicitly closing a regulatory gap where there never was one.

197.    But the non-traditional, sweet, and enticing flavors were critical to the PUFF

---

[110]  2021 E-Cigarette Use Among Middle and High School Students, *supra* n.20. "Among high school current e-cigarette users, 26.1% reported that their usual brand was Puff Bar, followed by Vuse (10.8%) . . . Among middle school current users, 30.3% reported that their first brand was Puff Bar, and 22.5% reported JUUL."

[111] 222022 E-cigarette Use Among Middle and High School Students, *supra* n.22, at 1283-85.

Defendants' business model as they drove revenue significantly more than tobacco flavored products.[112] As PUFF Defendants' co-CEO Patrick Beltran told the United States Senate Permanent Subcommittee on Investigations ("Senate Subcommittee"), "Puff Bar's portfolio of flavors was 'definitely' a business enabler that drove company revenue and explained that if the company only sold Tobacco flavor, the company 'would definitely take even more of a decline' than it already had."[113]

198.    For that reason, the PUFF Defendants doubled down on their illicit conduct and continued to offer new and "more unique blends of flavors," all while "fail[ing] to conduct any studies or surveys regarding user preference for these flavors, including the potential appeal of these flavors to youth and young adults."[114]

199.    Internal sales figures provided to the Senate Subcommittee showed that Puff Plus-Banana Ice, Puff Plus-Cool Mint, Puff Flow-Cool Mint, Puff Flow-Aloe Grape, and Puff Plus-Lush "accounted for $1.4 million in sales – over 26 percent of the $5.3 million total sales in 2021."[115] Internal sales figures also showed that "Puff Plus-Banana Ice, Puff Plus-Cool Mint, Puff Plus-Lush, Puff Plus-Strawberry Banana, and Puff Plus-Blueberry Ice were the top selling products and flavors totaling over 275,100 units – 28 percent of the nearly 959,500 total units sold" in 2021.[116]

---

[112] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.94, at 119.

[113] *Id.*

[114] *Id.* at 120.

[115] *Id.* at 121.

[116] *Supra* n.94, at 121.

200.    In contrast, "Puff Flow-Menthol, Puff Plus-Menthol, and Puff Bar-Tobacco products contributed $228,896 in sales and over 33,000 units sold – only 4% of total sales and 3% of total units sold."[117]

201.    The PUFF Defendants knew that their flavors appealed to youth and young adults— indeed, they bet on it. Although the PUFF Defendants superficially claimed that their flavors also helped smokers transition away from combustible cigarettes, they "never studied the impact of [their] products on user cessation of combustible cigarettes."[118]

202.    On October 6, 2022, the FDA issued a second warning letter to the PUFF Defendants for selling Disposable Vapes on the website https://puffbar.com that were not authorized by the FDA to be marketed and sold in the U.S.[119]

203.    The FDA again directed the PUFF Defendants to remove their PUFF brand Disposable Vapes from the market. The PUFF Defendants were required to ensure that any PUFF brand Disposable Vape that did not comply with the FD&C Act and the FDA implementing regulations was not marketed or sold in the U.S. This included PUFF brand Disposable Vapes advertised on the website https://puffbar.com, "on any other websites (including e-commerce, social networking, or search engine websites), in any other media in which . . . [PUFF Defendants]

---

[117] *Supra* n.94, at 121.

[118] *Supra* n.94, at 123-24.

[119] Letter from Ann Simoneau, Dir., Off. of Compliance & Enforcement, Center of Tobacco Products, U.S. Food & Drug Admin., to Nicholas Minas Alfaro, Patrick Beltran, EVO Brands, LLC and PVG2, LLC (Oct. 6, 2022), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/evo-brands-llc-and-pvg2-llc-dba-puff-bar-643091-10062022 (last visited Feb. 14, 2025).

advertise, and in any retail establishments."[120]

204.    FDA review of https://puffbar.com and additional information revealed the

following regarding the supply chain leading the PUFF brand Disposable Vapes to the individual

consumer:[121]

> EVO Brands, LLC and PVG2, LLC receive and deliver
> ENDS products without a marketing authorization order.
> Specifically, PVG2, LLC receives the products, including
> those listed below, from a foreign manufacturer and
> distributes those products in the United States to some or all
> of the retailers listed on https://puffbar.com. EVO Brands,
> LLC and/or PVG2, LLC owns and operates the website
> https://puffbar.com, which lists the products below for sale,
> identifies retailers that sell those products, and directs
> consumers to those retailers. Such retailers . . . are found in
> the "Store Locator" tab of https://puffbar.com.

205.    Upon information and belief, PUFF brand Disposable Vapes not only continued to

be marketed and sold in the U.S. after the 2022 FDA Warning Letter, but all the while—dating

from its inception, through its first and second Warning Letters—the PUFF Defendants marketed,

distributed, and shipped their products into New York.

206.    On July 27, 2023, the FDA issued yet another warning letter, this time to ABS

Distribution Inc., a distributor of PUFF brand Disposable Vapes, for selling and/or distributing

PUFF brand Disposable Vapes that were not authorized by the FDA to be marketed and sold in

the U.S.[122]  Again, the PUFF Defendants were not deterred and continued sales in the U.S. directly

---

[120] *Id.*

[121] *Id.*

[122] Letter from Ann Simoneau, Dir., Off. of Compliance & Enforcement, Center of Tobacco Products, U.S. Food &

and through other distributors, including to New York.

207.    Upon information and belief, during the Relevant Time Period, the PUFF Defendants, including through their predecessor corporate forms, marketed, sold, and shipped Disposable Vapes to New York distributors, wholesalers, retailers and/or individual consumers and/or used https://puffbar.com to direct New York individual consumers to retail stores located in New York to purchase their Disposable Vapes.

208.    The PUFF Defendants have always deliberately marketed Puff Bar Disposable Vapes specifically to youth. Specifically, the PUFF Defendants have long known that the Puff Bar products were extraordinarily attractive and popular with underage users, and also knew that Puff Bar related content was "extremely popular" on social medial platforms, such as Instagram and TikTok.[123]

209.    The PUFF Defendants deliberately marketed their products to youth, by using the sweet and fruity flavors known to appeal to youth, by using colorful, animation-themed campaigns, and by taking advantage of user-generated social media content as a core marketing channel. Indeed, many clearly youth-targeted Instagram posts, such as the below posts, included "#puffbar"

---

Drug Admin., to Amanpreet S. Kohl and ABS Distribution Inc. (July 27, 2023), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/abs-distribution-inc-660030-07272023 (last visited Feb. 14, 2025).

[123] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.94, at 132.

and/or "#puff" hash tags:[124]





lookitsmj • Follow
The Vapor Shop Vape Bar and Vape Lounge

lookitsmj I probably need to get some more puff bars before I leave 🤭 @puffbarofficial
Especially since I don't want to be traveling around with my box mods and mechs.
📷 @edwinjovel_ 📓 @thevaporshop

#puffbar #vape #vapor #vaping #vapephotography #vapemodels #filipino #philippines #travel #cloudtricks #cloudchasing #cloutchasing #vapetricks

41w

dianna_krn 🔥🧡🙌
41w   1 like   Reply

View replies (2)

364 likes
JULY 16, 2019



officialpuffbar • Follow

officialpuffbar @xanxiety thank you for the support! Can we send you a box of our unreleased flavors? Are you guys ready for Raspberry 🍓🍓 Watermelon Ice?
•
•
•
•
•

#puffbars #puff #puffvape #vapepuff #puffwholesale #wholesale #wholesalevape #juul #juulcbd #cbd #juulmemes #juulpods #juultricks #juulnation #juulcentral #juulgang #vape #vapenation #vapelife #puffbar #puffbardisposable #officialpuffbars #puffbaroffical #like #like4likes #follow #followforfollowback #followtrain

fiw

895 likes
JANUARY 2

Add a comment....                    Post

71

210.    The PUFF Defendants through Beltran told the Senate Subcommittee that "the '#PuffBar' and '#Puff' hashtags each had over 900 million impressions for a total of one billion impressions."[125] In the words of its co-CEO, "'to have a billion impressions of your brand, without you having to pay for it' is 'like any company's dream.'"[126]

211.    The PUFF Defendants, including through their predecessor corporate forms, were aware of and approved dangerous social media challenges, notoriously popular among underage and risk-prone children. Specifically, for example, the PUFF Defendants indirectly marketed their products through a Puff Bar Challenge in which the user tries to take as many hits as possible off a Puff Bar in under one minute. Username "Nate420" with 369,000 subscribers, posted a YouTube video on February 23, 2020, of himself taking the Puff Bar Challenge. As of February 4, 2025, the video has been viewed 94,929 times, and it shows Nate420 collapsing on the floor following the vape trick.[127]

212.    Below is a picture of another similar video posted by username "happycloudsatx," which includes the "#puffbar" hashtag, in which a user appears to be taking the Puff Bar Challenge by smoking 15 Puff Bars at once. This video was also posted on the Happy Clouds Smoke Shop Facebook page, likewise including the "#puffbar" hashtag:[128]

---

[125] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.94, at 132.

[126] *Id.*

[127] Nate420, *Puff Bar Challenge*, YouTube (Feb. 23, 2020), https://www.youtube.com/watch?v=-X4pg7_kgq8 (last visited Feb. 14, 2025).

[128] Image  obtained from SRITA Database, https://tobacco-img.stanford.edu/wp-content/uploads/disposables/puff-bar-main/puff-bar-instagram/ig_27.jpg (last visited Feb. 4, 2025); Happy Clouds Smoke Shop, *15 Puff Bar Challenge*, Facebook (Jan. 30, 2020), https://www.facebook.com/happycloudsatx/videos/official-puffbarofficial-



213.    The PUFF Defendants also benefited from two egregious "solo break" email marketing campaigns distributed by their predecessor corporate forms during the Covid-19 pandemic in 2020. As seen below, the ads marketed directly to youth with its reference to escaping "parental texts" and an image of a young-looking woman blowing a cloud of vapor:[129]

---

puff-bar-challenge%EF%B8%8F-15-puff-bar-challenge-by-notwenyase/171012460887955/ (last visited Feb. 4, 2025).

[129] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.94, at 127-28.

 

214.    The current co-CEOs of Puff Bar were responsible for promoting Puff Bar products at the time and sent out the "solo break" email campaigns on behalf of the PUFF Defendants and their former corporate forms.[130]

215.    These marketing campaigns achieved their desired effect—brand notoriety, and by the time PUFF Defendants relaunched their products in 2021, they no longer needed to rely on traditional marketing efforts, as the PUFF brand became synonymous with Disposable Vapes, and as Patrick Beltran told the Senate Subcommittee, "from a brand perspective, 'that notoriety is

---

[130] *Id.* at 127.

great.'"[131]

216.    The PUFF Defendants knew that there were little barriers to underage purchases of PUFF Bar Disposable Vapes in retail stores. The co-CEOs admitted to the Senate Subcommittee that, "throughout 2021, the company received messages from parents stating their children were able to purchase Puff Bar products from retail stores."[132] The PUFF Defendants admitted to the Senate Subcommittee that they "didn't have a good strategy" on how to handle underage sales by retailers.[133] That failure was by design.

217.    During the Relevant Time Period, PUFF Bar Disposable Vapes were available for sale in New York retail shops and sold and/or offered for sale to New York consumers.[134]

218.    The PUFF Defendants, including through their predecessor corporate forms, have also used and continue to use confusing and inaccurate messaging as a powerful marketing tool to attract customers who were trying to learn about or purchase Disposable Vapes.

219.    The PUFF Defendants, including through their predecessor corporate forms, have made claims regarding the purported health benefits of their products despite not having obtained

---

[131] *Id.* at 130.

[132] *Id.* at 136-37.

[133] *Id.* at 137.

[134] Parents Against Vaping e-cigarettes ("PAVe"), a nonprofit national advocacy and education organization that fights the e-cigarette industry's attempts to market addictive nicotine products to youth submitted a declaration and spreadsheet in support of New York City's motion for a preliminary injunction in the City's action against several Flavored E-Cigarette manufacturers and distributors, including Defendants Magellan and Ecto World. *See* Exhibit A to the Declaration of Meredith Berkman, ECF Doc. 43-1, *The City of New York v. Magellan Technology, Inc., et al.*, Docket No. 23-cv-5880 (S.D.N.Y. 2023). PAVe conducted visits to retail stores throughout New York City in 2023 to document the proliferation of New York City retailers selling Flavored E-Cigarettes that are illegal under New York State and City laws. The spreadsheet showed the results of the store visits and includes the name of the retail store, whether the store was a licensed vapor products retailer, and identified examples of the Flavored E-Cigarette brands available at each store. PUFF brand Disposable Vapes were available for sale at several retail stores.

FDA approval to make a modified risk claim.

220.    The Puff Bar website at one time stated that "Puff Bar was founded with three core values in mind: simplicity, value, and offering a healthier alternative to cigarettes."[135]

221.    The Puff Bar website also at one time made the following representations regarding its Flavored E-Cigarettes:[136]

   a.    Made from medical-grade soaked cotton with 5% salt nicotine and flavoring, the Puff Bar heats liquid to produce vapor without burning carcinogens.

   b.    Smoking isn't cheap, so we want a product that motivates you not just for health reasons.

   c.    Value is important because smoking cigarettes is not cheap habit. Making the switch shouldn't only be a health-conscious decision but a budget-friendly one as well.

   d.    Quit smoking today with Puff Bar. Over 24 options to choose from. Traditional cigarettes contain a laundry list of chemicals that are proven harmful. There is still more research to be done on the negative effects of vaping, but we believe it is the healthier alternative and adults should have that choice. **Plus** you won't smell like an ash tray.

222.    The PUFF Defendants were not authorized to make these deceptive and unfounded claims, which ultimately outstated the benefits of smoking their products and actively concealed the harms.

223.    According to the 2024 Senate Report on the Rise of JUUL and Puff Bar, the PUFF Defendants ceased all marketing and sales of its nicotine Disposable Vapes following the 2022 FDA Warning Letter to PUFF Defendants and have since pivoted to marketing and selling

---

[135] Puff Bar Defendants Answer to Second Amended Complaint, ¶ 52, ECF Doc. 59, *Lara v. Puff Bar, et al.*, Docket No. 20-cv-8030 (D.N.J. 2020).

[136] Letter from Ann Simoneau, *supra* n.21.

purportedly zero-nicotine Disposable Vape and cannabis products. [137]

224. However, the PUFF Defendants' website, as of November 2023, raised doubt on whether the PUFF Defendants' purportedly nicotine-free products actually contain zero nicotine.

225. The PUFF Defendants have made confusing and conflicting claims regarding their zero-nicotine Disposable Vapes. At times during the Relevant Time Period, PUFF Defendants described their zero-nicotine Disposable Vapes as being "nicotine free" but also having "5% nicotine" on the very same screen in which the products were offered for sale.

226. As an aside, zero-nicotine Disposable Vapes are harmful. Among other reasons, multiple studies and tests have demonstrated that Flavored E-Cigarettes marketed as having zero-nicotine have at least trace amounts of nicotine, if not significant quantities, in addition to other toxic chemicals. [138]

227. As of December 17, 2024, the PUFF Defendants continued to market and in fact sold into New York a strawberry flavored zero-nicotine Disposable Vape purchased from their website, https://puffbar.com, demonstrating that sales from their website continue.

228. Thus, in addition to being the enterprising creators of the Disposable Vape craze among youth, and continuing to push a product that is the model for each of the other Defendant's

---

[137] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.94, at 142.

[138] *See, e.g.*, Goniewicz ML, Gupta R, Lee YH, Reinhardt S, Kim S, Kim B, Kosmider L, Sobczak A. *Nicotine levels in electronic cigarette refill solutions: A comparative analysis of products from the U.S., Korea, and Poland*. Int J Drug Policy. 2015 Jun;26(6):583-8. doi: 10.1016/j.drugpo.2015.01.020. Epub 2015 Feb. 7, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC4457636/ (last visited Feb. 4, 2024); https://www.theguardian.com/society/2023/sep/23/nicotine-free-vapes-sold-on-amazon-found-to-contain-nicotine (last visited Feb. 4, 2025); https://www.ascendantny.com/no-nicotine-vape/#:~:text=No%2Dnicotine%20vapes%20are%20electronic,been%20found%20to%20contain%20nicotine (last visited Feb. 14, 2025).

Disposable Vape products, the PUFF Defendants targeted adolescents throughout the Relevant Time Period by, among other things, (i) using flavors, bright colors, and themes that were deliberately designed to attract children, including fruity and candy flavors, (ii) innovating the Flavored E-Cigarette devices into the ubiquitous, small, cheap, ready-to-use Disposable Vapes that have become known to be easily concealable from parents and other adults, and (iii) utilizing social media to gain brand recognition to market and reach underage customers with their false premise-that Flavored E-Cigarettes are harmless fun when in fact they are dangerous and illegal.

229.    Moreover, by their commercial conduct throughout the Relevant Time Period the PUFF Defendants repeatedly violated the PACT Act by, among other things, upon information and belief, failing to maintain detailed records and submit reporting to New York State and other regulators. Also, the PUFF Defendants also repeatedly violated New York's Public Health Law, by, among other things, (i) ignoring New York's complete retail ban on Flavored E-Cigarette products, (ii) failing to make any of the legally required disclosures concerning their products' harmful ingredients, and (iii) routinely and illegally shipping their Flavored E-Cigarette products to their New York customers.

230.    Without Puff Bar's earlier influence and marketing, none of the other Defendants would have been able to position themselves as currently successful players in the Flavored E-Cigarettes market.

### B.  The DEMAND Defendants – *The Biggest Flavored E-Cigarette Importer and Master Distributor*

231.    Magellan and Demand Vape (together, the "DEMAND Defendants") are corporate affiliates, importing and distributing respectively, Flavored E-Cigarettes, including Disposable

Vapes, upon information and belief, more than any other company in the U.S.  Together, these New York-based Defendants, upon information and belief, marketed, sold, and shipped more products to New York-based purchasers than any other Defendant during the Relevant Time Period.

232.    Magellan's indirect and Demand Vape's direct substantial sales into New York include sales and shipments to e-cigarette distributors, wholesalers, and retailers throughout the Relevant Time Period.

233.    Some examples of the DEMAND Defendants' enticing products are:

    a.  Novo Bar AL 6000 Disposable- Sugar Rush (Demand Vape Exclusive)

    b.  Lost Vape Orion Bar 7500 Summer Love Edition- Wild Berry Bliss (Demand Vape Exclusive)

    c.  Candy King Gold Bar Disposable 5%- Rainbow Dweebz

    d.  Geek Bar Pulse Disposable 5%- Tropical Rainbow Blast

    e.  Raz TN9000 Disposable 5%- Graham Twist

234.    Defendant Magellan is the purchasing arm for Demand Vape and imports or causes to be imported from China into the U.S. Flavored E-Cigarettes exclusively for Demand Vape's distribution, including into New York.  Demand Vape sells a wide range of Flavored E-Cigarettes, including but not limited to, Magellan's trademarked products, such as Hyde, Juno, and Raz.[139]

235.    In this way, the "DEMAND Defendants" are affiliates and sister companies that

---

[139] In December 2023, the Raz trademark was assigned by Magellan to a Delaware limited liability company which trademark records indicate has a principal place of business at the identical address as Demand Vape in Buffalo, New York.

operate a common enterprise to sell Flavored E-Cigarettes to retailers and distributors in New York.

236.    The DEMAND Defendants have been in the vapor product business since 2013. Matthew J. Glauser, the President of Magellan, as well as the Chief Strategy Officer and a co-founder of Demand Vape got in on the ground floor of the electronic cigarette industry in the U.S. in approximately 2007.

237.    Since then, according to the DEMAND Defendants' own statements, they have become "one of the largest—if not the largest—e-cigarette distributor in the United States, offering approximately 30,000 products and selling to approximately 5,000 retailers in 49 states and internationally, with approximately 283 employees, a monthly payroll in the millions, and annual revenue between $500 and $600 million."[140]

238.    The DEMAND Defendants' portfolio includes approximately 8,000 or more SKU codes that correspond to Flavored E-Cigarettes.  Upon information and belief, many of these Flavored E-Cigarettes were first marketed after 2016, and none of these products have FDA premarket authorization.

239.    Many of the DEMAND Defendants' products also include youth-attracting flavors and visuals, such as rainbow cotton candy, grape bubblegum, mint with visuals evocative of the game Candyland, and blueberry lemonade with a bored ape non-fungible token (NFT) figure.

240.    Since 2013, Mr. Glauser, in his capacity within the DEMAND Defendants, has

---

[140] Magellan Technology Inc.'s and Ecto World LLC's Answer to Amended Complaint, *City of New York v. Magellan Technology et al.*, 1:23-cv-05880, Dkt. 122 ¶ 81.

frequently visited China, where 99% of e-cigarettes are made, and developed close business relationships with several Chinese manufacturers. For example, since 2014, he made 15 visits to a single manufacturing factory in China, positioning the DEMAND Defendants to serve as the Chinese Manufacturer's master distributor.

241.    Mr. Glauser, likewise in his capacity as leader of the DEMAND Defendants, on information and belief, also has attended over 50 trade shows a year for several years and visited approximately one thousand brick and mortar retail outlets, such as vape shops and convenience stores that sell e-cigarettes yearly.

242.    In 2019, reporting indicated that most of Demand Vape's sales came from Juno-branded products, and that "Demand Vape has a leading position in the industry, aside from Juul Labs."[141]

243.    According to the DEMAND Defendants, in approximately 2020 and 2021, the Hyde Brand of Products became their bestselling product.

244.    Then, in October 2021, the DEMAND Defendants started distributing the popular Elf Bar brand.  By 2022, Elf Bar eclipsed Hyde to become the number one product in the U.S., even more popular than legal alternatives Vuse and Juul.

245.    In 2022, Elf Bar represented between 25-35%, or hundreds of millions of dollars, of the DEMAND Defendants' overall revenue.

246.    Following the Puff Bar model, Hyde and Elf-Bar vapes, in contrast to pod systems,

---

[141] Dan Miner, *Up in Smoke? Demand Vape's explosive growth in Buffalo runs into regulatory, legal questions*, BUFFALO BUSINESS FIRST, Nov. 8, 2019, *available at* https://www.bizjournals.com/buffalo/news/2019/11/08/up-in-smoke-demand-vape-s-explosive-growth-in.html (last visited Feb. 19, 2025).

are disposable products which are "ready-to-use for consumers."[142]

247.    According to the DEMAND Defendants, "The disposable category has very much become like the mainstream staple category of this entire industry." They also stated that disposables offer the same kind of convenience as cigarettes and are "night and day" compared to open system products "from an ease-of-use perspective" and that the popularity of Disposable Vapes is attributable to being more convenient for the consumer or everyday smoker and "much more accessible to the masses."[143]

248.    The DEMAND Defendants stated that they were selling Elf Bar, during the Relevant Time Period, "faster than we could get it in," and that Elf Bar products provided a profit margin of about 30% per device, compared to the 15% average across other products.[144]

249.    Those significant profits have enabled the DEMAND Defendants to exponentially increase their business.

250.    For example, recently, the DEMAND Defendants were reported to be vastly expanding their operational footprint. In January 2024, they purchased an additional warehouse on 1370 William Street in Cheektowaga, New York, for approximately $4 million. Then, six months later, in June 2024, they purchased yet another warehouse for $6.5 million at 3500 Genesee Street because they still needed more space. The DEMAND Defendants are also tenants of a warehouse at 132 Dingens Street in Buffalo, New York.

---

[142] *See* Defendants Consolidated Opposition to Motion for Preliminary Injunction, *VPR Brands v. Shenzhen Weiboli Technology Co. Ltd, et al.*, 9:22-cv-81576-AMC, (S.D.F.L.) Dkt. 32 at 14.

[143] *VPR Brands v. Shenzhen Weiboli et al.*, Dkt. 60 at 94-95.

[144] *Id.* at 98, 119.

251.    According to the DEMAND Defendants they "primely [sic] sell directly to the vape shops, smoke shops, and convenience stores, but we do master distribute a lot of products as well."[145]

252.    The DEMAND Defendants remain the master distributor of Hyde and Juno products. Some of those products are manufactured for them in China, and then imported to the U.S. for sale. Upon information and belief, these Chinese manufacturers and suppliers do not have a presence in the U.S. Thus, Magellan as the purchaser and importer and Demand Vape as the first domestic distributor are deemed manufacturers for purposes of N.Y. Pub. Health L. § 1700, *et seq.*

253.    The DEMAND Defendants are also a master distributor for the Elf Bar brand and related brands, and a master distributor for several other brands such as Geekvape, Raz, and Smok, the maker of Spaceman. Magellan as the purchaser and importer and Demand Vape as the first domestic distributor are deemed manufacturers for purposes of N.Y. Pub. Health L. § 1700, *et seq.*

254.    As a master distributor the DEMAND Defendants receive "certain preferential treatment, including heavily discounted pricing, early access to newly released products, custom designed and manufactured products (OEM), and specialized packaging."[146]

255.    According to the DEMAND Defendants, as to the Chinese companies with which they have a master distribution arrangement, they have a partnership that goes beyond just a buying and selling relationship. They are in constant communication, and they provide their Chinese partners with valuable information to develop successful products for their mutual benefit.  For

---

[145] *Id.* at 87:21-23.

[146] *VPR Brands v. Shenzhen Weiboli et al.*, Dkt. 107-2 at ¶ 17.

example, the DEMAND Defendants conduct customer surveys where they offer free samples of Flavored E-Cigarettes in exchange for feedback about new flavors, which are then manufactured in China, and then imported and distributed through the DEMAND Defendants.

256.    At the same time, the Chinese manufacturers share product samples, product images, and marketing and promotional material, allowing the DEMAND Defendants to actively participate in the promotion and marketing of these products to their extensive U.S. customer base, rather than function as a fully independent, third-party distributor.

257.    For instance, Demand Vape, with Defendant Happy Distro, *infra* ¶¶ 288-319, acted as U.S. representatives of the Spaceman line of Disposable Vapes at the 2024 Champs Trade Show in Las Vegas in July 2024:



258.    Spaceman's use of its own social media account to attribute its in-person marketing and event participation to Demand Vape and Happy Distro illustrates that each of these Defendants has a fundamental level of control over Spaceman's branding, marketing, and reach in the U.S.

84

Moreover, Spaceman would not entrust its image in the U.S. to master distributors who are not aligned with its message—one that recklessly entices underage use.

259.    Indeed, shortly after that trade show, Spaceman posted a video to their official Instagram account of a young adult doing vape tricks with the caption "Vape Trick Thursday incoming! 👑 Show off your vape trick using any Spaceman device and mention us to get reposted. 💡":



260.    Similarly, upon information and belief, Demand Vape was likewise the U.S. representative for Geek Bar at the 2024 Champs Trade Show in Atlantic City and, along with

Happy Distro, a U.S. representative for Geek Bar at the 2024 Champs Trade Show in Las Vegas. Accordingly, Demand Vape and Happy Distro operate as master distributors to Geek Bar, but also actively participate in the promotion and marketing of these products to their extensive U.S. customer base.

261.    And Geek Bar's message is as transparent as that of Spaceman—one that Demand Vape and Happy Distro push to their joint commercial benefit.  For instance, the Geek Bar ("geekbarvape") Instagram account regularly advertises their products with posts featuring young people and using colors, filters, and social media interactive elements.[147] that appeal to youth:



262.    According to the DEMAND Defendants, in 2019, they were the "single largest wholesaler and distributor of [e-cigarettes] to vape shops in the state of New York" and 90% of

---

[147] *See supra* ¶ 41.

their products would qualify as flavored e-liquid under a precursor regulation to the 2020 flavor ban.[148] Upon information and belief, Demand Vape remains the single largest wholesaler and distributor of Flavored E-Cigarettes in New York State.

263.    In New York, the DEMAND Defendants' key customer base consists of over 500 shops, which Demand Vape admitted would go out of business if they ceased selling flavored e-liquid products, their most popular products.

264.    Despite the flavor ban, which became effective despite the DEMAND Defendants opposition through a purportedly third-party industry association, called Vapor Technology Association, the DEMAND Defendants continue to sell banned Flavored E-Cigarettes to New York distributors, sub-distributors, and retailers, which then ultimately sell the products to the New York public, especially its youth.

265.    The DEMAND Defendants have profited immensely from their illegal sales and shipments into New York during the Relevant Time Period:

   a.  From 2018-2024, Demand Vape has made approximately $389 million in revenue from New York state sales and sold at least 54 million units of product.

   b.  During the month of June 2023 alone, Demand Vape made approximately $11.4 million in revenue from New York sales and sold approximately 1.7 million units into the State.

266.    Throughout the Relevant Time Period, the DEMAND Defendants made thousands of sales to New York retailers each year.

267.    The DEMAND Defendants have not registered with the DTF and do not file PACT

---

[148] Glauser Decl., *Vapor Technology Association et al. v. Cuomo*, 906514-19, Dkt. 17 ¶¶ 2-5, 7-8.

Act reports with New York State, even though they are required to do so.

268.    The DEMAND Defendants routinely engage in interstate commerce as defined by the PACT Act because they import their vapor products from China into New York, and they have repeatedly sold their vapor products to entities on Indian reservations.

269.    Upon information and belief, the DEMAND Defendants have repeatedly delivered Flavored E-Cigarettes in quantities in excess of 10 pounds in a single shipment. For example, in a February 23, 2022 order, the DEMAND Defendants shipped 900 Hyde-branded Blue Razz Disposable Vapes to Defendant Price Point by common carrier.  At 10 mL of e-liquid per e-cigarette, the DEMAND Defendants shipped at least 9 Liters, or approximately 20 pounds, of Blue Razz Disposable Vapes. That shipment contained other Disposable Vapes as well, making the total weight of that single shipment even higher. Similarly, in a January 6, 2023 order, the DEMAND Defendants shipped 16,500 Hyde Minty O's Disposable Vapes to A&D Wholesale of WNY Inc., by common carrier. Each Minty O Disposable Vape contains 10 mL of e-fluid, which means the DEMAND Defendants shipped at least 165L, or approximately 363 pounds. That shipment also contained additional Disposable Vapes, approximately totaling 1,049L, making the total weight of the shipment at least about 2,307 pounds.

270.    Upon information and belief, the DEMAND Defendants also illegally shipped Disposable Vapes through the USPS. Some of those shipments went to retailers, such as Big Indian LLC d/b/a Big Indian Smokeshop in Irving, New York, and the Parish Mini Mart in Parish, New York.

271.    On the DEMAND Defendants' website, demandvape.com, under the heading

88

"Delivery Information," they state that, "packages delivered from demandvape.com must be signed by an adult 18 years or older upon delivery," and note only Massachusetts and Texas as states where the adult must be 21 years old.[149] However, the minimum age for the purchase of vapor products in New York is likewise 21 years, and the DEMAND Defendants' omission falsely suggests otherwise.

272.    Upon information and belief, the DEMAND Defendants routinely accepted import shipments falsely labeled as "battery chargers," even though they were aware that the contents were Flavored E-Cigarettes.

273.    Similarly, Demand Vape received shipments of Disposable Vapes from Defendant Happy Distro, where the shipment was in excess of 10 pounds, and the bill of lading not only did not contain the necessary labelling, it also falsely stated that the shipment contained "smoke detectors."

274.    The DEMAND Defendants sell Disposable Vapes through their website demandvape.com, as well as separate domains that they own and control, such as www.hydedisposables.com.

275.    The demandvape.com website alone received over 100,000 visitors per month from October to December 2024.

276.    Through their website, the DEMAND Defendants offer discounts on Flavored E-Cigarettes through banners advertising promos and everyday deals. For example, during the

---

[149] https://www.demandvape.com/delivery-information (last visited Feb. 5, 2025).

Relevant Time Period, it offered select Disposable Vapes for $2, and discounts, such as 50% off all UWell/Caliburn vapes and 20% of Geekvape Q-kits for Black Friday.

277.    In December 2024, the DEMAND Defendants' website prominently advertised Disposable Vapes in red and green Christmas edition colors. Some of the advertisements included snow men, north pole imagery, or the inclusion of limited-edition swag, like Raz-branded Christmas socks, with each purchased vape.

278.    The DEMAND Defendants also advertise exclusive flavors, products and bundles for Flavored E-Cigarettes that include swag, such as trucker hats, stickers, gift boxes, and lanyards.

279.    Some of these advertisements promising branded swag or other gifts remain on their website, even after New York's 2024 prohibition on giveaways and promotions of that kind. N.Y. Pub. Health L. § 1399-bb-1. *See supra* ¶ 107(b).

280.    The DEMAND Defendants' website, HydeDisposables.com, likewise advertises the affordability and ease of use of their products, boasts that they have so many flavors, and suggests that you can travel on airplanes with them.

281.    In addition to their websites, during the Relevant Time Period, the DEMAND Defendants actively marketed their Flavored E-Cigarettes through YouTube and Instagram. For example, the profile "officialhydedisposable" contains a vape trick photo, photos of the flavored disposable products, and includes a link to the Hydedisposable.com website.



282.    Also, through the DEMAND Defendants' website, demandvape.com, the DEMAND Defendants directly market Raz Disposable Vapes using a youth-appealing font and names meant to evoke the children's fruit snack Gushers: [150]

---

[150] https://www.demandvape.com/raz-ltx-25k-gush-edition-disposable-5-display-box-of-5-master-case-of-150 (last visited Feb. 5, 2025).



283.    The DEMAND Defendants have long been aware that their commercial conduct is

illegal.    For instance, the DEMAND Defendants have previously admitted to selling Disposable

Vapes that have not been granted premarket authorization by the FDA. [151]

284.    Demand Vape argued in federal court in 2022 that selling an electronic cigarette

that was first marketed after 2016 and which did not have an FDA marketing authorization order

---

[151] Dkt. 122 Answer to Amended Complaint, *City of New York v. Magellan Technology, Inc. et al.*, 1:23-cv-05880-LLS at ¶ 84.

is unlawful behavior.[152] Thus, Demand Vape sells several brands and products that by their own acknowledgement are unlawful to sell.

285.    In October 2018, Defendant Magellan received a warning letter from the FDA for manufacturing, *inter alia*, certain flavored Juno-branded products without premarket authorization.[153] And in 2019, the FDA inspected Magellan's warehouse and applied a "VAI" designation to the inspection,[154] meaning that "objectionable conditions or practices were found, but the agency is not prepared to take or recommend any administrative or regulatory action."[155]

286.    Thus, in addition to becoming the top master distributor of Flavored E-Cigarettes in New York and the country, the DEMAND Defendants have targeted adolescents throughout the Relevant Time Period by, among other things, (i) marketing and designing their own trademarked brands and others through partnerships with Chinese manufacturers to use flavors, bright colors, and themes that are deliberately designed to attract children, including fruity and candy flavors, (ii) concentrating their sales efforts on Disposable Vapes, which are most accessible by price and form to adolescent use, and (iii) utilizing social media, including influencers, to market and reach underage customers with their false premise-that Flavored E-Cigarettes are harmless fun when in

---

[152] *VPR Brands v. Shenzhen Weiboli et al.*, Dkt. 32 at 3, 7-9; Dkt. 81 ¶¶ 7-17.

[153] Letter from Ann Simoneau, Dir. Off. of Compliance and Enforcement, Center for Tobacco Products, to Mr. Anes Ali President, Magellan Technology Inc. (Oct. 12, 2018), available at https://fda.report/media/117535/IHCTOA+Unauthorized+Marketing+Letter+Magellan.pdf (last visited Feb. 19, 2025).

[154] https://datadashboard.fda.gov/ora/firmprofile.htm?FEIi=3011704622&identity=3011704622 (last visited Feb. 5, 2025).

[155] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-basics/inspection-classifications (last visited Feb. 5, 2025).

fact they are dangerous and illegal.

287.    Moreover, by their commercial conduct throughout the Relevant Time Period the DEMAND Defendants repeatedly violated the PACT Act by, among other things, (i) shipping packages many times over the 10-pound legal weight limit, (ii) failing to maintain detailed records and submit reporting to New York State and other regulators, and (iii) illegally using the USPS to ship their Flavored E-Cigarette products.  Moreover, the DEMAND Defendants have also repeatedly violated New York's Public Health Law, by, among other things, (i) ignoring New York's complete retail ban on Flavored E-Cigarette products, (ii) failing to make any of the legally required disclosures concerning their products' harmful ingredients, (iii) selling swag, (iv) routinely and illegally shipping their Flavored E-Cigarette products to their New York customers, and (v) using illegal discounts to maximize their reach and sales.

### C.  Happy Distro – *The Master Distributor Who Exerts Control Upstream and Downstream*

288.    Happy Distro is a major distributor of Flavored E-Cigarettes, including Disposable Vapes, which marketed, sold, and shipped a substantial number of products into New York during the Relevant Time Period.

289.    Happy Distro's substantial sales into New York include sales and shipments to e-cigarette distributors, wholesalers, and retailers throughout the Relevant Time Period.

290.    Some examples of Happy Distro's enticing products are:

a.   Funky Republic Ti7000 Rainbow Cloudz

b.   Geek Bar Meloso Mini- Gummy Bear

c.   Geek Bar Pulse- Fcuking Fab

94

    d.  Novo Bar AL6000- Strawberry Shake

    e.  iJoy 8000 Puff- Cotton Candy

291.   Happy Distro conducts its business through a network of fictious affiliates, subsidiaries, and/or purportedly separate entities, all of whom it directly controls and all of whom do business collectively as Happy Distro. For example:

    a.  FT Distro Inc. an entity with a principal place of business in Richardson, TX and an additional place of business in Tucson, AZ, has shipped Flavored E-Cigarettes products to New York. On at least one shipping invoice from FT Distro Inc. to New York retailer Vape Ranger, Happy-Distro.com is listed as the place to report customer service issues.

    b.  DKSS Distribution Inc., an entity with a principal place of business in Addison, TX, has shipped flavored disposable vapor products to New York. Xin Wang is the agent authorized to accept service for both DKSS Distribution Inc. and YLSN Distribution Inc. On at least one shipping invoice from DKSS Distribution Inc. to New York retailer Vape Ranger, Happy-Distro.com is listed as the place to report customer service issues. Moreover, in a Reddit Post looking to hire a marketing analyst for DKSS Distribution Inc. the description reads: "About us[:] Happy Distro is a small business in Richardson, TX. We are professional, agile, innovative and our goal is to To Be the Biggest B2B Company."[156]

    c.  For at least some segment of the Relevant Time Period, Happy Distro also conducted business through Rocky-MountainWholesale.com as an alternative website.

292.   Happy Distro conducts or has conducted a substantial portion of its business through the website https://www.happy-distro.com.[157]

---

[156] https://www.reddit.com/r/MarketingJobsHub/comments/1hh2635/hiring_prouduct_marketing_analystmandarin_speaker/?rdt=47263 (last visited Feb. 18, 2025).

[157] Happy Distro also conducted business through the website https://rocky-mountainwholesale.com/ during the Relevant Time Period. The Rocky-MountainWholesale.com website stated that, "we provide fast shipping with USPS and local deliver (sic) team. You can order from anywhere, anytime[,]…Happy-Distro.com will make the best effort to ship items in a timely manner." *Formerly at* https://rocky-mountainwholesale.com/ and https://rocky-

293.    On their website, Happy Distro boasted that "over 10,000 vape business proprietors place their trust in Happy Distro," and that they were "the fastest-growing distribution company in the vape industry for two-consecutive years."[158]  Upon information and belief, a significant portion of that business came from New York customers.  For instance, in 2022, New York was the ninth highest state in terms of revenue for Happy Distro, solidifying New York's significance to Happy Distro's portfolio.

294.    Through their website, Happy Distro also claimed to "[i] offer a range of resources and strategies to help vape retail stores expand their customer base and increase sales…[ii] foster a partnership approach that empowers vape wholesalers to collectively strengthen their marketing presence…and [iii] offer tailored solutions to maintain your [vape] brand image through strategic brand marketing."[159]

295.    In other words, Happy Distro did not only distribute Flavored E-Cigarettes to New York customers, but it actively and openly endeavored to control the sales strategies and brand marketing downstream as well.

296.     Through its website, Happy Distro also claimed to be a trusted partner of renowned brands of Flavored E-Cigarettes worldwide, such as Airmez, Chillax, Geek Bar, iJoy, Lost Mary, Lost Vape Orion Bar, Meloso, Rab Beats, and Spaceman. Indeed, upon information and belief, Happy Distro is a master distributor of Chinese-manufactured and imported brands

mountainwholesale.com/shipping-policy/ (retrieved Dec. 30, 2024).

[158] *Formerly at* happy-distro.com (retrieved Nov. 14, 2024).

[159] *Id.*

Geek Bar, iJoy, iMiracle products (such as Lost Mary), and Spaceman.

297.    Through these "partnerships," Happy Distro has also actively and openly endeavored to control the strategies and brand marketing upstream too.  For instance, Happy Distro advertised a now expired job posting, titled "Geek Bar Flavor Tester (Vape)" with the following job description: "Flavor Specialist will be responsible for developing new flavors for our electronic cigarette products, providing feedback on existing flavors, and ensuring the successful development of new flavors through effective communication with relevant personnel."[160]  By directly employing a Geek Bar-specific "flavor specialist" to "develop[] new flavors…[and] ensur[e] the successful development of new flavors," Happy Distro's behind the scenes control of its manufacturer partner's product development and marketing clearly oversteps that of a neutral, downstream distributor.

298.    Happy Distro's efforts have paid off.  Its leading brands are incredibly popular among youth.  For instance, the 2024 National Youth Tobacco Survey estimated that 90,000 underage users reported using Geek Bar in the prior month.[161] This is likely an underestimate since Geek Bar was only a write in option and has grown in popularity since the data for the survey stopped being collected in May 2024. Upon information and belief, these national trends hold true in New York as well.

299.    Happy Distro also has a Purchase and Sale agreement with Hong Kong-based vapor

---

[160] https://www.simplyhired.com/job/73Kxu1hbRCT7aY5nbFa7ER939tCOZmU_GBK6A0Kn6HEMIGvfJufLZw
(last visited Feb. 5, 2024).

[161]  2024 E-Cigarette Use Among Middle and High School Students, *supra* n.13, at 917-24.

products seller and importer Value Personal Limited to buy multiple brands of vapor products at a negotiated price.

300.    Despite its lucrative position as a Master Distributor, and first domestic distributor, Happy Distro has failed to make any ingredient disclosures to the NYSDOH at any time.

301.    In addition, to the brands listed above, Happy Distro's catalog includes Disposable Vapes from other popular brands, such as Death Row (featuring Snoop Dogg), Elf Bar, EB Create, and sometimes boasts of close collaborations with these brands.  Their comprehensive catalog thereby includes many products attractive to youth, with advertising and marketing themes that include celebrities, comic strips, gummy-bear flavors, and skull imagery.

302.    Happy Distro's marketing material also includes Geek Bar-branded swag, like hats, shirts, and notebooks, as well as Lost Mary-branded shirts, hats, and gift bags for purchase, despite these items being illegal in New York.

303.    Happy Distro's harmful imprint on the Disposable Vape industry—both upstream and downstream—is apparent through its direct youth-appealing marketing, which downplays the harmful effects of vaping in favor of highlighting a casual, fun experience.  For instance, Disposable Vapes were advertised as "Every day [*sic*] use vapes" next to a picture of a youthful user on Happy Distro's alternative website, Rocky-MountainWholesale.com: [162]

---

[162] *Formerly at* https://rocky-mountainwholesale.com/ (retrieved Dec. 30, 2024).



304.    Happy Distro self-describes its business as a "wholesale distributor of vapor products,"[163] including Flavored E-Cigarettes, which it has intentionally and repeatedly marketed and sold into New York State since 2022 and with great success.

305.    For instance, Happy Distro made over $1 million in revenue from New York sales by selling over 165,000 units into New York in October 2022 alone.  These sales figures do not include sales that Happy Distro made through its fictitious affiliates, DKSS or FT Distro.

306.    For the time period January 2022 through February 2024, Happy Distro made at least $ 4.2 million in revenue from New York-based sales, by selling approximately 701,000 units over that period. Again, these sales figures do not include sales that Happy Distro made through its fictitious affiliates, DKSS or FT Distro.

---

[163] Declaration of Xin Wang, *VPR Brands v. Shenzhen Weiboli et al.*, Dkt. 132-6 at ¶ 4.

307.    Among these sales, Happy Distro has sold to at least 25 New York customers, including Defendants Price Point and Demand Vape. *See infra* ¶¶ 497-498.  At least two of those customers were retailers purchasing Flavored E-Cigarettes beyond the scope of their licensing, and on information and belief at least one, Syltech Trading LLC, was a retailer in New York State that was unlicensed to sell even legal vapor products at the time of its purchase from Happy Distro.

308.    Moreover, Happy Distro has sold Flavored E-Cigarettes into New York State at a discount. For example, on an October 31, 2022 invoice, Happy Distro applied a discount in excess of $12,000 on a nearly $196,000 order placed by D2D Distro, a Mineola, New York entity.

309.    Happy Distro or its agents have failed to include the necessary labelling on their bills of lading, as required by the PACT Act.

310.    More troubling, Happy Distro has knowingly and repeatedly shipped Disposable Vapes to New York by falsely indicating that the shipments contained smoke detectors on the bills of lading, rather than their true content—vapes.

311.    Additionally, Happy Distro has knowingly and repeatedly shipped or caused to be shipped packages over the 10-pound weight limit on single shipments of Disposable Vapes.

312.    For example, on May 12 and May 23, 2023, Happy Distro shipped Disposable Vapes to Defendant Demand Vape. The corresponding bills of lading did not contain the necessary labeling, the shipments were over 10 pounds, and the shipments were described as "smoke detector[s]" in the description.

313.    In yet another violation of applicable law, Happy Distro has shipped Disposable Vapes to New York through the USPS. For example, in June 2022, Happy Distro mailed Elf Bar-

100

branded Disposable Vapes to OJ's Smokeshop in Steamburg, NY, via the USPS.

314.    Happy Distro has also failed to include the required information in their PACT Act reports submitted to the Department of Taxation and Finance. For example, the PACT Act submissions for YLSN Distribution Inc. from 2022-2024 did not include the name, address, and phone number of the person delivering the shipment.

315.    In addition to their websites, Happy Distro uses Facebook, Instagram, and YouTube to directly advertise Disposable Vapes. For instance, in May 2024, on Facebook and Instagram, Happy Distro advertised access to an exclusive chat for Electric Daisy Carnival attendees where they offered $5 off Geek Bar and a free gift.  For all followers, they offered future discounts and free merchandise.

316.    As discussed *supra* ¶¶ 257-261, Happy Distro was one of the two U.S. faces of Spaceman and Geek Bar at the Champs Trade Show in Las Vegas.  Both Spaceman and Geek Bar have an active social media presence where they promote their products using vape trick videos, videos from music festivals, and other posts. Like Demand Vape, given that Happy Distro is actively engaged in development and marketing on behalf of its "partner" manufacturers, Happy Distro is not only aware of the harmful imagery, tactics, and messaging on Spaceman and Geek Bar's social media outlets, Happy Distro controls and perpetuates it.

317.    Happy Distro argued in federal court in 2022 that selling an electronic cigarette that was first marketed after 2016 and which did not have an FDA marketing authorization order is

unlawful behavior.[164]

318.    Thus, in addition to becoming a profitable master distributor of Flavored E-Cigarettes in New York and the country, Happy Distro has targeted adolescents throughout the Relevant Time Period by, among other things, (i) controlling the development and marketing of certain manufacturer partners to use flavors, bright colors, themes, and technologies that are deliberately designed to attract children, including fruity and candy flavors, (ii) concentrating its sales efforts on Disposable Vapes, which are most accessible by price and form to adolescent use, and (iii) utilizing social media through its brand representations to market and reach underage customers with its false premise-that Flavored E-Cigarettes are harmless fun when in fact they are dangerous and illegal.

319.    Moreover, by its commercial conduct throughout the Relevant Time Period, Happy Distro repeatedly violated the PACT Act by, among other things, (i) shipping packages over the 10-pound legal weight limit, (ii) failing to maintain detailed records in reporting to New York State and other regulators, and (iii) illegally using the USPS to ship their Flavored E-Cigarette products. Moreover, Happy Distro has also repeatedly violated New York's Public Health Law, by, among other things, (i) ignoring New York's complete retail ban on Flavored E-Cigarette products, (ii) failing to make any of the legally required disclosures concerning their products' harmful ingredients, (iii) selling swag, (iv) using illegal discounts to maximize their reach and sales, and (v) routinely and illegally shipping their Flavored E-Cigarette products to their New York

---

[164] *VPR Brands v. Shenzhen Weiboli et al.*, Dkt. 32 at 3, 7-9; Dkt. 81 ¶¶ 7-17.

customers.

### D.  Midwest Goods – *A Leading Distributor with a Big Media Focus*

320.    Midwest Goods Inc. is a major distributor of Flavored E-Cigarettes, including Disposable Vapes, which marketed, sold, and shipped a substantial number of products into New York during the Relevant Time Period.

321.    Midwest's substantial sales into New York include sales and shipments to e-cigarette distributors, wholesalers, and retailers throughout the Relevant Time Period.

322.    Some examples of the Midwest Goods' enticing products are:

    a.  Pillow Talk Ice Control in Sour Watermelon Gummies

    b.  Off-Stamp X Cube Powered by Lost Mary with interactive animation in Bangin Watermelon

    c.  Lucid Boost in Watermelon Bubblegum Ice

    d.  Juice Head in Rainbow Swirl

    e.  South Connect in Grape Blow Pop

    f.  Geek Bar Pulse X in Orange Fcuking Fab

    g.  Chris Brown CB15K in Apple Gummies

    h.  Iron Mike Tyson in Cake

    i.  Death Row Vapes in Candy

    j.  RODMAN by Aloha Sun in Allstar Blue Razz Ice

    k.  Gumi Bar in Strawberry Ice Cream

323.    Due to growth in operations and staff, Midwest Goods moved into their current 85,000 square foot facility, located in Bensenville, Illinois, in 2019. That facility includes a

purchasing and customer service center and is filled with over 60,000 different products, mostly comprised of Flavored E-Cigarettes. Most, if not all, of the Flavored E-Cigarettes sold or offered for sale were first marketed after 2016. The vast majority of Midwest Goods' cache of Flavored E-Cigarettes have not received premarket authorization by the FDA to be marketed and sold in the U.S.

324.    Midwest Goods markets and offers Flavored E-Cigarettes via (i) its website, at www.midwestgoods.com, (ii) an online monthly digital publication, called "ejuice Magazine," that it regularly maintains, *available at* https://ejuicemagazine.com/, together with a corresponding blog, called "Vape Life Blog," hosted on the same domain, (iii) an active YouTube channel, at https://www.youtube.com/@midwestgoodsinc/videos, which, as of February 6, 2025, has 880 subscribers, and (iv) an active Instagram account, under the username "midwestgoodsinc" with 21,200 followers as of January 10, 2025.

325.    Midwest Goods is widely regarded as a top vape distributor in the U.S. and boasts on its website that they are the "#1 Distributor for Vape & Smoke." And its business is growing. Between 2018 and 2024, the number of Midwest Goods' customers increased from approximately 7,500 to approximately 12,000 buyers.  Upon information and belief, that upward trend is consistent with its growth in business with New York customers.

326.    By their website alone, Midwest Goods has far reach.  In December 2024 alone, upon information and belief, www.midwestgoods.com had over 102,000 visitors.

327.    Midwest Goods has used its media tools, including its website and Vape Life Blog, to reach as broad an audience as possible with the false message that vaping is harmless fun.

Routinely, Midwest Goods uses its channels to overstate the benefits of vaping and falsely misrepresent or conceal the harms. This has become a powerful marketing tool to attract customers who are trying to learn about or purchase Flavored E-Cigarettes.

328.    For example, Midwest Goods published a Vape Life Blog post, dated August 19, 2021, titled "State AGs Pressure FDA to Reject Flavored Vape PMTAs," decrying the letter sent by the Attorneys General of 31 states, including New York, to then FDA Acting Commissioner Janet Woodcock calling on the FDA to ban flavored vapor products and restrict advertising and marketing.[165] Noting that New York already has a flavor ban, the post complains that the letter is the latest example of federal and state officials and anti-vape special interest groups pressuring the FDA, stating, "[i]n recent months, the federal agency has been called before a U.S. House committee hearing, received pushy letters from U.S. senators, been subjected to pressure campaigns from the Campaign for Tobacco-Free Kids and American Lung Association and harassed by a form letter campaign from an anti-vaping parent group.[166] Most alarming, it goes on to accuse Attorneys General of spreading misinformation:[167]

> The AGs repeat the unproven claim that nicotine 'has particularly harmful effects on the developing brain.'

Rather, it is Midwest Goods' misstatement that is dangerous and contrary to the substantial scientific and medical evidence on the especially harmful effects of nicotine on adolescents. *See*

---

[165] Vape Life Blog, August 19, 2021, *State AGs Pressure FDA to Reject Flavored Vape PMTAs*, https://ejuicemagazine.com/state-ags-pressure-fda-to-reject-flavored-vape-pmtas/ (last visited Feb. 6, 2025).

[166] *Id.*

[167] *Id.*

105

*infra* ¶¶ 508-514.

329.    Moreover, Midwest Goods operates with a misleading veil of legitimacy. For instance, Midwest Goods' website includes quick links for "Shipping Information," "Update Business License," "USPS Form," and "Tax Information," all of which are link headings designed to convince website visitors that the business complies with all federal and state laws. For instance, the "Shipping Information" link provides shipping carrier information and states that Midwest Goods uses USPS Ground services to ship products to the U.S. 48 states. It omits, however, that under federal law, Flavored E-Cigarettes are nonmailable, unless between "legally operating businesses," and prohibited to be deposited in or carried through the USPS.[168] As discussed above, Flavored E-Cigarettes are banned in New York, and any business that sells and ships Flavored E-Cigarettes to a business in New York, and any New York business that places an order for the products are not legally operating businesses. *See supra* ¶¶ 112-116.

330.    A deeper look into Midwest Goods' website reveals more conflicting and misleading information. For instance, the Midwest Goods website includes the broad disclaimer that "[t]he purchaser/retailer is responsible for ensuring that any products purchased are legal within their municipal, or state laws prior to sale of the products."[169]  The page goes on to state that Midwest Goods requires its customers to be a "valid retail business," and that MidwestGoods.com "reserves the right to cancel any orders that are found to be placed by non-

---

[168] *See* 18 U.S.C. § 1716E.

[169] https://www.midwestgoods.com/terms-condition/ (last visited Feb. 6, 2025).

qualified accounts." [170]

331.    But that statement does not reflect Midwest Goods' practice. Rather, Midwest Goods knew that Flavored E-Cigarettes were banned in New York, and any retail business in New York that was selling Flavored E-Cigarettes was not lawfully operating and not a "valid retail business," but it continued to enjoy remarkable profits from its prolific sales to those illegally operating establishments nonetheless.  In order to address its own responsibilities, the Midwest Goods website requires its customers to submit their business license for Midwest Goods to keep on file to show USPS that their customers are "lawfully acting businesses," all the while knowing that this is fundamentally untrue. [171] In other words, Midwest Goods collects business licenses from New York entities, is aware of New York's retail flavor ban, purports to confirm that each entity is "lawfully acting," but nonetheless has routinely sold Flavored E-Cigarettes into New York throughout the Relevant Time Period.

332.    Midwest Goods' website also presents incomplete information regarding state requirements and laws concerning vapor products. For instance, the website identifies those states for which it "collects and remits taxes," but does not identify the states which outright prohibit the sale of products advertised on its website, such as Flavored E-Cigarettes. [172]  There is no mention on the website that Flavored E-Cigarettes are prohibited in New York.

---

[170] *Id.*

[171] https://www.midwestgoods.com/update-business-information-questionnaire/?utm_source=Website&utm_medium=Link&utm_campaign=Pact+Act+Form/ (last visited Feb. 6, 2025).

[172] https://www.midwestgoods.com/tax-information/ (last visited Feb. 14, 2025).

333.    In addition, through its virtual magazine, https://ejuicemagazine.com/, which is not age-gated, and its Vape Life Blog, Midwest Goods (i) promotes the Flavored E-Cigarettes it sells, including brands endorsed by celebrities, such as singer Chris Brown and the former boxer Mike Tyson, (ii) reports on vape-related domestic and international news, including FDA regulatory process developments, enforcement actions involving Flavored E-Cigarettes, and proposed and enacted flavor bans in states and localities across the U.S., and (iii) encourages action against restrictions on vape sales, all while failing to accurately disclose the risks and harms associated with vaping.

334.    Through its YouTube outlet, Midwest Goods further communicates with the general public. Its YouTube channel includes over a hundred videos, many of which are not age-gated, and mostly promote Flavored E-Cigarettes, including the now popular smart vapes that incorporate technologies such as digital screens, interactive notifications, games, and power level/usage indicators. For instance, Midwest Goods posted a video on October 29, 2024, that promotes the North Connect Pro Disposable Vape, which features Bluetooth connectivity, a built-in speaker, 5% nicotine strength, three games, and over 15 downloadable apps, all with a vaping capacity of a staggering 40,000 puffs:[173]

---

[173] *Formerly at* https://www.midwestgoods.com/north-connect-pro-40k-puffs-20ml-disposable-device-with-bluetooth-connections-engraved-grip-texture-display-of-5-msrp-25-00-each/ (last visited Jan. 10, 2025).



335.    In these ways, Midwest Goods has been particularly focused on becoming a prolific and widely referenced source for Flavored E-Cigarette customers and business owners. These efforts have not only driven Midwest Goods' success, but also the public's general exposure to Flavored E-Cigarettes.

336.    Through partnerships and marketing and exclusive master distribution agreements, Midwest Goods also creates the market for certain Flavored E-Cigarettes. For instance, Midwest Goods is one of the U.S. global partners of Flavored E-Cigarette China-based manufacturer

Geekvape, as are Defendants Demand Vape and Safa Goods. [174] Upon information and belief, as a U.S. global partner of Geekvape, Midwest Goods imports or causes to be imported from China Geekvape brand Flavored E-Cigarettes for sale in the U.S. Upon information and belief, Geekvape does not have a presence in the U.S., making Midwest Goods, as the importer or first domestic distributor of Geek Bar products, the manufacturer for purposes of New York's Public Health Law § 1700 *et seq*.

337.    Midwest Goods also helps create and directs the Flavored E-Cigarette market through digital marketing agreements, whereby Midwest Goods develops and implements marketing plans and programs for specific products. Midwest Goods has entered into digital marketing agreements with Flavored E-Cigarette brands Fifty Bar, Monster Vape, Coastal Clouds Co., and Shenzhen Woody Vapes Technology Co.  In this way, the marketing for each of these brands is controlled and executed by Midwest Goods.

338.    Midwest Goods also creates and fills the demand for certain Flavored E-Cigarettes as exclusive master distributors of certain brands. For instance, on September 30, 2023, Midwest Goods entered into an Exclusive Master Distributor agreement with GT Wholesale, Inc., a New York-based wholesaler, and Aroma King US LLC, a manufacturer of Disposable Vapes which, among other things, has a license to use the Bugatti luxury brand name. Under the terms of the agreement, Midwest Goods and GT Wholesale were the exclusive distributors of Bugatti-branded Disposable Vapes within the territory defined under the agreement. As exclusive distributors, they

---

[174] https://us.geekvape.com/partners.html (last visited Feb. 6, 2025).

had the right to appoint sub-distributors within the territory and the sole right to determine the sales price of the Bugatti vapes. They were contractually required to purchase the Bugatti-branded vapes solely from Aroma King, to maximize the sales of the product, to promote the interests of Aroma King and Bugatti-branded vapes, and to ensure adequate supply of the Bugatti vapes.

339.    As an exclusive master distributor of Bugatti-branded vapes, Midwest Goods marketed, sold, and shipped a substantial number of Bugatti Disposable Vapes to distributors and retailers in New York during the Relevant Time Period—all while exclusively controlling the marketing, price, and availability of the products. Upon information and belief, Midwest Goods fulfilled and shipped no less than $167,000 worth of Bugatti Disposable Vapes between September 2023 and March 2024 alone into New York:

    a.  On November 30, 2023, Midwest Goods fulfilled and shipped an order of Bugatti Disposable Vapes totaling $27,000 to GT Wholesale.

    b.  On March 8, 2024, Midwest Goods fulfilled and shipped an order of Bugatti Disposable Vapes totaling $11,200 to GT Wholesale.

    c.  In September 2023 and October 2023, Midwest Goods shipped four orders of Bugatti Disposable Vapes to Vape More, a New York distributor and retailer.

340.    Several of the Flavored E-Cigarette brands Midwest Goods has in the past and/or currently offers for sale on its website and/or prominently featured in its ejuice Magazine have received FDA warning letters.  But that has been no deterrent to Midwest Goods, which continues to profit from their large inventory of Flavored E-Cigarettes. Indeed, based on their website's offerings, the overwhelming majority, if not all, of the Flavored E-Cigarettes marketed and sold by Midwest Goods were first marketed after 2016, but have not been authorized by the FDA to be marketed and sold in the U.S.

341.    Many of Midwest Goods' Flavored E-Cigarettes primarily exist in youth-appealing flavors, such as OG Tropical Blue, Strawberry Banana, Blue Razz Ice, Strawberry Watermelon, Frozen Peach, Pina Colada, and Mix Berries, and, as noted above, integrate cutting-edge youth-attractive technologies.

342.    Moreover, during the Relevant Time Period, Midwest Goods has sold and shipped into New York some of the most popular Flavored E-Cigarettes, including but not limited to Disposable Vapes brands Hyde, Geek Bar, Lost Mary, Raz, Mylé, Pod Juice, Esco Bar, Air Bar, and Elf Bar.

343.    Midwest Goods has intentionally and repeatedly marketed, sold, and shipped Flavored E-Cigarettes into New York throughout the Relevant Time Period, making millions of dollars in sales of Flavored E-Cigarettes to distributors, wholesalers, and retailers located in New York—none of whom could have been legally operating because of New York's statutory and regulatory protections.

344.    Between January 2021 and August 2024, Midwest Goods shipped orders totaling $11,258,790.86 to New York retailers. Upon information and belief, the majority of the products shipped to New York retailers were Flavored E-Cigarettes prohibited for sale under the PACT Act, New York State law, and other local laws.

345.    Between January 2021 and August 2024, Midwest Goods shipped orders totaling $35,924,407.36 to New York local distributors. Upon information and belief, the majority of the products shipped to New York distributors were Flavored E-Cigarettes prohibited for sale under the PACT Act, New York State law, and other local laws.

346.    Midwest Goods has made a staggering profit from its illegal New York business. For instance, during the Relevant Time Period, Midwest Goods shipped Flavored E-Cigarettes to GT Import & Wholesale Inc., Kayla Wholesale, Pioneer Imports LLC, Urban Smoke Distributors, Vape More Inc., G&A Dist. Inc. I, and Mahant Krupa 56 LLC/Empire Smoke Distributors. Each of these businesses is a current defendant in litigation commenced by the City of New York regarding the illegal sale and shipment of Flavored E-Cigarettes in violation of the PACT Act, N.Y. Pub. Health L. § 1399-ll, and the New York City Administrative Code § 17-715.[175] In each of these instances, Midwest Goods routinely supplied illegally operating downstream entities for its own financial benefit—sales that exceed $16 million to these 7 illegally operating buyers alone:

    a.    Between 2022 and 2024, Midwest Goods sold and shipped products totaling $10,111,451.74 to GT Import & Wholesale Inc. alone.  Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

    b.    Between 2021 and 2024, Midwest Goods sold and shipped products totaling $3,929,616.65 to Kayla Wholesale alone. Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

    c.    Between 2023 and 2024, Midwest Goods sold and shipped products totaling $1,029,319.00 to Pioneer Imports LLC alone. Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

    d.    Between 2023 and 2024, Midwest Goods sold and shipped products totaling $288,694.49 to Urban Smoke Distributors alone. Upon information and belief,

---

[175] GT Import & Wholesale Inc., Kayla Wholesale, Pioneer Imports LLC, Urban Smoke Distributors, Vape More Inc., Pioneer Distribution Inc., and G&A Dist. Inc. I are defendants in *The City of New York v. EnviroMD Group LLC*, *et al.*, Docket No. 24-cv-5161 (SDNY). *See* Second Amended Complaint, Doc. 61. Upon information and belief, Pioneer Imports LLC and Pioneer Distribution Inc. are the same or closely related entities as they have the same address. Mahant Krupa 56 LLC/Empire Smoke Distributors is a defendant in *The City of New York v. Magellan Technology, Inc., et al.*, Docket No. 23-cv-5880 (SDNY).

the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

e. Between 2023 and 2024, Midwest Goods sold and shipped products totaling $447,305.00 to Vape More Inc. alone. Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes. Midwest Goods' ongoing supply relationship with Vape More is especially troubling. Upon information and belief, Vape More's website, https://vapemoreinc.com/, advertises and sells Flavored E-Cigarettes to the New York public. The website and Vape More's owner Sunny Chawla, were the subject of a February 27, 2024 warning letter from the FDA for offering for sale or distribution Flavored E-Cigarettes that lacked an FDA marketing authorization order, including popular brands such as EBDesign (formerly Elf Bar), Funky Republic, Hyde Edge, and Lost Mary.

f. Between 2022 and 2024, Midwest Goods sold and shipped products totaling $282,382.50 to G&A Dist. Inc. I. alone. Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

g. In 2022, Midwest Goods sold and shipped products totaling $123,047.31 to Mahant Krupa 56 LLC/Empire Smoke Distributors alone. Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

347. Midwest Goods also had a lucrative business selling Flavored E-Cigarettes to their retail customers located in New York, who then sold or offered for sale the banned products to individual New York consumers. Midwest Goods' sales to just the following five retailers between 2021 and 2024 exceeded $2 million:

a. Midwest Goods sold and shipped products totaling $346,748.85 to retailer Wading River Smoke Shop. Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

b. Midwest Goods sold and shipped products totaling $665,339.54 to retailer Universal. Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

c. Midwest Goods sold and shipped products totaling $886,107.45 to retailer

General Vape. Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

d.  Midwest Goods sold and shipped products totaling $258,120.91 to multiple locations of retailer Giggles World Corp. Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

e.  Midwest Goods sold and shipped products totaling $241,837.63 to retailer Sector 4. Upon information and belief, the majority of the products Midwest Goods sold and shipped were Flavored E-Cigarettes.

348.    Midwest Goods utilized a rewards program to entice its customers to purchase more products. The program offered discounts based on the number of points accumulated. Points were earned for every $1 spent and could be redeemed for coupon codes or store credit:



349.    During the Relevant Time Period, Midwest Goods also purchased Flavored E-Cigarettes from Defendants Demand Vape, Happy Distro, MYLÉ Vapor, Pod Juice, Price Point

115

Distributors, Mi-One, and Safa Goods, and, upon information and belief, sold and shipped products purchased from those Defendants to their distributor, wholesale, and retail customers in New York:

    a.   Upon information and belief, Midwest Goods purchased Flavored E-Cigarettes totaling $5,011,720 from Defendant Demand Vape, including popular Disposable Vape brands Hyde Edge, Raz, and Geek Bar Pulse in 2018, 2022, 2023, and 2024. Upon information and belief, Midwest Goods then sold a substantial number of those products into New York.

    b.   Upon information and belief, during the period of 2021-2023, Midwest Goods purchased Flavored E-Cigarettes totaling $1,303,300 from Defendant Happy Distro, including popular Disposable Vape brands Geek Bar, Elf Bar, and Lost Vape. Upon information and belief, Midwest Goods then sold a substantial number of those products into New York.

    c.   Upon information and belief, during the period of 2019-2020 and 2022, Midwest Goods purchased Mylé branded Disposable Vapes, totaling $352,080 from Defendant Mylé. Upon information and belief, Midwest Goods then sold a substantial number of those products into New York.

    d.   Upon information and belief, during the period of 2018-2024, Midwest Goods purchased Flavored E-Cigarettes totaling $8,512,217.75 from Defendant POD Juice, including the POD Juice partnership with Oxbar Magic Maze Disposable Vapes and the POD Juice partnership with Raz series of e-liquids. Upon information and belief, Midwest Goods then sold a substantial number of those products into New York.

    e.   Upon information and belief, between 2021-2022, Midwest Goods purchased Flavored E-Cigarettes totaling $21,525 from Defendant Price Point Distributors. Upon information and belief, Midwest Goods then sold a substantial number of those products into New York.

    f.   Upon information and belief, between 2018-2023, Midwest Goods purchased Flavored E-Cigarettes totaling $17,381,618.50 from Defendant Mi-One, including popular Disposable Vape brands Elf Bar and Lost Mary. Upon information and belief, Midwest Goods then sold a substantial number of those products into New York.

    g.   Upon information and belief, between 2020-2023, Midwest Goods purchased

116

Flavored E-Cigarettes totaling $2,641,105 from Defendant Safa Goods, including popular Disposable Vape brands Elf Bar, Lost Mary, and Puff Bar Flavored E-Cigarettes. Upon information and belief, Midwest Goods then sold a substantial number of those products into New York.

350.    Indeed, like some of its best customers, several of Midwest Goods' upstream distributors have received FDA warning letters for selling products without the required FDA marketing authorization orders:

a.    The FDA sent a warning letter to Daddy's Vapor Distro Inc. on November 6, 2024, for selling and/or distributing e-liquid products, specifically MRKT PLCE ELIQUID brand in blood orange tangoberry 100 mL and 3 mg, without the required marketing authorization order in violation of the FD&C Act.[176] In 2024, Midwest Goods purchased 35,540 units of MRKT PLCE ELIQUID at a total order cost of $207,615.00. Midwest Goods has sold and shipped MRKT PLCE e-liquid to at least one business in New York.

b.    The FDA sent a warning letter to JBrands LLC on December 19, 2024, for manufacturing, offering for sale, and/or distributing celebrity boxer Tyson 2.0 Vape Round 2 brand Flavored E-Cigarettes without the required FDA marketing authorization orders in violation of the FD&C Act.[177] Between 2023 and 2024, Midwest Goods purchased 183,540 units of Tyson 2.0 Vape Round 2 Disposable Vapes at a total order cost of $12,397,470.

c.    The FDA also sent a warning letter to Fifty Bar on September 12, 2024, for manufacturing and offering for sale or distribution Fifty Bar Flavored E-Cigarettes without the required FDA marketing authorization orders in violation of the FD&C.[178] Between 2023 and 2024, Midwest Goods purchased

---

[176] Letter from John E. Verbeten, Dir., Off. of Compliance & Enforcement, Center for Tobacco Products, U.S. Food & Drug Admin., to Daddy's Vapor Distro Inc. (Nov. 6, 2024), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/daddys-vapor-distro-inc-696036-11062024 (last visited Feb. 14, 2025).

[177] Letter from John E. Verbeten Dir., Off. of Compliance & Enforcement, Center for Tobacco Products, U.S. Food & Drug Admin., to JBrands LLC (Dec. 19, 2024), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/jbrands-llc-698420-12192024 (last visited Feb. 14, 2025).

[178] Letter from John E. Verbeten Dir., Off. of Compliance & Enforcement, Center for Tobacco Products, U.S. Food & Drug Admin., to Beard Management Inc. d/b/a Beard Vape Co. d/b/a Lucky Bar Holdings, d/b/a Fifty Br (Sept. 12, 2024), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/beard-management-inc-dba-beard-vape-co-dba-lucky-bar-holdings-dba-fifty-bar-692147-09122024 (last visited Feb. 14, 2025).

13,420 units of Fifty Bar Disposable Vapes at a total order cost of $703,885.00.

351.    Midwest Goods should have had, and upon information and belief, did have knowledge long before these warning letters that the products sold by these suppliers were illegal. The FDA has publicly maintained a list of e-cigarettes authorized by the FDA. As of January 2024, there were only 23 e-cigarettes authorized by the FDA, all from only three manufacturers: Logic Technology Development LLC, NJOY LLC, and R.J. Reynolds Vapor Company. None of the authorized products as of January 2024 were in a flavor other than tobacco. As of January 2024, no authorized product was a Disposable Vape.

352.    Midwest Goods' shipments and sales of Flavored E-Cigarettes to New York distributors and wholesalers were in violation of N.Y. Pub. Health L. § 1399-ll, which only permits shipments to licensed retailers, export warehouse proprietors or operators of a customs bonded warehouse, or the U.S. government. Such sales were also delivery sales as defined by the PACT Act.

353.    As a business that sells and ships Flavored E-Cigarettes into New York, Midwest Goods is required to file with New York's DTF monthly reports of their shipments of Flavored E-Cigarettes into New York. Midwest Goods failed to appropriately report all information required to be provided, including, *inter alia*, "the name, address, and phone number of the person delivering the shipment to the recipient on behalf of the delivery seller."[179]

354.    Upon information and belief, Midwest goods has repeatedly delivered Flavored E-

---

[179] 15 U.S.C. § 376(a)(2).

Cigarettes in quantities more than 10 pounds in a single shipment. For example, on August 2, 2022, Midwest Goods shipped 702 units of Disposable Vapes to a retailer located in Shirley, New York. The Disposable Vapes had various amounts of e-liquid, ranging from 1.8 mL to 14 mL. The order contained a total volume of approximately 5.09 liters or about 11.19 pounds of e-liquid alone, and that does not include the weight of the other component parts of each Disposable Vape.

355.    Most recently, the FDA issued a warning letter to Midwest Goods on January 8, 2025, for selling and/or distributing e-liquid products that lacked the required FDA marketing authorization order in violation of the FD&C. The warning letter notified Midwest Goods that it is Midwest Goods' responsibility to ensure that the tobacco products they sell and/or distribute, and all related labeling and/or advertising on any websites or other media comply with the FD&C Act and the FDA's implementing regulations.[180]

356.    Based on its wide offerings, including exclusive products, Midwest Goods purchases some of its Flavored E-Cigarettes directly from China, and/or is the importer or first domestic distributor of Flavored E-Cigarettes made abroad by manufacturers without a presence in the U.S., and as such was during the Relevant Time Period required, but failed, to comply with the ingredient disclosure requirements of the Public Health Law throughout the Relevant Time Period.

357.    Thus, in addition to becoming a profitable master distributor of Flavored E-

---

[180] Letter from John E. Verbeten, Dir., Off. of Compliance & Enf't, Ctr. for Tobacco Prods., U.S. Food & Drug Admin., to Midwest Goods Inc., d/b/a Midwest Distribution and Midwest Distribution Illinois  (Jan. 8, 2025), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/midwest-goods-inc-dba-midwest-distribution-and-midwest-distribution-illinois-696454-01082025 (last visited Feb. 10, 2025).

Cigarettes in New York and the country, Midwest Goods has targeted adolescents throughout the Relevant Time Period by, among other things, (i) controlling the marketing and distribution of brands through partnerships and marketing agreements to use flavors, bright colors, themes, and technologies that are deliberately designed to attract children, including fruity and candy flavors, (ii) selling Disposable Vapes, which are most accessible by price and form to adolescent use, and (iii) utilizing social media outlets and online publications to market and reach customers with its false premise-that Flavored E-Cigarettes are harmless fun when in fact they are dangerous and illegal.

358.    Moreover, upon information and belief, by its commercial conduct throughout the Relevant Time Period, Midwest Goods repeatedly violated the PACT Act by, among other things, (i) shipping packages over the 10-pound legal weight limit; (ii) failing to maintain detailed records and/or submit all required reporting to New York State and other regulators, and (iii) illegally using the USPS to ship their Flavored E-Cigarette products.  Moreover, Midwest Goods has also repeatedly violated New York's Public Health Law, by, among other things, (i) ignoring New York's complete retail ban on Flavored E-Cigarette products, (ii) failing to make any of the legally required disclosures concerning their products' harmful ingredients, (iii) routinely and illegally shipping their Flavored E-Cigarette products to their New York customers, and (iv) using illegal discounts to maximize their reach and sales.

### E. Pod Juice – *A Manufacturer and Distributor of Highly Potent Flavored E-Cigarettes*

359.    Pod Juice is a manufacturer and major distributor of Flavored E-Cigarettes, including Disposable Vapes, which marketed, sold, and shipped a substantial number of products

into New York during the Relevant Time Period.

360.    Pod Juice's substantial sales into New York include sales and shipments to e-cigarette distributors, wholesalers, retailers, and directly to New York individual consumers throughout the Relevant Time Period.

361.    Some examples of Pod Juice's most enticing products are:

   a.   Strawberry Jam

   b.   Orange Soda

   c.   Cotton Carnival

   d.   Loops, with its label design including an image of what appear to be loops of sugary cereal, and

   e.   Pink Burst, which is infused with the essence of strawberry candy

362.    Currently, Pod Juice markets and sells its e-juice products by the bottle, for use in container style e-cigarettes, *see supra* ¶ 48(b), as well as pre-filled in Pod Juice branded and co-branded Disposable Vapes.  To expand its Disposable Vapes reach, Pod Juice not only manufacturers and sells its own pre-filled disposable devices, but it allows other companies with popular mechanisms to pre-fill their devices with Pod Juice's e-juice.

363.    From its outset, Pod Juice endeavored to push a high-potency product loaded with extraordinarily high concentrations of nicotine, touting on its website that it "revolutionized the industry with the first-ever 55 mg smooth salt nic line for pod systems" having "purposefully created a 55mg nicotine line for people who want greater satisfaction."[181]  Pod Juice has so heavily

---

[181] https://podjuice55.com/ (last visited Feb. 10, 2025);
https://web.archive.org/web/20180818031355/https://podjuice55.com/ (last visited Feb. 10, 2025).

invested in its 55 mg product, which is the equivalent concentration of 5.5% nicotine, that it has incorporated that product specification into its identity and website: podjuice55.com.

364.    By deliberately pushing its e-juice to these new higher concentrations, Pod Juice became a major player in the industry, one to be credited for the sharp recent increase in sales of e-cigarettes and Disposable Vapes with greater than 5% nicotine. *See supra* ¶ 68.

365.    In addition to especially high nicotine content, Pod Juice is recognizable for employing colorful displays, enticingly named flavors, and child-appealing imagery to sell its products.   Pod Juice's marketing of its Fruity Bears e-juice, for instance, exemplifies these textbook methods of appealing to children and adolescents:



366.    Securing its position as a domestic manufacturer of e-juice, Pod Juice entered the Disposable Vapes industry after identifying the strong market trend away from re-fillable systems. In order to stay relevant and highly competitive, in 2019, Pod Juice expanded its presence in the

emergent market for Disposable Vapes and introduced its own line of Disposable Vapes, called "Instapod." It touted this release with a post on podjuice55.com, calling Disposable Vapes, "the newest salt nic trend."[182]

367.    In that same 2019 website announcement, Pod Juice stressed Disposable Vapes' convenience, replaceability, and ease of concealment. Pod Juice described their new Disposable Vapes as "extremely small and discreet," adding that the consumer "can easily go out and use [the] disposable without attracting attention or having to carry something bulky around in your pocket."[183]

368.    Since the 2019 release of its branded Disposable Vape, Pod Juice has continuously endeavored to further develop its market share in this space, introducing other lines of its own branded Disposable Vapes, such as Podstick and Pod Pocket, as well as offering co-branded devices with other popular Disposable Vape manufacturers like Oxbar.

369.    Pod Juice's commitment to creating and growing the Flavored E-Cigarette market generally, and particularly Disposable Vapes, as well as maximizing its own sales is evident from its marketing materials on its website, as well as Pod Juice marketing published on websites of other major distributors who carry its products. For instance, on its website, Pod Juice states, "Today, we continue to expand on our original offerings, consistently delivering the most delicious and innovative flavors in both disposable and bottled formats."[184] Similarly, Defendant Price

---

[182] https://podjuice55.com/blogs/news/disposables-the-newest-salt-nic-trend (last visited Feb. 14, 2025).

[183] *Id.*

[184] https://podjuice55.com/ (last visited Feb. 14, 2025).

Point's website touts that Pod Juice, having quickly gained momentum in the vaping world, had "now expanded into disposables and freebase liquids, being one of the best-known USA based manufacturers around the world." [185]

370.    Since 2019, Pod Juice has regularly sold its e-juices, as well as Pod Juice-branded and co-branded Disposable Vapes into New York, and routinely shipped its products to New York recipients.

371.    Upon information and belief, from 2019 through 2021, Pod Juice made its sales primarily through its website podjuice55.com. Throughout the Relevant Time Period, Pod Juice otherwise operated through the website JewelDistribution.com, maintained by Pod Juice and, upon information and belief, its successor entity Headway Funding Inc. d/b/a Jewel Distribution.

372.    Pod Juice also maintains direct relationships with major New York distributors, such as Defendants Demand Vape and Price Point.

373.    Between 2021 and 2023, Pod Juice sold millions of dollars' worth of its products per year into New York, as total sales rose from $4,398,359 in 2021 to $6,864,310 in 2023.  Pod Juice sold Disposable Vapes and/or e-juices into New York throughout the Relevant Time Period. Its New York sales attributed to only a segment of 2024 amounted to $308,700.22. Upon information and belief, since January 2024, Pod Juice continues to operate some segment of its business through a fully controlled successor, Headway Funding Inc. d/b/a Jewel Distribution, selling ENDS products, including Disposable Vapes, into New York.

---

[185] https://www.pricepointny.com/collections/pod-juice (last visited Feb. 10, 2025).

374.    Pod Juice has deliberately targeted the New York market, with Pod Juice representatives, including owner Mohammad Shubyre Humkar, making repeated trips into New York during the Relevant Time Period to meet with major distributors such as Demand Vape. These relationships have resulted in co-branded promotional campaigns to enhance Pod Juice's position in the New York vaping market, often through bundling and discount offers that are in violation of New York law.

375.    For example, through its partnership with Demand Vape, Pod Juice entered into exclusive, co-branded promotions, including starter bundles that included with the purchase of 30 bottles of Pod Juice in various enticing flavors, items such as trucker hats, t-shirts, lanyards, and other swag.  An image from one such promotion lays out the terms of this impermissible offer using bright, dazzling, saturated colors that are known to appeal to youth:

125



376.    In another example, Pod Juice entered into an illegal discount promotion with Price Point, offering 25% off certain Pod Juice products.

377.    These are only two examples of Pod Juice both independently and in partnership with distributors offering illegal "buy X, get Y free," bundling, or discount deals to consumers in New York.  Upon information and belief, these discounts and swag giveaways were a routine and

126

ordinary part of Pod Juice's New York-related business.

378.    Through its corporate meeting minutes, Pod Juice's relentless work to increase its

sales and market share in the vaping world is evident:

      a.    In January 2018, Pod Juice resolved to launch new branding, increase sales, increase the number of sales representatives, and increase its presence at trade shows.

      b.    In January 2019, Pod Juice committed to reinvest half of six months' worth of its net profits into product and brand development to expand its business operation.

      c.    In July 2019, Pod Juice memorialized its plan to launch new e-liquid lines to appeal to a broader scope of demographics in both U.S. and foreign markets.

      d.    In January 2021, Pod Juice recorded its plan to hire new personnel to manage an influx of business activity from multiple markets.

      e.    In January 2022, Pod Juice was planning to employ even more personnel, including new sales representatives to increase brand awareness and an outside consultant to provide a strategy for increasing revenues.

379.    By January 2023, Pod Juice's minutes reveal that it was ready to collaborate with

large distributors, brands, and manufacturers to grow its domestic presence.

380.    Just a few months later, in July 2023, Pod Juice, in its corporate minutes, committed

to purchase other brands to expand its portfolio, and to co-brand a new Disposable Vape with

Oxbar in a joint effort to expand their market presence among U.S. consumers.

381.    Pod Juice has met its business goal—which is to reach the broadest possible

audience with their youth-attractive products and marketing materials, and profited from this plan,

including from its New York-based business.

382.    In the year 2020, Pod Juice sold $93,881.08 worth of Flavored E-Cigarettes through

127

its website podjuice55.com to New York consumers.  That same year, Pod Juice sold an additional $133,261-worth of Flavored E-Cigarettes to New York through its distribution channel, bringing its total New York sales for 2020 to $227,142.  The following year, 2021, Pod Juice's combined New York sales through its distribution channel and direct sales to consumers through podjuice55.com grew exponentially to $4,398,359.  Though Pod Juice discontinued direct sales to New York consumers through the website podjuice55.com in 2021, its New York sales through its distribution channel continued to soar in 2022 ($5,436,763) and 2023 ($6,864,310), flooding the state with its Flavored E-Cigarettes.  Through May 2024, Pod Juice sold another $308,700.22 worth of its Disposable Vapes and e-juices into New York.

383.    Among other violations of law, Pod Juice has mailed Flavored E-Cigarettes into New York via the USPS in violation of the PACT Act.  Pod Juice disclosed a list of carriers for its ENDS products shipments that includes USPS. This fact is borne out by Pod Juice's invoices.  For instance, two orders containing flavored E-Cigarette products placed in March 2021 by American East Trading in Smithtown, New York were fulfilled by using USPS Priority Mail.

384.    Pod Juice has also routinely made shipments of its e-juice and Flavored E-Cigarette products far in excess of the 10-pound weight limit imposed by the PACT Act, with single shipments weighing as much as 97 pounds.

385.    Pod Juice has endeavored to flood the market with its e-juices and Disposable Vapes, despite its full awareness that its products have not been approved by the FDA and despite its failure to make the required ingredient disclosures to the NYSDOH.

386.    In fact, on September 14, 2021, Pod Juice received a Marketing Denial Order

128

("MDO") from the FDA, denying approval to market a massive list of Pod Juice's flavored products. In spite of the FDA's denial, Pod Juice continued selling the products listed in the MDA, prompting the FDA to issue a warning letter, dated January 7, 2022, notifying Pod Juice that it was manufacturing or offering for sale on its website podjuice55.com new tobacco products without FDA authorization, citing specifically products that were denied in the MDO. Pod Juice was not deterred from its illegal commercial conduct.

387.    Pod Juice also received warning letters from the FDA dated December 15, 2021, and August 19, 2022, advising Pod Juice that it was in violation of the FD&C Act for selling Flavored E-Cigarettes without premarket authorization on its website podjuice55.com. The August 19, 2022 letter specifically references Pod Juice flavored e-juices Cotton Carnival Tobacco-Free Nicotine Vape Juice by Pod Juice and Pink Burst Tobacco-Free Nicotine Vape Juice by Pod Juice.

388.    Despite the fact that Pod Juice has not received FDA approval for any of its e-juices or other ENDS products, it deceptively states on its website, podjuice55.com, that its "smooth and satisfying juice is always created and tested in an FDA-compliant, ISO laboratory in sunny LA," leading unsuspecting visitors to surmise that Pod Juice operates in compliance with FDA regulations.

389.    Thus, in addition to becoming a profitable manufacturer and distributor of Flavored E-Cigarettes in New York and the country, Pod Juice has targeted adolescents throughout the Relevant Time Period by, among other things, (i) exclusively controlling the marketing of its branded and co-branded products, including Disposable Vapes, to use flavors, bright colors, and

themes that are deliberately designed to attract children, including fruity and candy flavors, and (ii) concentrating its sales efforts on Disposable Vapes, which are most accessible by price and form to adolescent use.

390.    Moreover, by its commercial conduct throughout the Relevant Time Period, Pod Juice repeatedly violated the PACT Act by, among other things, (i) shipping packages many times over the 10-pound legal weight limit, (ii) failing to maintain detailed records and/or submit all required reporting to New York State and other regulators, and (iii) illegally using the USPS to ship their Flavored E-Cigarette products.  Moreover, Pod Juice has also repeatedly violated New York's Public Health Law, by, among other things, (i) ignoring New York's complete retail ban on Flavored E-Cigarette products, (ii) failing to make any of the legally required disclosures concerning their products' harmful ingredients, (iii) routinely and illegally shipping their Flavored E-Cigarette products to their New York customers, (iv) selling swag, and (v) using illegal discounts to maximize their reach and sales.

### F.  Safa Goods – *A One-Stop Shop for Vape Sellers with a Nationwide Distribution Network*

391.    Safa Goods is a major distributor of Flavored E-Cigarettes, including Disposable Vapes, which marketed, sold, and shipped a substantial number of products into New York during the Relevant Time Period.

392.    Safa Goods' substantial sales into New York include sales and shipments to e-cigarette distributors, wholesalers, and retailers throughout the Relevant Time Period.

393.    Some examples of Safa Goods' enticing products are:

    a.  Memers Blue Razz Ice Wukong V40000 5% Nic Disposable Vapes, containing

up to 40,000 puffs

b.   Off-Stamp Rocket Popsicle X-Cube 25K 5% Nic Disposable Vape Kit

c.   Starbuzz Banana Cookie Super Max 15K 0.5% Nic Disposable Vapes

d.   Fruitia x Fifty Bar Blueberry Pound Cake 20K 5% Nic Disposable Vapes

e.   AirMez Banana Taffy Freeze X-Beats 40K 5% Nic Disposable Vapes

394.   Safa Goods describes itself as "a national wholesale master distributor of vape products; e-cigarettes, cartridge and refill liquids including nicotine and liquids without nicotine."[186] Through strategies like partnering with Chinese manufacturers to distribute a host of Disposable Vape brands, Safa Goods quickly grew its distribution network and has demonstrated its success by opening branches in at least 25 states.

395.   A June 22, 2024 market analysis done by well-known international vape manufacturer Ecigator placed Safa Goods at number 6 of its list of the top 15 vape distributors in the U.S.   Safa Goods has secured a correspondingly leading role in New York's Flavored E-Cigarettes market as well.

396.   Specifically, in the period from 2020 through March of 2024, Safa Goods sold $14,412,821.61 worth of vapor products, including Flavored E-Cigarettes, to New York distributors, wholesalers, and retailers.   These sales consisted almost exclusively of Disposable Vapes.

397.   In recent years, Safa Goods' New York sales of Flavored E-Cigarettes have grown to millions of dollars per year, amounting to $4,475,331.5 in 2022, and increasing substantially to

---

[186] https://www.safagoods.com/about-us (last visited Feb. 14, 2025).

$8,039,930.75 in 2023.

398.    From January 2020 to March 2024, Safa Goods sold millions of dollars' worth of Flavored E-Cigarettes to New York's largest wholesalers and distributors, including Defendant Magellan, to whom Safa Goods' sales amount to no less than $881,948.25, and Vape Plus Distribution, to whom Safa Goods sales amounted to no less than $6,984,612.50.  Particularly, between June 2022 and January 2024, Vape Plus purchased hundreds of Flavored E-Cigarettes from Safa Goods, including brands EB Design, Funky Republic, and Lost Mary.

399.    Safa Goods proudly advertises its status as a master distributor of popular Disposable Vape brands Lost Mary, Off-Stamp, Raz, and Viho.

400.    Across the brands of Flavored E-Cigarettes that Safa Goods sells into New York, there is a multitude of flavors clearly designed to entice young people, like Orange Soda, Ice Cola, Caramel Popcorn, and Lemon Crumble flavors.

401.    In addition to alluring flavors, Safa Goods also promotes Disposable Vapes to youth by displaying for sale on its website, safagoods.com, Disposable Vapes with features such as interactive touch screen displays, like the brand Yovo's space-themed "Starwalk 40K 5% Nic Disposable Vape," which boasts 40,000 puffs per unit and is lauded in the ad copy for its "convenience and portability.":[187]

.

---

[187] https://www.safagoods.com/product-details/yovo-starwalk-40k-5-nic-disposable-vapes-5pc?id=45510 (last visited Feb. 14, 2025).



402.    Another example of flashy, youth-focused advertising on safagoods.com is the banner ad for Safa Goods' product called the RAZ –LTX-, which comes in a 25,000-puff "Gush Edition" Flavored E-Cigarette and in alluring flavors, such as "Strawberry Peach Gush, "Blue RAZ Gush" and others, and advertising a "MEGA HD SCREEN" on the front of the devices:



403.    Notably, regarding the brand Raz, in December 2023, Defendant Magellan assigned the trademark Raz (Serial numbers: 97725200, 97725208) to Raz Holdings LLC.  In the trademark assignment document, Haitham Shriteh, one of the founders of Safa Goods, is identified as the "Manager of RAZ Holdings LLC."  Accordingly, Safa Goods, through its principal Haitham Shriteh, maintains control of Raz's marketing, development, and all aspects of its presence and

success in the Flavored E-Cigarettes market, in New York and elsewhere. However, despite becoming the trademark holder and controlling the Raz brand, Safa Goods has not met its ingredient disclosure obligations.

404.    Safa Goods operates deliberately outside of the law.  In fact, Safa Goods received a warning letter from the FDA on October 5, 2023, advising Safa Goods that it was in violation of the FD&C Act for selling Flavored E-Cigarettes without premarket authorization.  Safa Goods was undeterred.

405.    Moreover, Safa Goods offers illegal incentive sales on its website, safagoods.com. To cite but one example, in December 2024, safagoods.com advertised a Christmas sale offered by Memers Vape, of which Safa Goods is a master distributor, wherein customers were offered a "buy 5 get 1 free" deal on Disposable Vapes.

406.    Safa Goods has also violated the PACT Act by mailing Flavored E-Cigarettes to New York customers via the USPS. For example, on April 27, 2023, Safa Goods shipped via USPS Express $87,450.00-worth of flavored ENDS products to Vape Plus Distribution in Brooklyn, New York.

407.    Safa Goods has also submitted PACT Act reports to DTF containing false or misleading information.  For instance, PACT Act reports submitted by Safa Goods repeatedly indicate a weight of "zero" for shipments of Flavored E-Cigarettes in quantities ranging up to hundreds of units.  Upon information and belief, many of these shipments also violated the 10-pound weight limit on deliveries of Flavored E-Cigarettes.  Safa Goods completed one such 500-unit shipment, containing a total capacity of 65,000 mL of e-juice within the E-Cigarettes; this

134

volume of liquid, assuming its weight is equivalent to that of water, weighs 143 pounds.

408.    Thus, in addition to becoming a profitable distributor of Flavored E-Cigarettes in New York and the country, Safa Goods has targeted adolescents throughout the Relevant Time Period by, among other things, (i) controlling the marketing of Raz branded and other products, including Disposable Vapes, as well as the broad use of flavors, bright colors, and themes that are deliberately designed to attract children, including fruity and candy flavors, and (ii) concentrating its sales efforts on Disposable Vapes, which are most accessible by price and form to adolescent use.

409.    Moreover, by its commercial conduct throughout the Relevant Time Period, Safa Goods repeatedly violated the PACT Act by, among other things, (i) shipping packages over the 10-pound legal weight limit, (ii) failing to maintain detailed and correct records and/or submit all required reporting to New York State and other regulators, and (iii) illegally using the USPS to ship their Flavored E-Cigarette products.  Moreover, Safa Goods has also repeatedly violated New York's Public Health Law, by, among other things, (i) ignoring New York's complete retail ban on Flavored E-Cigarette products, (ii) routinely and illegally shipping their Flavored E-Cigarette products to their New York customers, and (iii) failing to make any of the legally required disclosures concerning their products' harmful ingredients.

### G.  Mi-One – *A Brand, Distributor, and Conspiracist*

410.    Mi-One is a major distributor of its branded Flavored E-Cigarettes, including Disposable Vapes, which marketed, sold, and shipped a substantial number of products into New York during the Relevant Time Period.

135

411.    Mi-One's substantial sales into New York include sales and shipments to e-cigarette distributors, wholesalers, retailers, and individual consumers throughout the Relevant Time Period.  *See supra* ¶ 169(b), (c).

412.    Some examples of Mi-One's enticing products are:

   a.   Fcuking FAB Soda FASTA Burrst 35000, complete with 35,000 puffs and a flashy electronic screen casing

   b.   Sour Lush Gummy OFF STAMP SW9000 Disposable

   c.   Rocket Pop Lost Mary MT15000 Turbo

   d.   Baja Slushie Fifty Bar 20K

   e.   Banana Taffy Freeze Geek Bar Pulse X 25k

413.    Mi-One markets and sells Flavored E-Cigarettes primarily through its websites mipod.com and mipodwholesale.com.

414.    Mi-One holds itself out as the designer and manufacturer of its branded E-Cigarettes, such as Mi-Pod and these products are manufactured in China; Mi-One is the importer and first distributor of its products in the U.S.

415.    The Flavored E-Cigarettes Mi-One sells into New York come in flavors with tantalizing descriptions clearly designed to appeal to youth, such as Orange Soda, Iced Grape Bomb, Gummy Bear/Candy, Marshmallow/Cotton Candy, Strawberry Cake, and Melon Bubblegum, to name a few.

416.    Despite its position in the supply chain, Mi-One has failed to make any of the required ingredient disclosures regarding any of its Flavored E-Cigarettes, including Disposable Vapes, to the NYSDOH.

136

417.    Moreover, to maximize its reach and manipulate its pricing, Mi-One offers illegal incentive deals, such as offers to get one free Disposable Vape with the purchase of five Disposable Vapes, holiday sales, and other "buy X, get Y free" offerings for vaping kits and Disposable Vapes. In fact, Mi-One maintains on its website mipod.com a page dedicated to "Daily Deals" on the products it sells, with offers like, "Save $10+ on Disposable 10 Packs" and "Save $30 on Orders over $200."

418.    Mi-One will sell to anyone who will buy its products.  Indeed, Mi-One has sold Flavored E-Cigarettes directly to New York individual consumers and has shipped close to $600,000 worth of Flavored E-Cigarettes, including Disposable Vapes, e-juice, and vape pods, directly to residential addresses in New York during the Relevant Time Period.  Each and every one of those sales is illegal.

419.    Mi-One's illicit New York-based business has been lucrative.  Throughout the Relevant Time Period, Mi-One has sold into New York well over a million dollars of Flavored E-Cigarettes per year: $1,022,009.93 in 2020, $1,918,453.46 in 2021, $1,644,000.24 in 2022, $1,649,599.30 in 2023.  Between January and March 2024, Mi-One had sold at least $534,763.34 worth of Flavored E-Cigarettes into New York.  In the period from January 2020 through March 2024, Mi-One sold $6,806,190.26 worth of Flavored E-Cigarettes, including Disposable Vapes, e-juice, and replacement pods, to New York distributors, wholesalers, retailers, and directly to customers.

420.    Mi-One has built its brand on appealing to certain sensibilities of style and fashion to attract new users.  On its website mipod.com, Mi-One boasts of the success of its strategy to

137

sell "small" Disposable Vapes as a fashion statement: "Mi-Pods" became a fashion statement, setting a trend for small, stylish devices in over 60 countries. This marketing strategy of promoting a small, concealable yet fashionable device screams of a design to appeal to youth, particularly early teens or pre-teens at an age when appearing cool and independent are at a premium among their peers, while hiding "adults only" behaviors from parents and authority figures is also prized.

421. Mi-One's strategy of appealing to youth through fashion and style is borne out by the reaction of media tastemakers. For instance, a 2018 article in Forbes, entitled, "Smoking Vapor's MiPod Is A Solid, Hip Vape That Transcends My Outdated Lingo," elucidates how Mi-One captivates youth in the context of one of their earlier, refillable vaporizers by glamorizing a lifestyle that appeals to most teens:[188]

> It just happens to remind me of a bunch of young, club hopping rich kids in their 20s posting vape cloud pictures on their Instagram accounts, then hangover pictures the next day. Then something about their tiny dog. This is the vape that says I have a tribal tattoo and I'm damn proud of it. This is a vape that, like my self image after ten minutes walking around an L.A. Fitness, fits in your pocket. This is a vape that you want if you are tired of the flashy pen vapes and are looking for something square and matches every color of spray paint on the spoiler on your 1998 Accord.

The same Forbes article declares that the Mi-One device's features are "as hip as the raddest broheim."

422. Mi-One reinforces the appeal to stylishness and concealability of its signature

---

[188] https://www.forbes.com/sites/curtissilver/2018/04/20/smoking-vapors-mipod-is-a-solid-hip-vape-that-transcends-my-outdated-lingo/ (last visited Feb. 14, 2025).

devices on its website mipodsvape.com:[189]

> Providing a flavorful, smooth hit and a convenience you'll find in no other device, the Mi-Pod blends advanced technology with fashion-forward style to give you the best hit on the market. The Mi-Pod is small and discreet, emitting small clouds that allow you to vape in peace and help reduce the stigma associated with e-cigarettes.

423.    Mi-One's strategy to appeal to youth through fashion and peer pressure propelled the company to great financial success.  On August 13, 2023, Mi-One bragged about its success on its website mipodwholesale.com, "Mi-One Brands is proud to announce that it has earned a spot on the esteemed Inc. 5000 list for the seventh time, achieving an all-time best ranking of 600. The Inc. 5000 list ranks the fastest growing private businesses in the US."[190]

424.    Mi-One deliberately operates its business of dangerous and addictive products that are not approved for sale by the FDA undeterred, notwithstanding having received an FDA Warning Letter in October 2018 for potentially importing new finished tobacco products including e-liquids without premarket authorization.  Mi-One received yet another FDA Warning Letter in December 2022 for manufacturing and offering for sale or distribution ENDS products without a marketing authorization order in violation of the FD&C Act.

425.    Not only does Mi-One market and sell Flavored E-Cigarettes without FDA approval, but it has also engaged in a disinformation campaign to create a false sense of legitimacy around its products.

---

[189] https://mipodsvape.com/our-story/ (last visited Feb. 14, 2025).

[190] https://mipodwholesale.com/blogs/news/mi-one-brands-makes-inc-5000-for-seventh-time (last visited Feb. 14, 2025).

426.    In a Reddit post by Mi-One founders Geoff Habicht & Amir Hakak, knowing that none of their Flavored E-Cigarettes have received premarket approval from the FDA, misleadingly state that "ALL of our products are legally marketed in line with the current FDA rules, regulations and guidelines."

427.    However, more troubling, in that same post, the Mi-One founders advanced conspiracy theories to brush away any concerns over the safety and illegality of Flavored E-Cigarettes. Their theories include an unfounded and harmful accusation that state governments were motivated to crush vaping out of a selfish bid to bolster combustible tobacco revenues, and thereby their advances on payments directed by the MSA reached by a coalition of states' attorneys general in litigation against big tobacco companies. In this post, the Mi-One founders also alleged that "big pharma" was engaged in a lobbying campaign to present false information about vaping in order to protect their interests in smoking cessation remedies, such as medications and nicotine infused gum and patches.

428.    Mi-One consistently relies on disinformation and conspiracies to mislead consumers about the dangers of vaping. In a blog post available on Mi-One's website mipod.com, dated November 13, 2019, and titled "The Truth About the Vaping Epidemic – Governments Dirty Little Secrets Revealed," a Mi-One marketing manager advances the same conspiracy theory that state governments were working in league with big tobacco to prop up sales of combustible tobacco products, thus serving the states' interests in the MSA with the big tobacco companies. This post features a YouTube video elaborating on this conspiracy theory produced by a group deceptively calling itself the Consumer Advocates for Smoke-Free Alternatives Association.

429.    By perpetuating these false conspiracies and through other statements, Mi-One has affirmatively overstated the benefits of vaping while downplaying, even concealing, the truth about the danger and toxicity in its Flavored E-Cigarettes.

430.    Mi-One regularly promotes its brand and vaping in general on social media outlets, such as Facebook and Instagram, by posting articles and videos suggesting without any basis and deceptively that vaping is safe and has benefits in terms of smoking cessation as well as reduction in overall combustible cigarette use.  Prominent among these social media postings are videos and articles critical of FDA regulation of vaping and arguing that the regulatory environment for vaping is misguided and should or will be changed.

431.    One way Mi-One uses social media to penetrate the youth market is through influencers.  One such influencer on Instagram is BuffaloJuiceGirl, who posts to her followers alluring selfies with Mi-Pod devices.  Upon information and belief, Mi-One benefits from this influencer's Mi-One marketing content:



432.    Mi-One also promotes discount offers through its social media presence, such as a

50% -off sales on various ENDS products it offered for "Black Friday" in November 2024.



433.     Mi-One also routinely breaks the law in the course of its business.  For instance, it has violated the PACT Act by using the USPS among its carriers to ship Flavored E-Cigarettes into New York.  Mi-One has disclosed that it used the USPS to ship vapor products, including

Flavored E-Cigarettes, until 2023.  This fact is corroborated in Mi-One's PACT Act reports filed with the DTF.  For example, the PACT Act report submitted for December 2021 shows that Mi-One vapor products were mailed via USPS to multiple individual consumers in New York.

434.    Mi-One has also submitted PACT Act reports to DTF containing false or misleading information, repeatedly reporting shipments of Flavored E-Cigarettes, even those containing multiple units, as having no weight and entering zeros into every cell calling for total weight over volume.  Upon information and belief, Mi-One routinely shipped in excess of the PACT Act's 10-pound limit.

435.    Thus, in addition to becoming a profitable brand and distributor of Flavored E-Cigarettes in New York and the country, Mi-One has targeted adolescents throughout the Relevant Time Period by, among other things, (i) exclusively controlling its marketing of its branded products, including Disposable Vapes, as well as the broad use of flavors, bright colors, and stylish themes that are deliberately designed to attract adolescents, including fruity and candy flavors, (ii) concentrating its sales efforts on Disposable Vapes, which are most accessible by price and form to adolescent use, and (iii) utilizing social media and other outlets to market and reach underage customers with its false premise—that  Flavored E-Cigarettes are harmless fun when in fact they are dangerous and illegal.

436.    Moreover, by its commercial conduct throughout the Relevant Time Period, Mi-One repeatedly violated the PACT Act by, among other things, (i) shipping packages over the 10-pound legal weight limit, (ii) failing to maintain detailed and correct records and/or submit all required reporting to New York State and other regulators, and (iii) illegally using the USPS to

143

ship their Flavored E-Cigarette products.  Moreover, Mi-One has also repeatedly violated New York's Public Health Law, by, among other things, (i) ignoring New York's complete retail ban on Flavored E-Cigarette products, (ii) routinely and illegally shipping their Flavored E-Cigarette products to their New York customers, (iii) using illegal discounts to maximize their reach and sales; and (iv) failing to make any of the legally required disclosures concerning their products' harmful ingredients.

### H.  Mylé – *A Favored Brand and Distributor with Swag*

437.    MVH I is the owner of the word-mark trademark, MYLÉ, in the category of tobacco, smokers' articles, matches, and a family of marks consisting of or incorporating the term "MYLÉ" and/or its distinctive black and white design.

438.    Mylé Vape (*a.k.a.,* Myle Vape Inc.), which sometimes does business as Mylé Vapor Inc., is the operating entity that distributes Disposable Vapes bearing the Mylé brand on behalf of MVH I. Also, Mylé Vape is the owner of the word-mark trademarks, MYLÉ and MYLE, in the category of apparel, accessories, and other swag.

439.    Mylé Vape has also owned and operated the Mylé main website, Mylévape.com for a substantial segment of the Relevant Time Period.

440.    Accordingly, MVH I and Mylé Vape (together, the "MYLÉ Defendants") are affiliates that operate a common enterprise to sell MYLÉ brand Disposable Vapes to distributors, wholesalers, retailers, and/or individual consumers in New York.

441.    Together, the MYLÉ Defendants are a major distributor of their branded Flavored E-Cigarettes, including Disposable Vapes, and marketed, sold, and shipped a substantial number

144

of products into New York during the Relevant Time Period.

442.    The MYLÉ Defendants' substantial sales into New York include sales and shipments to e-cigarette distributors, wholesalers, and retailers throughout the Relevant Time Period.

443.    In 2020, MYLÉ sold into New York $37,836,544.59 worth of vapor products, consisting almost entirely of Disposable Vapes.  In the ensuing years, MYLÉ continued to sell into New York millions of dollars' worth of vapor products per year, with 2021 seeing $38,015,205.00 in sales, 2022, $16,076,419.21, 2023, $5,952,521.50, and at least $2,165,275.00 in the first ten months of 2024.  Again, the vast majority of these sales consisted of prohibited Disposable Vapes.

444.    Some examples of MYLÉ's popular products are:

    a.   MYLÉ Slim Lush Ice Disposable Device

    b.   MYLÉ Strawberry Mango Ice Mini Disposable Device

    c.   MYLÉ Iced Quad Berry Nano Disposable Device

    d.   MYLÉ Iced Watermelon Nano Disposable Device

    e.   MYLÉ Strawberry Banana Mini Disposable Device

445.    Mylé's products are manufactured in Dubai, U.A.E.  Mylé is therefore the importer and first domestic distributor.  However, despite this crucial and lucrative position in the supply chain, Mylé has failed to make any of the required ingredient disclosures to the NYSDOH.

446.    Mylé, on its website Mylévapor.com, describes its Mini disposables as "[f]illed with flavor...easy to use" and "with no complicated buttons or settings." It also touts this disposable product's high "5% nicotine level in each pod," so that the consumer's "cravings will be satisfied,"

145

and also describe it as "[w]eightless, disposable, [and] pocket-sized."  In these ways and others, Mylé markets its products as ready-to-use and concealable—factors that appeal most to adolescents.

447.    Mylé's website, Mylévape.com, represents that Mylé is an industry world leader and falsely markets its products as "safe" in its "About" section: [191]

> Through the development of modern vaping device technology combined with scientifically based e-liquid formulas, MYLÉ has achieved their goal in becoming a world leader in the e-cigarette industry....[Mylé is] [r]ecognized as one of the fastest growing safe and affordable nicotine delivery systems worldwide [and] has set the global market standard in providing consumers with a premium vaping experience through modern design and technology.

448.    Ariel Gorelik, founder and CEO of Mylé, has been quoted as saying that the company "invests heavily in the US market." [192]  Upon information and belief, Mylé has invested the corresponding and proportional effort to drive profits in the New York segment of this industry.

449.    Mylé's investment in developing the Flavored E-Cigarettes market has paid off.  In 2022, Mylé won multiple awards from industry peers.  An October 3, 2022 news article, titled "Mylé Vape Winds Gold & Bronze Awards," heaps the following praise on Mylé and its vaping devices: [193]

> What a year for MYLÉ! On the heels of winning 'Industry

---

[191] https://www.mylevape.com/about/ (last visited Feb. 14, 2025).

[192] https://www.prnewswire.com/news-releases/myle-vape-wins-gold--bronze-awards-301637184.html (last visited Feb. 14, 2025).

[193] *Id.*

146

> Leader' and 'Best Brand' this summer in global competitions, MYLÉ has done it again winning GOLD and BRONZE awards in Cstore Decisions 'Hot New Products of 2022'. Winners were announced last week and MYLÉ received top placement for the Micro and Drip disposable devices in the competitive Tobacco Vape category.

450. Despite the fact that most of the Flavored E-Cigarettes that Mylé sells have not received premarket authorization from the FDA, Mr. Gorelik deceptively stated that Mylé makes sure that its "devices are in compliance with FDA regulations."[194]

451. Mr. Gorelik could not have been more wrong. To the contrary, Mylé had received an FDA warning letter, dated October 12, 2018, advising that Mylé was improperly selling new finished tobacco products including, but not limited to, Mylé Devices, Mylé Pods, and Mylé Starter Kits without premarket authorization.

452. And Mylé received a second FDA warning letter, dated July 20, 2020, advising it that the FDA's "review of the website https://www.Mylévapor.com revealed that [Mylé] manufacture[s] and offer[s] for sale or distribution to customers in the United States the following ENDS products without a marketing authorization order":[195]

     a. Mylé Mini – Iced Lychee Disposable Device,

     b. Mylé Mini – Lemon Mint Disposable Device,

     c. Mylé Mini – Peach Disposable Device,

     d. Mylé Mini – Pink Lemonade Disposable Device,

---

[194] *Id.*

[195] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/myle-vape-inc-608630-07202020 (last visited Feb. 14, 2025).

    e.   Mylé Mini – Cubano Disposable Device,

    f.   Mylé Mini 2 – Iced Apple Mango Disposable Device,

    g.   Mylé Mini 2 – Iced Watermelon Disposable Device,

    h.   Mylé Mini 2 – Menthol Disposable Device,

    i.   Mylé Mini 2 – Peach Disposable Device, and

    j.   Mylé Mini 2 – Red Apple Disposable Device.

The FDA noted that this list was not comprehensive, but rather "for example," and thus did not represent all of the violative products that were offered for sale on the website.

    453.   Nonetheless, Mylé persists in marketing and selling these very products on its website, including under this colorful and fruit-focused banner, including in flavors that the FDA specifically warned them to stop selling:[196], [197]



    454.   Mylé had also previously received an FDA warning letter dated October 12, 2018, advising that Mylé was improperly selling new finished tobacco products including, but not limited to, Mylé Devices, Mylé Pods, and Mylé Starter Kits without premarket authorization. Despite

---

[196] https://www.mylevape.com/product-tag/mini/page/2/ (last visited Feb. 4, 2025).

[197] https://www.mylevape.com/product/myle-mini-iced-lychee-disposable-device/ (currently selling "Mylé Mini – Iced Lychee Disposable Device," *see supra* ¶ 452(a) (last visited Feb. 4, 2025).

knowing that Mylé had been advised by the FDA that it was marketing products in violation of the FD&C Act *twice*, Mr. Gorelik doubled down on his misrepresentations in October 2022, stating that, "This means [Mylé's] retail partners can confidently sell MYLÉ products in store."

455.    Mylé currently markets and sells other insidious Disposable Vapes, available in such flavors as Strawberry Keys, Lush Ice, Frozen Peach, Royal Mango, and Magic Moon, that sport an ultra-sleek design, complete with an LED digital screen, providing "instant access to real-time information," up to 5% nicotine concentration, and 20,000 puffs.  The ad copy for this product invites users to "[a]djust the airflow to your liking with precision Touch Control, ensuring each puff is just the way you like it."[198]



456.    Indeed, Mylé products are sold in New York retail establishments, which is evident from internet reviews and influencers promoting such sales on social media platforms.

---

[198] https://www.mylevape.com/product/strawberry-keys-myle-turbo-disposable-device/ (last visited Feb. 19, 2025).

457.    Publicly available photos on social media and review websites show MYLÉ products in New York vape shops, including one in Brooklyn which was captured displaying Mylé Flavored E-Cigarettes in a Yelp post in February 2023:[199]



458.    Contrary to New York's Public Health Law prohibition on promotional events, *see supra* ¶ 107(b), on September 2022, Mylé ran a booth promoting its vaping products at the Rolling Loud NYC hip hop festival at Citi Field in Queens, New York.

459.    To expand its reach, Mylé uses other marketing avenues that target underage users. For instance, social media influencers have made posts promoting Mylé from New York events, like Rolling Loud and others:

---

[199]    https://www.yelp.com/biz/bath-vape-and-tobacco-brooklyn (last visited Feb. 14, 2025) (red highlights added).





460.    Mylé also markets and sells branded apparel and accessories, including hats, t-shirts, and backpacks, none of which are legal under New York law.

151

461.    Mylé displays for sale on its website https://www.mylevape.com/product-tag/apparel/ branded items of apparel such as lanyards, backpacks, shirts, and caps:



462.    Mylé has maximized its sales through relationships with multiple distributors that ship within and to New York, including Defendant Price Point, as well as other New York retailers, like VapeDeal and APVapeShop.  Within the period of 2019-2020 and 2022, Mylé also sold Midwest Goods their branded Disposable Vapes totaling $224,060.  Upon information and belief, Midwest Goods then sold a substantial number of Mylé's Disposable Vapes into New York.

463.    Certain Mylé sales data shows that the company has repeatedly made extremely large-quantity shipments of Flavored E-Cigarettes and other vapor products to customers in New York throughout the Relevant Time Period.  Among these are shipments containing tens of thousands of units with sales totals in the hundreds of thousands of dollars.  For example, an invoice, dated February 17, 2023, shows that Mylé shipped to Price Point in Farmingdale, New York, 40,000 units of Iced Mint-flavored Mylé Mini disposable kits for a total of $200,000.00.  Upon information and belief, each of these kits comes in a box containing two Disposable Vape

devices filled with e-juice containing 50mg of nicotine.  It is beyond cavil that such shipments violated the 10-pound weight restriction imposed by the PACT Act.

464.    Thus, in addition to becoming a profitable brand and distributor of Flavored E-Cigarettes in New York and the country, Mylé has targeted adolescents throughout the Relevant Time Period by, among other things, (i) exclusively controlling its marketing of its branded products, including Disposable Vapes, as well as the broad use of flavors, bright colors, and stylish themes that are deliberately designed to attract adolescents, including fruity and candy flavors, (ii) concentrating its sales efforts on Disposable Vapes, which are most accessible by price and form to adolescent use, and (iii) utilizing social media to market and reach underage customers with its false premise-that Flavored E-Cigarettes are harmless fun when in fact they are dangerous and illegal.

465.    Moreover, by its commercial conduct throughout the Relevant Time Period, Mylé repeatedly violated the PACT Act by, among other things, (i) shipping packages many times over the 10-pound legal weight limit, and (ii) failing to maintain detailed and correct records and submit reporting to New York State and other regulators.  Moreover, Mylé has also repeatedly violated New York's Public Health Law, by, among other things, (i) ignoring New York's complete retail ban on Flavored E-Cigarette products, (ii) routinely and illegally shipping their Flavored E-Cigarette products to their New York customers, (iii) selling swag and using live events to promote their e-cigarette brand, and (iv) failing to make any of the legally required disclosures concerning their products' harmful ingredients.

## I.    Price Point – *New York's Least Discreet Distributor and Retailer*

466.    Price Point is a major New York distributor and retailer of Flavored E-Cigarettes, including Disposable Vapes, which marketed, sold, and shipped a substantial number of products to New York customers during the Relevant Time Period. Upon information and belief, Price Point fulfills retail orders for Flavored E-Cigarettes at its corporate headquarters, 500 Smith Street in Farmingdale, New York, and from 176 Central Avenue Unit 17 in Farmingdale, New York and ships from those Farmingdale fulfillment center-locations to customers within New York State.

467.    Price Point's substantial sales to New York customers include sales and shipments to e-cigarette distributors, wholesalers, retailers, and individual consumers throughout the Relevant Time Period.

468.    Price Point has sold many products that overlap with the other Defendants' catalogues, *see e.g. supra* ¶¶ 181(c-d) 233(d-e), 290(a),(c), 322(f-h), 412(e), 444(d), and some additional examples of Price Point's enticing products are:

    a.    Air Bar Nex- Unicorn

    b.    Geek Bar Pulse- OMG Blow Pop

    c.    Geek Bar Pulse- White Gummy Ice

    d.    Fifty Bar V2- Strawberry Cereal Donut Milk

    e.    RAZ TN 9000- Strawberry Shortcake

    f.    EB BC 5000- Rainbow Clouds

469.    The products Price Point sells, distributes, and ships, include a variety of vaping

products and "smoking accessories,"[200] including branded vaping devices, such as Air Bar and Breeze Disposable Vapes, vaping devices from popular brands such as Suorin and Geek Bar, and a wide variety of Flavored E-Cigarettes from brands like Mylé, Hyde, and Raz.

470.    During the Relevant Time Period, until December 31, 2024, Price Point operated as an online distributor and retailer of Flavored E-Cigarettes through its website https://pricepointny.com.  As of December 31, 2024, Price Point purportedly ceased operations, though it is currently still "offering support for orders placed prior to 01/01/2025."[201]

471.    According to business records filed by Price Point with the New York Department of State, Individual Defendant Hamza Jalili has served as the Chief Executive Officer of Price Point, with a listed address of 500 Smith St., Farmingdale, New York, 11735.

472.    Moreover, Individual Defendant Hamza Jalili is not only the Chief Executive Officer, but also Director, President, and a Shareholder of Price Point.

473.    Individual Defendant Weis Khwaja is a Director, Vice President, Secretary and a Shareholder of Price Point.

474.    Individual Defendant Mohammad Jalili is a Shareholder of Price Point.

475.    Upon information and belief, Individual Defendants Hamza Jalili and Weis Khwaja have a significant financial interest in serving as corporate officers of Price Point and as shareholders.

476.    Upon information and belief, Individual Defendant Mohammad Jalili has a

---

[200] https://www.pricepointny.com/pages/about-price-point-ny (last visited Feb. 5, 2025).

[201] https://www.pricepointny.com/pages/shut-down (last visited Feb. 4, 2025).

significant financial interest in Price Point as a shareholder.

477.    Upon information and belief, Individual Defendants Hamza Jalili, Weis Khwaja, and Mohammad Jalili have received financial distributions as a result of their respective roles in Price Point.

478.    Price Point has held itself out as operating in the business of "supply chain management of various vaping products."[202] Specifically, on its website, https://pricepointny.com, Price Point describes itself as follows in its "About Us" section:[203]

> For more than three years, we have been distributing various … vape products to customers nationwide. We offer a wide selection of options and carry all major brands to ensure you can find exactly what it is that you are looking for, as conveniently as possible….Whether you're looking for a select few products for your personal use or you are a distributor of smoking and vaping products yourself, you can find exactly what you are looking for when you shop with us. We gladly fulfill small orders and large wholesale orders…we offer the absolute best prices around and we ship fast! Other distributors charge high prices and charge just as much, if not more for shipping. That's something you will never experience at Price Point NY!

479.    Accordingly, Price Point, through the Individual Defendants, positioned itself to sell small or large, direct to individual consumers or to other e-cigarette industry players.  It used the cheapest and quickest methods of delivery, notwithstanding regulations barring certain means, and it bragged about having the cheapest prices.

480.    Price Point's self-described business model included being price competitive with

---

[202] Answer Breeze Smoke LLC v. Yatin Enterprises Inc. et al., 1:22-cv-01182-HYJ-SJB (W.D.Mich) Dkt. 117 at 2.

[203] Price Point NY, *supra* n.200.

others in the industry. For that reason, Price Point customarily offered discounts and Flavored E-Cigarettes, contrary to New York law.

481.    Upon information and belief, during the Relevant Time Period, one of Price Point's key advantages was a "rewards program," which allowed Price Point customers to "unlock exciting perks...[and] exciting rewards" as part of membership in the rewards program (the "PP Rewards Program"):



482.    Upon information and belief, the PP Rewards Program permitted customer-participants to earn points for different actions, such as types of purchases made on the Price Point website, which could be subsequently turned into rewards that participants could redeem from

Price Point.  Additionally, as part of the PP Rewards Program, participants received discounts and free gifts from Price Point in connection with qualifying purchases from Price Point.

483.    Price Point did not even wind down its business in a lawful way.  Rather, on their website, Price Point announced they would honor a 10% discount to be applied automatically at checkout on all items that did not already have a discount in advance of their December 2024 closure.

484.    Upon information and belief, Price Point also transmitted electronic messages to its customers announcing the December 31, 2024 shutdown and offered a blanket 10% discount on all purchases until the closing date.

485.    None of the discounts Price Point offered and allowed its customers to redeem throughout the Relevant Time Period were legal under New York law.

486.    Additionally on their website, Price Point boasted about the option of "discreet orders," in order to keep customers' "privacy protected...if that's something that interests" the customer.[204]

487.    To that end, Price Point routinely ignored its shipping, packing, and recordkeeping obligations.  For instance, upon information and belief, Price Point sold an Esco Bar flavored Disposable Vape on June 9, 2023 to a New York address. The order was delivered on June 13, 2023, via common carrier to the New York recipient address, but the outside of the package did not identify the product as e-cigarettes, and no customer signature was required or given for receipt

---

[204]  Price Point NY, *supra* n.200.

of the package. Prior to this order and shipment, on May 12, 2023, the FDA issued an import alert for Esco Bar Products putting them on its red list, but Price Point was undeterred. [205]

488.    Instead of meeting its legal obligations, Price Point sold and delivered to New York customers Flavored E-Cigarettes in violation of federal and New York laws by failing to properly label packages delivering e-cigarette goods, by failing to require age verifications for delivery of flavored e-cigarettes, and failing to require signatures for the delivery of such products. Upon information and belief on at least twenty occasions, between 2023 and 2024, Price Point sold to New York customers Flavored E-Cigarettes that were delivered to customers at New York addresses through the USPS, for which no signature or age verification were required upon delivery. Moreover, upon information and belief, on at least three occasions, Price Point shipped Flavored E-Cigarettes that were delivered to customers at New York addresses in packages that failed to properly include a label identifying that the shipment contained e-cigarettes, as required by law.  Specifically, upon information and belief, New York City authorities made several purchases of Disposable Vapes from Price Point through an investigator and, for each purchase, the products were delivered through the USPS to a New York City address, and no signature or age verification were required upon delivery.

489.    Price Point has long defied its regulators.  Among other things, Defendants Weis Khwaja and Price Point Distributors Inc. received an FDA warning letter on August 21, 2020 for offering for sale or distribution Flavored E-Cigarettes on the www.pricepointny.com website that

---

[205] https://www.fda.gov/tobacco-products/ctp-newsroom/fda-puts-firms-responsible-esco-bars-and-breeze-two-popular-disposable-e-cigarette-brands-notice (last visited Feb. 14, 2025).

had not received the required FDA marketing authorization and therefore could not be marketed or sold in the U.S. [206] The warning letter advised Price Point that it was their responsibility to ensure that its Flavored E-Cigarettes "and all related labeling and/or advertising on . . . [its] website (including e-commerce, social networking, or search engine websites), in any other media in which you advertise, and in any retail establishments comply with each applicable provision of the FD&C Act and FDA's implementing regulations." [207] Price Point was undeterred.

490.    Upon information and belief, in response to the warning letter, the FDA was told in 2020 that Price Point intended to sell Flavored E-cigarettes only to international customers. However, Price Point continued selling flavored e-cigarettes to New Yorkers.

491.    Moreover, Price Point benefitted from social media and influencer tactics to maximize its exposure and attract young customers. For instance, in a series of videos that are accessible without age verification on YouTube, a user reviewed Flavored E-Cigarettes and noted that the Fume, Viva, and Yami branded flavored disposable vapes he was reviewing were buy one get one on pricepointny.com.

492.    Throughout the Relevant Time Period, the Individual Defendants not only controlled Price Point, but they designed and executed each of its illicit business practices in order to maximize their own profits and acting in their own individual interests.  Each of the Individual

---

[206] Letter from Ann Simoneau, Dir., Off. of Compliance & Enforcement, Center for Tobacco Products, U.S. Food & Drug Admin., to Weis Khwaja and Price Point Distributors Inc. d/b/a Price Point NY (Aug. 21, 2020), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/price-point-distributors-inc-dba-price-point-ny-610212-08212020#:~:text=WARNING%20LETTER&text=The%20Center%20for%20Tobacco%20Products,customers%20in%20the%20United%20States. (last visited Feb. 19, 2025) [hereinafter "2020 FDA Warning Letter to Price Point"].
[207] *Id206206.*

Defendants held a controlling, decision-making capacity within Price Point, and exercised that authority to engage in illegal conduct through Price Point.

493.    Upon information and belief, the Individual Defendants shuttered Price Point because Price Point was the subject of investigations and litigation by multiple different parties. In addition to being a named defendant in the action filed by the City of New York, it is also a respondent in a complaint brought by R.J. Reynolds Tobacco Company before the United States International Trade Commission, and, upon information and belief, is being investigated by the Bureau of Alcohol, Tobacco, Firearms and Explosives pertaining to their sales and shipments of Flavored-E-Cigarettes in violation of the PACT Act. [208]

494.    The Individual Defendants are residents of New York who have long operated and controlled Price Point, have developed personal relationships with other members of the Flavored E-Cigarettes industry, including upstream manufacturers and distributors, as well as downstream customers, including individual New Yorkers, and are therefore well positioned to easily re-open their illicit business under a new name in New York.

495.    Thus, in addition to becoming a successful distributor and retailer of Flavored E-Cigarettes to clients small and large in New York and the country, Price Point—through each Individual Defendant—has targeted adolescents throughout the Relevant Time Period by, among other things, (i) following the other Defendants' lead and stocking Flavored E-Cigarettes that use flavors, bright colors, and themes that are deliberately designed to attract adolescents, including

---

[208] *City of New York v. Price Point Distributors Inc., et al.*, 2:24-cv-07762-JMW (S.D.N.Y.); *In the Matter of Certain Disposable Vaporizer Devices and Components and Packaging Thereof*, Inv. No. 337-TA-1381; *In the Matter of Certain Vaporizer Cartridges and Components Thereof*, Inv. No. 337-TA-1211.

fruity and candy flavors, (ii) concentrating its sales efforts on Disposable Vapes, which are most accessible by price and form to adolescent use, (iii) failing to institute and implement required age verification procedures at delivery to prevent adolescents from purchasing Flavored E-Cigarettes, and (iv) offering price discounts on their Flavored E-Cigarettes such as two-for-one deals.

496.    Moreover, by its commercial conduct throughout the Relevant Time Period, Price Point—through each Individual Defendant—repeatedly violated the PACT Act by, among other things, (i) shipping Flavored E-Cigarettes to individual New York consumers who purchased said products on the Price Point website, (ii) illegally using the USPS to ship their Flavored E-Cigarette products, and (iii) using a shipping method that fails to require the person signing to accept delivery to present a valid, government-issued photo I.D. indicating that the individual is at least the minimum age required to purchase Flavored E-Cigarettes.  Moreover, Price Point—through each Individual Defendant—has also repeatedly violated New York's Public Health Law, by, among other things, (i) ignoring New York's complete retail ban on Flavored E-Cigarette products, (ii) routinely and illegally shipping their Flavored E-Cigarette products to their New York customers, and (iii) using illegal discounts to maximize their reach and sales.

### J.  The Relationship Between Defendants

497.    Defendants commonly sell and purchase e-cigarette products among themselves to establish an overlapping inventory of various vapor products, brands, and flavors to satisfy customer demands by a single supplier.  For instance, Defendant Midwest Goods purchases e-cigarette products from Defendants Demand Vape, Mi-One, Safa Goods, Pod Juice, and Happy Distro.  *See supra* ¶ 349. Likewise, Defendant Happy Distro has sold flavored e-cigarette products

162

to the DEMAND Defendants, Midwest Goods, and Mi-One; the DEMAND Defendants have sold e-cigarette products to Defendants Safa Goods, Price Point, Midwest Goods; Mi-One and has sold to others Mylé Products, Puff Bar products, Mi-One products, and Pod Juice products. Defendant Price Point has purchased products from Defendants Pod Juice, Demand Vape, and Happy Distro.

498.    This interrelationship between Defendants underscores their collective control over the New York market and coordination to ensure that they are each profiting in this saturated market.  It also demonstrates how each Defendant has made a direct and indirect contribution to the nuisance given each Defendant's unique posture or offerings.

## IV.    THE PRICE PAID BY THE STATE:  DEFENDANTS' FLAVORED VAPOR PRODUCTS HAVE HARMED NEW YORK AND WILL CONTINUE TO DO SO IF UNABATED.

499.    The influx of Flavored E-Cigarettes into New York is a significant threat to public health and safety.  As summarized above, New York has passed laws to avoid this crisis, relied on federal regulations and laws, and acted swiftly to quell the harm evolving out of the tobacco-age crisis, *see supra* Part II.  But by the conduct described in detail above, *see supra* Part III, Defendants not only undermine those efforts, they affirmatively harm New Yorkers by creating and perpetuating a misapprehension around the safety of all vapor products and marketing their specific products in such a way that entices New York's youth to begin vaping and continue vaping, which increases their risk of illness and complications caused by the flavored vapor products themselves and also increasing the likelihood that they will ever use combustible cigarettes and experience all the grave harm and suffering associated with that conduct.[209]

---

[209] https://tobaccocontrol.bmj.com/content/26/e2/e106 (last visited Feb. 10, 2025).

### A. Too Many New York Teens Are Vaping Today Because of the Defendants-Controlled Market for Disposable Vapes, Despite a Steep Decline in the Use of Tobacco Products.

500.    As discussed above, rates of youth smoking combustible cigarettes in New York fell dramatically following various public health mandates, policies, and actions.  According to the NYSDOH, the rate of cigarette use among middle and high school students dropped extraordinarily between 2000 and 2014:



**Percentage of Current Smokers among Middle and High School Students**



| | 2000 | 2002 | 2004 | 2006 | 2008 | 2010 | 2012 | 2014 |
|---|---|---|---|---|---|---|---|---|
| Middle School | 10.2% | 6.1% | 5.1% | 4.0% | 3.4% | 3.2% | 3.1% | 1.2% |
| High School | 27.1% | 20.4% | 18.5% | 16.3% | 14.6% | 12.6% | 11.9% | 7.3% |

501.    But that downward trend in tobacco product use spiked back up following the emergence of e-cigarettes. Between 2014, when use of e-cigarettes among high school students was first measured in New York, to 2018, the use of tobacco products among high school students increased by 57%. The increase in tobacco product use was due entirely to e-cigarette use which more    than    doubled    from    10.5%    to    27.4%    during    the    4-year    period.

164



**Trends in Any Tobacco Product Use² among High School Students in NYS, NY-YTS 2000-2022**



| | 2000 | 2002 | 2004 | 2006 | 2008 | 2010 | 2012 | 2014 | 2016 | 2018 | 2020 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Any Tobacco Products | 33.6% | 26.2% | 24.3% | 21.8% | 22.8% | 21.2% | 21.8% | 19.5% | 25.4% | 30.6% | 25.6% | 20.8% |
| Cigarettes | 27.1% | 20.4% | 18.5% | 16.3% | 14.7% | 12.6% | 11.9% | 7.3% | 4.3% | 4.8% | 2.4% | 2.1% |
| E-Cigarettes | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 10.5% | 20.6% | 27.4% | 22.5% | 18.7% |
| Other Tobacco Products | 18.1% | 14.6% | 13.0% | 11.0% | 15.0% | 14.8% | 16.8% | 12.0% | 10.6% | 9.2% | 6.1% | 3.5% |

502.    While the rate of combustible cigarette use continued to decline through 2022, the overall rate of use for any nicotine-containing products shot up to approximately 10 times the usage rate of traditional cigarettes, owing primarily to e-cigarettes. At every grade level within high school, e-cigarette use exploded from 2014 to 2018 and beyond:

**Current Electronic Cigarette Use Among High School Youth by Grade Level, NYS-YTS 2014-2018**



165

503.    By 2022, New York rates of high school tobacco use even as to e-cigarettes fell slightly, but remained unacceptably high.  By then, New York was able to lower overall tobacco use to *1 in 5 high school students*, which based on enrollment in the 2022-2023 school year would equate to approximately 150,000 New Yorkers,[210] with the vast majority opting for e-cigarettes among the menu of tobacco products to choose from.  Although that rate demonstrates a year over year improvement since 2018, New York's 2022 youth e-cigarette use rate is *higher* than the national average, demonstrating the outsized effect of the flavored vapor product industry's influence on New York's youth.[211]

504.    This troubling trend is even more disturbing when viewed in light of its full context. These numbers do not represent casual use, nor are they skewed by a large number of single use instances.  Rather, "[d]isturbingly, … a growing percentage of America's youth who use e-cigarettes have become frequent e-cigarette users (defined as reporting use on 20 days or more of the prior 30-day period)."[212]  That frequent use, coupled with the high nicotine concentrations in these products is likely to result in long-term nicotine addiction in each of the high school students represented in the statistics above.[213]

---

[210] https://data.nysed.gov/enrollment.php?year=2023&state=yes (last visited Feb. 14, 2025).

[211] https://publichealthlawcenter.org/sites/default/files/resources/NYS-Flavored-Tobacco-Brief.pdf  (last visited Feb. 10, 2025) ("In 2022, 18.7% of New York State high school-aged children reported vaping as compared to 14.1% nationally.").

[212] USDHHS, FDA, & CTP, *supra* n.18.

[213] Neal L. Benowitz, *Nicotine Addiction*, N Engl J Med, June 17, 2010 ("The risk of [nicotine] dependence increases when smoking begins early. Studies of the developing brain in animals suggest that nicotine can induce permanent changes that lead to addiction. Brain changes in adolescent rats exposed to nicotine are greater than those in exposed adult rats. Adolescent rats that have been exposed to nicotine have higher rates of nicotine self-administration as adults, which is consistent with the idea that early exposure to nicotine increases the severity of dependence.").

505.    Upon information and belief, the reduction in teen usage of Flavored E-Cigarettes between 2018 and 2022 is in large part due to New York's flavor ban and its success in litigating against JUUL.[214]   Whereas, Defendants' commercial and marketing conduct and recent control over the vast majority of Flavored E-Cigarettes flowing into New York is responsible for the persistent users and new young users of those products from 2022 through today.

506.    Also of major concern in the case at bar, there is substantial scientific evidence that the use of vapor products increases the risk of ever using combustible tobacco cigarettes among youth and young adults.[215]   While combustible cigarette smoking is at an all-time low,[216] it remains the leading preventable cause of death and disease in the U.S.—more than 16 million Americans are living with a smoking-related disease.[217] and approximately 8,000 New Yorkers die of cancer attributable to smoking each year.[218]   Therefore, increasing the number of vaping adolescents substantially and reciprocally increases the number of to-be-smokers of combustible cigarettes, perpetuating again all of the harms and negative public health outcomes that arise.

507.    The staggering rates of middle and high school users in New York should be of no surprise to any Defendant.  Based on data available to the State to date, the median distance from

---

[214] https://www.publichealthlawcenter.org/sites/default/files/resources/NYS-Flavor-Bans.pdf (last visited Feb. 10, 2025) ("Comprehensive flavor bans on tobacco products in the U.S. and Canada have been successful in reducing smoking rates and saving lives.").

[215] USDHHS, FDA, & CTP, *supra* n.18.

[216] https://news.gallup.com/poll/648521/cigarette-smoking-rate-ties-year-low.aspx, (last visited Feb. 4, 2025).

[217] https://archive.cdc.gov/#/details?url=https://www.cdc.gov/tobacco/data_statistics/fact_sheets/fast_facts/diseases-and-death.html, (last visited Feb. 4, 2025); CDC, *State Fact Sheets* (Feb. 14, 2023), https://rb.gy/pau8fu (last visited Feb. 4, 2025).

[218] https://www.health.ny.gov/statistics/diseases/cancer/docs/tobacco_related_cancers_report_2016-2020.pdf (last visited Feb. 14, 2025).

a middle or high school to certain Defendants' customers was just 0.75 miles, making their products too easily accessible within walking distance of our public schools.

**B. Defendants' Disposable Vapes Are Negatively Affecting New York Adolescents' Health and Wellbeing.**

508.    But beyond statistics, rates, distances, sales numbers, and profit margins, the heart of this case lies in the harm Defendants' have brought upon New York's public health. Nicotine and its effects and harms are known to be magnified in adolescents because they are simply more vulnerable to its effects than adults.[219]

509.    Not only do young people report symptoms of dependence or addiction after exposure to even low levels of nicotine, but the consequences of Defendants' commercial successes include avoidable and substantial increased risk for New York's youth to experience:

  a.   interference with cognitive development, executive functioning, inhibitory control,

  b.   disturbances in working memory and attention,

  c.   nicotine toxicity, which may bring about headaches, abdominal pain, nausea, vomiting, heart palpitations, hand tremors, or in extreme cases, seizures or cardiac arrhythmia,

  d.   respiratory health issues, including increased incidence of respiratory disease, and lung inflammation,

  e.   poor cardiovascular health, including arterial stiffness, impaired blood vessel function, and increased blood pressure and heart rate,

  f.   increased susceptibility to oral infections,

---

[219] https://pmc.ncbi.nlm.nih.gov/articles/PMC3543069/ (last visited Feb. 10, 2025); *see also* https://pmc.ncbi.nlm.nih.gov/articles/PMC4560573/ (last visited Feb. 10, 2025) ("[A]dolescence is a sensitive period for maturation of brain circuits that regulate cognition and emotion, with resulting vulnerability to the effects of nicotine and tobacco.").

g.   development of mental and behavioral problems such as major depressive disorder, agoraphobia, panic disorder, addiction to other substances, antisocial personality disorder, or academic problems,

h.   development of psychiatric disorders and cognitive impairment in later life,

i.   higher rates of wheezing and coughs,

j.   facial and limb burns due to a malfunction of a vapor product,

k.   prevalence of asthma, and

l.   increased susceptibility to pulmonary (lung) infections.

510.   For those New York high schoolers who are already vaping, lifelong harm is already done: "Chronic nicotine exposure during adolescence produces alterations in neurochemistry and behavior that differ markedly from those in adulthood."[220]

511.   It is known that chronic nicotine exposure during adolescence causes long-lasting alterations in neurochemistry and behavior.[221]   "[M]ore recent studies have indicated that even brief exposure to a low dose of nicotine can produce lasting change in the adolescent brain," but the vast majority of Defendants' products carry extraordinarily high concentrations of nicotine, *see supra* ¶¶ 68-70; *see also, e.g.*, *supra* ¶ 363, and they have failed to disclose, or actively conceal, what other potentially hazardous compounds are being inhaled through their products, *see supra* ¶¶ 124-140.

512.   Even certain Defendants' zero-nicotine Flavored E-Cigarettes cause serious harm, such as mouth and airway irritation, inflammation, cell toxicity, chemical side effects, serious

---

[220] https://pmc.ncbi.nlm.nih.gov/articles/PMC4560573/ (last visited Feb. 10, 2025).

[221] *Id.*

169

respiratory illnesses, and increased risk of smoking combustible cigarettes.

513.    Each of Defendants' Flavored E-Cigarettes, particularly the most popular products, i.e., Disposable Vapes, are also hazardous to non-users. Between April 1, 2022, and March 31, 2023, the CDC found that 7,043 e-cigarette exposure cases were reported to the National Poison Data System.[222] That data showed a 32% increase in reported poisoning from e-liquid ingestion during this one-year period, with nearly 90% of the cases involving children younger than five years old. A brand that was among the most reported as involved in these incidents was "Elf Bar," a Disposable Vape available in a variety of flavors and sold by Price Point, the DEMAND Defendants, Happy Distro, and Midwest Goods.

514.    Accordingly, every young New Yorker is made less safe and has an increased risk of these physical and mental health injuries because of each Defendant's commercial conduct relating to its own products and their collective control over the marketing and sales of Flavored E-Cigarettes, particularly Disposable Vapes, in New York.

### C. Defendants Must Abate the Harm They Have Caused, Contributed to, or Maintained.

515.    As described above, New York has enacted a sweeping set of laws and has become a national leader in tobacco and nicotine control policy.  The purpose of New York's comprehensive suite of laws is stated as follows by the NYSDOH:[223]

> The state's strong and effective laws and regulations protect
> youth from deadly nicotine addiction by reducing access to

---

[222] Karen A. Cullen et al., *e-Cigarette Use Among Youth in the United States*, 2019, JAMA, Nov. 5, 2019 322(21), at 2095, *available at* https://jamanetwork.com/journals/jama/fullarticle/2755265 (last visited Feb. 5, 2025).

[223] https://www.health.ny.gov/prevention/tobacco_control/current_policies.htm (last visited Feb. 10, 2025).

Case 1:25-cv-01445    Document 1    Filed 02/20/25    Page 176 of 197


tobacco and vaping products; protect New Yorkers from exposure to dangerous secondhand cigarette smoke and e-cigarette aerosol; and hold tobacco and vapor product manufacturers to transparency…. The relevant provisions are designed to provide additional protection, together with NY's Clean Indoor Air Act, the ban on sales of tobacco or vapor products in any retail establishment with a pharmacy, the highest tax on tobacco and vapor products of any state, and the registration of tobacco and vapor product retailers and wholesalers.

516.    New York has had to confront the evolving nature of the vaping crisis, and while it continually updates and refreshes its tobacco-related policies, use remains too high. In fact, notwithstanding the strides made over decades, tobacco remains one of the focus areas in New York State's Prevention Agenda to Prevent Chronic Diseases Action Plan:[224]

Goal 1: Prevent initiation of tobacco use, including combustible tobacco and vaping products (defined as e-cigarettes and similar devices) by New York youth and young adults.

Some of the interventions that the State has identified to reach that goal are:

Intervention: Increase Tobacco Control Program Funding to the CDC-Recommended level, to ensure a comprehensive tobacco control program.

Intermediate-level measure: Raise program funding to $52 million, approximately 25 percent of recommended full funding.

Intervention: Use media and health communications to highlight the dangers of tobacco, promote effective tobacco control policies and reshape social norms.

Intermediate-level measure: Evidence of increasing support

---

[224] https://www.health.ny.gov/prevention/prevention_agenda/2019-2024/docs/ship/chr.pdf (last visited Feb. 10, 2025).

tobacco and vaping products; protect New Yorkers from exposure to dangerous secondhand cigarette smoke and e-cigarette aerosol; and hold tobacco and vapor product manufacturers to transparency…. The relevant provisions are designed to provide additional protection, together with NY's Clean Indoor Air Act, the ban on sales of tobacco or vapor products in any retail establishment with a pharmacy, the highest tax on tobacco and vapor products of any state, and the registration of tobacco and vapor product retailers and wholesalers.

516.    New York has had to confront the evolving nature of the vaping crisis, and while it continually updates and refreshes its tobacco-related policies, use remains too high. In fact, notwithstanding the strides made over decades, tobacco remains one of the focus areas in New York State's Prevention Agenda to Prevent Chronic Diseases Action Plan:[224]

Goal 1: Prevent initiation of tobacco use, including combustible tobacco and vaping products (defined as e-cigarettes and similar devices) by New York youth and young adults.

Some of the interventions that the State has identified to reach that goal are:

Intervention: Increase Tobacco Control Program Funding to the CDC-Recommended level, to ensure a comprehensive tobacco control program.

Intermediate-level measure: Raise program funding to $52 million, approximately 25 percent of recommended full funding.

Intervention: Use media and health communications to highlight the dangers of tobacco, promote effective tobacco control policies and reshape social norms.

Intermediate-level measure: Evidence of increasing support

---

[224] https://www.health.ny.gov/prevention/prevention_agenda/2019-2024/docs/ship/chr.pdf (last visited Feb. 10, 2025).

> for effective tobacco control measures that would reduce youth initiation.
>
> Intervention: Keep the price of tobacco uniformly high by regulating tobacco company practices that reduce the real price of cigarettes through discounts.
>
> Intervention: Decrease the availability of flavored tobacco products including menthol flavors used in combustible and non-combustible tobacco products and flavored liquids including menthol used in electronic vapor products.

517.    It is proven that "[w]ell-funded, accessible, culturally competent cessation programs serve an important role in reducing inequities and supporting individuals in their quit journey."[225] And New York meets that standard. Indeed, in addition to the above highlights of New York's supports for individual struggling with nicotine addiction, "individuals in New York State can get a free starter kit by calling the New York State Smokers' Quitline."[226]

518.    New York is engaged and invested in treating its young citizens who fell prey to Defendants' false and misleading messaging around the safety of Flavored E-Cigarettes. For example, the NYSDOH directs young users to the Drop the Vape initiative and also maintains the New York State Quitline:[227]

> Drop the Vape is a New York State-specific free and anonymous text messaging program, designed by the Truth Initiative®, and created with input from teens, college students, and young adults who have attempted to, or successfully, quit vaping. New York State youth, ages 13-17, and young adults, ages 18-24, can text DropTheVape to

---

[225] https://www.publichealthlawcenter.org/sites/default/files/resources/NYS-Flavor-Bans.pdf (last visited Feb. 10, 2025).

[226] *Id.*

[227] https://www.health.ny.gov/prevention/tobacco_control/campaign/e-cigarettes/ (last visited Feb. 10, 2025).

172

88709 to sign up to receive age-appropriate supportive and motivating text messages to support quit efforts. Enrollees in the program receive interactive daily text messages tailored to their sign-up date or their target quit date if they set one. Those without a quit date receive messages for at least one month. Program users who set a quit date (which they can change) receive messages for at least one week prior to the quit date and for at least two months following the quit date.

Drop the Vape also directs users to the New York State Quitline for free and confidential quit-coaching via telephone, internet, and text, and free starter kits of nicotine replacement therapy (NRT) for eligible New Yorkers.

519.    Additionally, New York's Tobacco Control Program has acted to prevent the initiation of nicotine-containing products' use, including e-cigarettes, by youth and young adults through its program called Reality Check: [228]

[Reality Check] is a youth engagement component for New York State teens, ages 13-18, to increase support for New York State's tobacco-free and vape-free norms through youth action and community engagement. Evidence-based, policy-driven, and cost-effective approaches are implemented to decrease youth tobacco use, protect youth from exposure to tobacco marketing and imagery, and eliminate exposure to secondhand smoke.

520.    These expenditures are necessary due in no small part to the unhealthy and dangerous conditions caused by Defendants' self-serving and illegal business practices.

521.    These interventions are not free.  And they are not easy to accomplish, especially when Defendants are actively working against the State's efforts and investments in preventing nicotine-related chronic illnesses.  For example, the NYSDOH has estimated that, since 2019, the

---

[228] *Id.*

State has spent, among other things:

    a.  Nearly $5.7 million on anti-vaping media, including the new "Nicotine Equals" media campaign launched in January 2025;

    b.  Over $5.3 million on necessary vaping surveys, policy research and related evaluations and report-making;

    c.  Over $3.8 million on Tobacco Dependence Treatment Contractors, who work within the Health Systems for a Tobacco-Free New York on tobacco dependence treatment;

    d.  Nearly $35 million on the Reality Check program, described above, *see supra* ¶ 519; and

    e.  Over $3 million on New York's Quitline and the Drop the Vape texting campaign, *see supra* ¶ 518.

While this list of expenditures does not represent the full extent of harm to the State's fisc related to the claims herein, it demonstrates that New York is grappling with a multi-faceted issue and that NYSDOH alone has contributed nearly $53 million to stem the crisis.

522.    Moreover, while the State was recently enjoying the benefit of improved public health following its effective responses to the tobacco industry and JUUL-caused harms, it must now repeat much of that work to prevent, save, and assist new generations from life-long nicotine addiction and the accompanying mental and physical detriments.

523.    By their conduct, Defendants are nullifying the benefits the State should be enjoying as a result of its dedication to this issue. Most obviously, Defendants are stripping New York's effective flavor ban of its impact, and consequently the number and rate of individuals throughout the state using Flavored E-Cigarettes, particularly Disposable Vapes, and developing nicotine addiction will continue to rise.

174

524.    Accordingly, given the nature of each Defendant's business practices and products, together with the known nature of the Flavored E-Cigarettes market and the statistical relationship between Disposable Vapes and youth use, Defendants are knowingly, negligently, and/or recklessly causing harm to New York's public health and safety.

525.    "[A] one-year delay in the age of substance use initiation is associated with a decrease of 4–5% in the likelihood of lifetime substance use disorder."[229]  To that end, when an individual has not started smoking before the age of 25, they are unlikely to ever smoke.[230]  But each Defendant's individual tactics and the collective impact of their illicit business conduct in New York hook children on their Disposable Vapes as young as possible, increasing the likelihood of lifetime substance use disorders across the youngest cohorts of users.

526.    With every sale Defendants have made during the Relevant Time Period, they circumvented, undermined, and violated New York's nicotine-related public health measures for their own profit, and have created, maintained, or contributed to a dangerous condition.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION
**REPEATED AND PERSISTENT ILLEGALITY IN VIOLATION OF N.Y. EXECUTIVE LAW § 63(12)**
*(Against All Defendants)*

527.    The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

---

[229] https://pmc.ncbi.nlm.nih.gov/articles/PMC11629554/ (last visited Feb. 10, 2025).

[230] https://www.publichealthlawcenter.org/sites/default/files/resources/NYS-Flavor-Bans.pdf (last visited Feb. 10, 2025).

528.    New York Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent illegal conduct in the carrying on, conducting, or transaction of business.

529.    Any conduct which repeatedly or persistently violates state or federal law or regulation is actionable as an "illegality" under New York Executive Law § 63(12).

530.    As set forth above, Defendants have each engaged in repeated or persistent illegal conduct in the carrying on, conducting, or transaction of business throughout the Relevant Time Period, such that, *inter alia*, each Defendant has:

      a.    *Shipping and selling Flavored E-Cigarettes*: Repeatedly sold and shipped or caused to be shipped vapor products, in violation of New York State and pertinent local laws. *See* N.Y. Pub. Health L. §§ 1399-bb, 1399-bb-1, 1399-ll, 1399-mm-1; *see also, e.g.*, N.Y.C. Admin. Code § 17-715;

      b.    *PACT Act Registration and Reporting Violations*: Engaged in interstate commerce in the course of marketing and selling qualifying products, but has failed to make the detailed, legally required disclosure and filing with the U.S. Attorney General and the tobacco tax administrators of New York State for each and every interstate shipment of its products;

      c.    *PACT Act Delivery Sales Violations*: Constituted a delivery seller under the PACT Act, but has violated the weight restrictions, the age verification requirement, and/or the detailed disclosures that must be readily visible on the outer packaging.  Moreover, the PACT Act requires conformity with all state and local laws applicable to ENDS, which each Defendant violated, including but not limited to N.Y. Pub. Health L. §§ 1399-ll, 1399-mm-1; N.Y.C. Admin. Code § 17-715;

      d.    *PACT Act Illegal Mailing Violations*: Deposited or caused the deposit of e-cigarettes in the mail, which is a violation of the PACT Act;

      e.    *Sales to individuals, unlicensed entities, or entities acting in clear violation of their license*: Illegally engaged common carriers to deliver their vapor products to private individuals, entities unlicensed to deal in tobacco products, or ostensibly licensed entities but whom are in clear violation of their licensing

such that each Defendant was aware at the time of each sale that such license was either secured under fraudulent pretenses or otherwise a nullity. *See* N.Y. Pub. Health L. § 1399-ll;

f. *Failure to disclose product ingredients*: Qualified as a manufacturer of vapor products under N.Y. Public Health Law § 1700, *et seq.*, because they are an importer, trademark holder, and/or manufacturer, and therefore each is required to submit to the New York State Department of Health Commissioner for public record, and simultaneously post on its own website detailed information regarding the ingredients used and included in their vapor products, but no Defendant has abided by this legal requirement. *See* N.Y. Pub. Health L. § 1701;

g. *Illegal promotions, coupons, rebates, and discounts on nicotine-containing products*: Engaged in illegal promotion by, among other things, sponsoring and/or causing to be sponsored social events, primarily via social media, in the brand name of various e-cigarette brands, and/or by offering discounts, coupons, rebates, and/or other price reductions on e-cigarettes. *See* N.Y. Public Health L. §§ 1399-bb, 1399-bb-1; and/or

h. *Unfair methods of competition under the Federal Trade Commission Act*, 15 U.S.C. § 45: Caused or acted in a manner that was likely to cause substantial injury to consumers health and wellbeing, that injury could not be reasonably avoided by consumers because each Defendant's deceptive marketing interfered with consumers' ability to effectively make decisions concerning their Flavored E-Cigarette products, and because each Defendant withheld material information or made affirmative misrepresentations concerning the nature and toxicity of their Flavored E-Cigarettes, and the injury to consumers is not outweighed by any existing countervailing benefits to consumers or to competition.

531. By reason of the foregoing, Defendants have engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## AS AND FOR A SECOND CAUSE OF ACTION
### REPEATED AND PERSISTENT FRAUDULENT CONDUCT IN VIOLATION OF N.Y. EXECUTIVE LAW § 63(12)
*(Against All Defendants)*

532. The State realleges each and every allegation in the paragraphs above as though

fully set forth herein.

533.    New York Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent fraudulent conduct.

534.    New York Executive Law § 63(12) defines "fraud" or "fraudulent" to "include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false premise or unconscionable contractual provisions."

535.    As set forth above, each Defendant has engaged in repeated or persistent fraudulent conduct in the carrying on, conducting, or transaction of business, by misrepresenting, directly or by implication, in their advertising and elsewhere, that

        a.    Flavored E-Cigarettes are generally safe and appropriate for use by all users, including adolescents;

        b.    The Flavored E-Cigarettes sold by each Defendant in New York are not harmful to a user's health, including adolescents;

        c.    Flavored E-Cigarettes generally may be legally marketed and sold in the State of New York; and/or

        d.    The Flavored E-Cigarettes sold by each Defendant may be legally marketed and sold in the State of New York

536.    As set forth above, each Defendant has also engaged in repeated or persistent fraudulent conduct in the carrying on, conducting, or transaction of business, by misrepresenting and/or concealing, directly or by implication, in their advertising and elsewhere, the

        a.    Adverse health consequences of Flavored E-Cigarettes generally; and/or

        b.    The adverse health consequences of the Flavored E-Cigarettes sold by each Defendant in New York.

537.    By reason of the foregoing, Defendants have engaged in repeated and persistent

fraudulent conduct in violation of New York Executive Law § 63(12).

## AS AND FOR A THIRD CAUSE OF ACTION
### COMMON-LAW PUBLIC NUISANCE
*(Against All Defendants)*

538.   The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

539.   Residents of the State of New York enjoy common rights, including, without limitation: (i) the maintenance of a well-regulated system for the manufacture, distribution, and sale of tobacco and ENDS products; and (ii) public health, safety, and order, unburdened by the introduction of foreseeable dangers such as those caused by the sale and consumption of illegal ENDS products, especially Disposable Vapes, among underage individuals.

540.   Each Defendant owed a duty to the public not to offend, interfere with, or cause damage to such common rights through illegal actions and omissions in violation of applicable laws and regulations.

541.   Each Defendant, individually and acting through agents and employees, has engaged in such actions and omissions which offend, interfere with, and/or cause damage to the public in the exercise of rights common to all in violation of said duties, in a manner such as to endanger or injure the property, health, safety, or comfort of a considerable number of persons in the State of New York, in the course of their manufacture, promotion, marketing, sales, and/or distribution of Disposable Vapes in New York State.

542.   Each Defendant engaged in violations of law through such actions and omissions, resulting in offense, interference, and/or damage to the public in the exercise of common rights.

179

543.   Each Defendant knew, or should have foreseen, that its actions and omissions would result in offense, interference, and/or damage to the public in the exercise of common rights.

544.   The offense, interference, and/or damage to the public in the exercise of common rights caused by Defendants' collective and individual actions and omissions remain unabated. Indeed, each Defendant's conduct is continuing in nature and has produced permanent and long-lasting negative effects. Each Defendant's unlawful conduct and foreseeable harm has so impacted e-cigarette addiction and consumption rates—particularly among young people—and public health that the public nuisance caused in substantial part by each Defendant's conduct is widely considered a public health crisis.

545.   By engaging in the acts described above, each Defendant's conduct constitutes a public nuisance.

## AS AND FOR A FOURTH CAUSE OF ACTION
### VIOLATIONS OF THE PACT ACT, 15 U.S.C. § 376a
#### DELIVERY SALES
##### (AGAINST ALL DEFENDANTS EXCEPT EVO BRANDS, MVH I, AND THE INDIVIDUAL DEFENDANTS)

546.   The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

547.   The PACT Act authorizes the Attorney General to bring a civil action in a United States District Court to seek civil penalties, money damages, and injunctive and other relief against any person for violating the PACT Act.

548.   Every delivery seller, as defined in 15 U.S.C. § 375(6), is subject to the PACT Act delivery sale requirements set forth in 15 U.S.C. § 376a.

549.   Each Defendant (except EVO Brands, MVH I, and the Individual Defendants)

operates as a delivery seller and makes delivery sales, as the term is defined in 15 U.S.C. § 375(5).

550.   Each Defendant (except EVO Brands, MVH I, and the Individual Defendants) maintains a website accessible to New Yorkers in which they advertise, sell, and offer for sale and delivery vapor products to the general public, including to consumers, as that term is defined in 15 U.S.C. § 375(4), located in New York. The sales are delivery sales within the meaning of the PACT Act because consumers can place orders remotely, on Defendants' website, by phone, by email, by mail, the internet, or other remote means, for vapor products which are then delivered to the consumer.

551.   Each Defendant (except EVO Brands, MVH I, and the Individual Defendants) has sold vapor products to "consumers," as defined under the PACT Act, and have shipped or caused to be shipped said products to consumers in New York. At no time during the purchase or delivery were Defendants in the physical presence of the consumers.

552.   Each Defendant (except EVO Brands, MVH I, and the Individual Defendants) sold vapor products to consumers, wherein the vapor products were delivered to said consumer located in New York by common carrier, private delivery service, or other method of remote delivery.

553.   Each Defendant (except EVO Brands, MVH I, and the Individual Defendants) made sales of vapor products to individuals, unlicensed and/or unlawfully operating retailers in New York, which are "consumers" under the PACT Act, and shipped said products to those consumers in New York. At no time during the purchase or delivery were Defendants in the physical presence of the consumers.

554.   As set forth above, as delivery sellers, each Defendant (except EVO Brands, MVH

I, and the Individual Defendants) was required but failed to comply with one or more of the following PACT Act shipping, packaging, weight, age verification, and recordkeeping requirements:

    a.  Including on the bill of lading, if any, and on the outside of the shipping package, on the same surface as the delivery address, a clear and conspicuous statement providing as follows: "CIGARETTES/NICOTINE/SMOKELESS TOBACCO: FEDERAL LAW REQUIRES THE PAYMENT OF ALL APPLICABLE EXCISE TAXES, AND COMPLIANCE WITH APPLICABLE LICENSING AND TAX-STAMPING OBLIGATIONS";

    b.  Selling, offering for sale, delivering or causing to be delivered in any single sale or single delivery vapor products weighing no more than 10 pounds;

    c.  Selling, delivering or causing to be delivered vapor products to persons 21-years of age or older;

    d.  Using a method of mailing or shipping that requires the purchaser placing the delivery sale order, or an adult who is at least 21-years of age, to sign to accept delivery of the shipping container at the delivery address;

    e.  Using a method of mailing or shipping that requires the person who signs to accept delivery of the shipping container to provide proof, in the form of a valid, government-issued identification bearing a photograph of the individual, that the person is at least 21-years of age;

    f.  Not accepting a delivery sale order from a person without (i) obtaining the full name, birth date, and residential address of that person; and (ii) verifying the information provided in (i) through the use of a commercially available database or aggregate of databases, consisting primarily of data from government sources, that are regularly used by government and businesses for the purpose of age and identity verification and authentication, to ensure that the purchaser is at least 21-years of age;

    g.  Keeping a record of any delivery sale, including the name and address of the person to whom the shipment was made, the brand, the quantity, and the name, address, and phone number of the person delivering the shipment to the recipient on behalf of the delivery seller, organized within the State, by the city or town and by zip code, into which the delivery sale is made;

    h.   Retaining the records of a delivery sale until the end of the 4th full calendar year that begins after the date of the delivery sale; and/or

    i.   Making its delivery sale records available to the Attorney General in order to ensure compliance of the PACT Act delivery sales requirements.

555.    As set forth above, as delivery sellers, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) was required but failed, in part or in whole, to comply with all State, local, tribal, or other laws generally applicable to the sale of vapor products, including Flavored E-Cigarettes, as if the delivery sales occurred entirely within New York, including one or more of the following laws:

    a.   *Age Restriction*, N.Y. Pub. Health L. § 1399-cc – New York law restricting access to tobacco products, liquid nicotine, and e-cigarettes to individuals under 21-years of age. These age restrictions apply to all vapor products, including Flavored E-Cigarettes, sold by each Defendant;

    b.   *Ban on Price Reductions*, N.Y. Pub. Health L. § 1399-bb – New York law restricts the sale or offer for sale of vapor products, including Flavored E-Cigarettes, for less than the listed price or non-discounted price;

    c.   *Ban on Swag and Event Promotions*, N.Y. Pub. Health L. §§ 1399-bb-1 – New York law restricts e-cigarette branded swag. Effective January 1, 2024, New York prohibits any manufacturer or distributor of e-cigarettes from marketing, licensing, distributing, selling, or causing to be marketed, licensed, distributed, or sold any item (other than electronic cigarettes and its component parts) or service which bears the brand name or other indicia of product identification of the brand. Moreover, no manufacturer, distributor, or retailer may sponsor any athletic, musical, or other social or cultural event, using any e-cigarette branding;

    d.   *Shipping Ban*, N.Y. Pub. Health L. § 1399-ll(1-a) – New York law prohibits the persons engaged in the business of selling vapor products to ship or cause to be shipped  vapor products, including Flavored E-Cigarettes, to any person in the state who is not: (a) a licensed vapor products retailer, (b) an export warehouse proprietor or customs bonded warehouse operator, or (c) an officer, employee or agent of the U.S. government;

    e. *Labeling Requirement*, N.Y. Pub. Health L. § 1399-ll(3) – New York law requires that when a person engaged in the business of selling vapor products ships or causes to be shipped any vapor products to any person in the state, other than in the vapor products manufacturer's original container or wrapping, the container or wrapping must be plainly and visibly marked with the words "vapor products;"

    f. *Flavor Ban*, N.Y. Pub. Health L. § 1399-mm-1 – New York law prohibits the sale or offer for sale at retail of any Flavored E-Cigarette, such that each and every sale of a Flavored E-Cigarette to a New York retailer is outside the scope of New York's retail licensing scheme, and together with Defendants' obligations under the PACT Act which limits Defendants' ability to remotely sell Flavored E-Cigarettes to consumers, is illegal by operation of New York's flavor ban; and/or

    g. *Ingredient Disclosures*, N.Y. Pub. Health L. § 1701 – New York law requires every manufacturer, as that term is defined in N.Y. Pub. Health L. § 1700(7), to furnish to the commissioner for public record and post on such manufacture's website information including, but not limited to:

        a. For each vapor product, a list naming each ingredient of each vapor product, including Flavored E-Cigarettes, distributed, sold, or offered for sale in New York; and

        b. For each e-cigarette, a list naming any toxic metal, including but not limited to lead, manganese, nickel, chromium, or zinc, as a constituent of any heating element included in such e-cigarette.

    556. By reason of the foregoing, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) has violated the PACT Act, 15 U.S.C. §376a, and is subject to civil penalties set forth in 15 U.S.C. § 377(b)(1)(A). The remedies available under 15 U.S.C. §§ 377-378 are in addition to any other remedies available under federal, state, local, tribal, or other law. 15 U.S.C. § 378(c)(4).

184

**AS AND FOR A FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE PACT ACT, 15 U.S.C. § 376**
**REGISTRATION & REPORTING**
**(AGAINST ALL DEFENDANTS EXCEPT EVO BRANDS, MVH I, AND THE PRICE POINT DEFENDANTS)**

557.    The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

558.    The PACT Act authorizes the Attorney General to bring a civil action in a United States District Court to seek civil penalties, money damages, and injunctive and other relief against any person for violating the PACT Act.

559.    New York State imposes a supplemental sales tax of twenty percent (20%) on receipts from the retail sale of vapor products sold in the state. N.Y. Tax L. § 1181.

560.    Each Defendant (except EVO Brands and MVH I) is a "person", as defined in 15 U.S.C. § 375(11) of the PACT Act engaged in the sale, transfer, and shipment for profit of vapor products in "interstate commerce", as defined in 15 U.S.C. § 375(10).

561.    Each Defendant (except EVO Brands and MVH I) advertised and/or offered the sale, transfer, and shipment of vapor products in interstate commerce.

562.    Each Defendant (except EVO Brands, MVH I, and the Price Point Defendants) have sold, transferred, and shipped for profit vapor products into New York through interstate commerce.

563.    Each Defendant (except EVO Brands, MVH I, and the Price Point Defendants) was required, but failed either entirely or substantially, to file with the tobacco tax administrators of New York, a statement setting forth the name, the addresses of the principal place of business and of any other place of business, the telephone numbers for each place of business, the principal e-

185

mail address, any website addresses, and the name, address and telephone number of an agent in New York authorized to accept service on behalf of the person.

564.    Each Defendant (except EVO Brands, MVH I, and the Price Point Defendants) was required, but failed either entirely or substantially, no later than the 10th day of each calendar month, to file with the tobacco tax administrator of New York a memorandum or a copy of the invoice covering each and every shipment of Flavored E-Cigarettes made during the previous calendar month into New York; the memorandum or invoice to include the name and address of the person to whom the shipment was made, the brand, the quantity thereof, and the name, address, and phone number of the person delivering the shipment to the recipient on behalf of the delivery seller, with all invoice of memoranda information relating to specific customers to be organized by city or town and by zip code.

565.    By reason of the foregoing, each Defendant (except EVO Brands, MVH I, and the Price Point Defendants) has violated the PACT Act, 15 U.S.C. §376, and is subject to civil penalties set forth in 15 U.S.C. § 377(b)(1)(A). The remedies available under 15 U.S.C. §§ 377-378 are in addition to any other remedies available under federal, state, local, tribal, or other law. 15 U.S.C. § 378(c)(4).

### AS AND FOR A SIXTH CAUSE OF ACTION
**VIOLATIONS OF THE PACT ACT, 18 U.S.C. § 1716E**
*NONMAILABLE DELIVERIES*
*(AGAINST ALL DEFENDANTS EXCEPT EVO BRANDS, MVH I, AND THE INDIVIDUAL DEFENDANTS)*

566.    The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

567.    The PACT Act authorizes the Attorney General to bring a civil action in a United

States District Court to seek "injunctive and equitable relief and damages equal to the amount of unpaid taxes on tobacco products mailed in violation of this section [18 U.S.C. § 1716E] to addresses in that State, locality, or tribal land." 18 U.S.C. § 1716E(h)(1).

568.    The PACT Act makes all vapor products, including Flavored E-Cigarettes, nonmailable and prohibits them from being deposited in or carried through USPS mails.

569.    Each Defendant (except EVO Brands, MVH I, and the Individual Defendants) deposited in and delivered through USPS mails nonmailable vapor products, including Flavored E-Cigarettes, in violation of 18 U.S.C. § 1716E.

570.    Each Defendant (except EVO Brands, MVH I, and the Individual Defendants) has committed, in part or in whole, violations of the PACT Act registration and reporting requirements set forth in 15 U.S.C. § 376, and the delivery sales requirements set forth in 15 U.S.C. § 376a, such that each Defendant is not a "legally operating business" for which the business purpose exception to 18 U.S.C. § 1716E would apply.

571.    As set forth above, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) has made delivery sales to individuals, unlicensed retailers, and/or unlawfully operating retailers in New York, such that each Defendants' delivery sales were not between "legally operating businesses" for which the business purpose exception to 18 U.S.C. § 1716E would apply.

572.    By reason of the foregoing, each Defendant (except EVO Brands, MVH I, and the Individual Defendants) has violated 18 U.S.C. § 1716E, in addition to any other fines and penalties applicable under Title 18 of the United States Code, is subject to an additional civil penalty in the

187

amount equal to 10 times the retail value of the nonmailable vapor products, including Flavored E-Cigarettes, and including all Federal, State, and local taxes. 18 U.S.C. § 1716E(d). The injunctive and equitable relief, and damages available under 18 U.S.C. § 1716E(h) are in addition to any other remedies available under Federal, State, local, or tribal, or other laws. 18 U.S.C. § 1716E(h)(4).

## AS AND FOR A SEVENTH CAUSE OF ACTION
### COMMON-LAW GROSS NEGLIGENCE
*(Against All Defendants)*

573.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

574.    Each Defendant had a duty of care to Plaintiff and residents of New York to conduct its business of manufacturing, promoting, marketing, and/or distributing Flavored E-Cigarettes in compliance with applicable State law.

575.    Each Defendant breached its duties through its false and misleading statements and omissions, and/or its violations of the N.Y. Pub. Health L., in the course of its manufacture, distribution, sale, and/or marketing of Flavored E-Cigarettes within the State.

576.    As a foreseeable consequence of each Defendant's breaches of its duties, Plaintiff suffered direct and consequential economic injuries.

577.    Each Defendant's breaches of its duties involved an indifference to duty amounting to recklessness and actions outside the bounds of reason, so as to constitute gross negligence.

578.    Each Defendant's gross negligence was egregious, directed at the public generally, and involved a high degree of moral culpability.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### COMMON-LAW WILLFUL MISCONDUCT
*(Against All Defendants)*

579.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

580.    Each Defendant committed intentional acts of an unreasonable character in disregard of known or obvious risks so great as to make it highly probable that harm would result in the course of its manufacture, distribution, sale, and/or marketing of Flavored E-Cigarettes within the State.

581.    As a consequence of each such intentional act, Plaintiff suffered direct and consequential economic injuries.

582.    Each Defendant's willful misconduct was egregious, directed at the public generally, and involved a high degree of moral culpability.

## AS AND FOR A NINTH CAUSE OF ACTION
### UNJUST ENRICHMENT
*(Against All Defendants)*

583.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

584.    As an expected and intended result of each Defendants' conscious and continuing wrongdoing, each has unjustly enriched itself at Plaintiff's expense.

585.    It is against equity and good conscience to permit Defendants to retain the benefits they received as a result of its wrongful and continuing acts, practices, and omissions.

189

## DEMAND FOR JURY TRIAL

586.    Pursuant to Federal Rule of Civil Procedure 38(b), New York demands a trial by jury on all the issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the People of the State of New York, respectfully requests that the Court enter an order and judgment that:

1.    Enjoins each Defendant, pursuant to New York Executive Law § 63(12) and 15 U.S.C. § 377(b):

    a.    From selling, shipping, distributing, or otherwise supplying vapor products, including Flavored E-Cigarettes, in any form to any person or entity with a current New York State shipping or billing address;

    b.    From selling, shipping, distributing, or otherwise supplying vapor products, including Flavored E-Cigarettes, in any form to any person whom the Defendant knows or should know intends to bring, ship, sell, or otherwise transport, carry, or transfer any such product to New York State or to any person or entity with a current New York State shipping or billing address; and

    c.    To issue public corrective statements regarding their false and misleading public statements and omissions;

2.    Permanently bars each Individual Defendant, WEIS KHWAJA, HAMZA JALILI, and MOHAMMAD JALILI, pursuant to New York Executive Law § 63(12), from serving as an officer, director, employee, consultant, or owner of any New York corporation or similar business entity registered and/or licensed in New York State which engages in commercial activities, indirectly or directly, relating to the sales, marketing, distribution, or manufacturing of any vapor product, including Flavored E-Cigarettes;

3.    Directs each Defendant, pursuant to New York Executive Law § 63(12), to:

    a.    Pay damages for its fraudulent and/or illegal practices that violated that statute and caused compensable injuries to Plaintiff or any other person;

    b.    Pay Plaintiff all applicable civil penalties for each separate violation of each

190

pertinent underlying statute, including Public Health Law §§ 1399-ll; and

  c. Disgorge all revenues it wrongfully obtained as a result of its fraudulent and/or illegal practices in violation of each statute;

4. Directs Defendants, jointly and severally, to endow an abatement fund with sufficient capital to eliminate the public nuisance they are responsible for creating, maintaining, exacerbating, contributing to and/or perpetuating;

5. Awards Plaintiff all appropriate fines and penalties, pursuant to Title 18, 18 USC § 1716E, 15 U.S.C. § 377(a);

6. Awards Plaintiff, pursuant to 15 U.S.C. § 377(b), a civil penalty, the greater of: (i) $5,000 for the first violation, or $10,000 for any other violation; or (ii) for any violation, 2% of each Defendant's gross sales of ENDS during the 1-year period ending on the date of the violation, as well as damages and equitable relief;

7. Awards Plaintiff a civil penalty, pursuant to N.Y. Pub. Health L. § 1399-mm-1(3), from each Defendant, $100 for each individual package of Flavored E-Cigarette sold to a New York retailer or consumer;

8. Awards Plaintiff, pursuant to common law:

  a. Direct and consequential damages from each Defendant caused by its fraud, gross negligence, and/or willful misconduct, in an amount to be determined at trial;

  b. Punitive damages from each Defendant on account of the egregiousness, publicly-directed nature, and high moral culpability of its fraud, gross negligence, and/or willful misconduct, in an amount to be determined at trial; and

  c. Equitable disgorgement from each Defendant of all benefits it wrongfully received;

9. Awards punitive damages, in an amount to be determined at trial;

10. Awards Plaintiff its costs and grants statutory costs pursuant to CPLR § 8303(a)(6); and

11. Grants such other and further relief as the Court deems just and proper.

Dated: New York, New York

191

February 20, 2025

LETITIA JAMES
Attorney General of the State of New York

By:      /s/ Monica Hanna
Monica Hanna
*Special Counsel*
28 Liberty Street
New York, New York 10005
(212) 416-8227
monica.hanna@ag.ny.gov

Joy Mele
Alex Finkelstein
Wil Handley* (SDNY admission pending)
*Assistant Attorneys General*

*Of Counsel*:

Darsana Srinivasan
*Chief, Health Care Bureau*

Leslieann Cachola
*Deputy Chief, Health Care Bureau*

Colleen K. Faherty
*Special Counsel for Complex Litigation*