**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, by Letitia James, Attorney General of the State of New York,<br><br>                    Plaintiff,<br><br>    v.<br><br>PUFF BAR, *et al.*,<br><br>                  Defendants. | Case No. 25-cv-01445 (MMG) |

**PLAINTIFF'S OPPOSITION BRIEF ADDRESSING THE**
**INTERPRETATION OF THE PACT ACT PENALTY PROVISION**

Defendants argue that the "2% of gross sales" calculation under the PACT Act penalty provision must be interpreted to apply to (i) just sales within New York and (ii) just for a single one-year period preceding the date of the first violation, even where there are multiple violations spanning many years. *See* Defendants' Brief on the Appropriate Interpretation of 15 U.S.C. § 377(b)(1)(A)(ii) ("Defs. Opening Br.") (Docket No. 172) at 2. Defendants' interpretation ignores the plain text of the penalty provision, as well as the structure and legislative history of the PACT Act, all of which compel using *nationwide* gross sales for the 2% calculation and imposing a separate penalty for each violation based on separate one-year lookback periods.

Defendants also contend the State's interpretation violates the Excessive Fines and Due Process Clauses. These constitutional claims are inapplicable because the penalty provision merely determines a cap on each "per violation" penalty rather than the actual amount of each penalty—a task left to the Court's discretion based on consideration of factors that ensure the penalties will serve their intended purpose without exceeding the bounds of reasonableness.

## I.   THE DEFENDANTS' INTERPRETATION CANNOT BE SQUARED WITH THE STATUTORY TEXT, STRUCTURE, OR LEGISLATIVE HISTORY OF THE PACT ACT PENALTY PROVISION

Under the penalty provision of the PACT Act, any "delivery seller" violating the statute is subject to a civil penalty that is capped by a formula that depends on applying the specific facts of each particular violation—namely, whether it is the first or subsequent violation and the date of the violation (for determining the one-year period of gross sales). 15 U.S.C. § 377(b)(1)(A). This provision can reasonably be interpreted only to reference total *nationwide* sales for the "gross sales" figure and only to apply separately for each violative delivery sale shipment.

### A.   There Is No Geographic Limitation For "Gross Sales"

As demonstrated in the State's opening brief, the statutory text of the penalty provision contains no geographical limit on "gross sales," and the common meaning of "gross sales,"

statutory structure, and legislative history all support interpreting "gross sales" as referencing each Defendant's nationwide sale of Flavored E-Cigarettes. *See* Plaintiff's Opening Brief (Docket No. 171) ("State Opening Br.") at Points I and II.

Defendants spend no time analyzing the text or structure of the penalty provision. They cite neither dictionary definitions of "gross sales" nor federal statutes using the same or similar term. They also fail to cite legislative history to explain why the term "gross sales" chosen by Congress and commonly understood to mean unadjusted "total sales" should be read to impose a geographical limit. Instead, they focus on the *enforcement* provision of the PACT Act, found at § 378. Defendants maintain that because, in their view, the enforcement provision confers standing on state and local government officials to commence actions to prevent or restrain only violations of the PACT Act "that occur within their borders," "[i]t follows" that the gross sales figure used to calculate the penalty cap must also be limited to sales "that occurred within the governmental plaintiff's borders." Defs. Opening Br. at 5–6.

Defendants' reliance on the enforcement provision is unavailing. The enforcement provision speaks to the *standing* a governmental law enforcement official has to bring an action for appropriate relief against any person violating the PACT Act; it does not limit the amount of civil penalties otherwise available under the penalty provision once a violation is established. *See* § 378(c)(1)(A) (expressly stating that "appropriate relief" includes "civil penalties"). Congress could have chosen to limit "gross sales" in the penalty provision to those "that occurred within the governmental plaintiff's borders," Defs. Opening Br. at 6, but it did not. *See Biden v. Texas*, 597 U.S. 785, 798 (2022) ("If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote."). The Court should decline to "read [] absent word[s] into the statute" to "soften the import of Congress' chosen words," even where the chosen

"words lead to a harsh[er] outcome" for Defendants. *Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004). "[I]t is not [the Court's] role to second-guess [Congress's] choice by unilaterally editing the statute now." *Cunha v. Freden*, No. 25-3141-PR, 2026 WL 1146044, at *8 (2d Cir. Apr. 28, 2026).

Moreover, Defendants' argument misapprehends the purpose of civil penalties. In general, civil penalties are designed "to punish culpable individuals" and not "simply to extract compensation or restore the status quo." *Tull v. United States*, 481 U.S. 412, 422 (1987); *see also New York v. United Parcel Serv., Inc.,* 942 F.3d 554, 599 (2d Cir. 2019) ("*UPS*") (same). Because civil penalties serve to deter defendants from committing future violations even if they can afford to compensate injured plaintiffs, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185–86, 188 (2000), they go "beyond remedying the damage caused to the harmed party." *Johnson v. SEC*, 87 F.3d 484, 492 (D.C. Cir. 1996). Accordingly, even if the Court found that the State has standing to pursue violations that occur only within New York, it does not "follow" that the cap on penalties must be limited to a percentage of the sales that occur only within New York.

Nor are Defendants correct that the State's interpretation would "punish defendants for conduct wholly outside its borders." Defs. Opening Br. at 6. To the contrary, any civil penalties awarded by the Court, even if based on a cap calculated using nationwide gross sales, will be for violations attributable to shipments made *into and within New York* that violate the PACT Act.

Finally, Defendants invoke the "rule of lenity" to support their interpretation, but even they concede this rule applies only where the statute is ambiguous. Defs. Opening Br. at 4. Here, for the reasons above, and in the State's opening brief, the penalty provision is clear and unambiguous.

### B. A Separate Civil Penalty Applies For Each Delivery Sale Shipment Made In Violation Of The PACT Act

Defendants maintain that where a delivery seller makes multiple shipments into New York that violate the PACT Act, the statute requires the Court to deem these multiple shipments to be a

3

single "continuing violation" subject to a single penalty, with gross sales "measured by the one-year period preceding" the date of the first shipment. Defs. Opening Br. at 2, 10. Defendants' interpretation is contrary to the plain text of the penalty provision, which requires that each shipment be treated as a separate violation subject to a separate penalty to be assessed by the Court subject to a separate cap.

Congress provided that the penalty cap is the greater of two values—a fixed amount or 2% of gross sales for the one-year period ending on the date of the violation. This two-tiered approach makes sense only if applied separately to each violation. If the violation is the delivery seller's first, then the cap is the greater of $5,000 or 2% of the gross sales for the one-year period preceding the date of the violation. And if it is a subsequent violation, then the cap is the greater of $10,000 or 2% of the gross sales for the one-year period preceding the date of the violation. This interpretation implements Congress's choice to apply different amounts for the first and subsequent violations and impose an alternate basis for the cap, if greater than the fixed amount, calculated at 2% of the delivery seller's gross sales for a one-year period preceding the date of each violation. Notably, by adopting this two-tiered approach for determining the cap, Congress covered the many permutations of business models employed by delivery sellers—those that make few shipments but do so in bulk, those that make many small shipments, and everything in between. The two-tiered approach ensures there will be an appropriate cap for each violation regardless of the delivery seller's business model.

Conversely, Defendants' interpretation cannot be squared with the plain text of the penalty provision for multiple reasons. As to the fixed amount—$5,000 or $10,000—the provision works only if the penalty applies separately to each violation, since Congress makes a clear distinction between the amount for the first violation and the amount for all subsequent violations.

4

Defendants' interpretation—deeming a delivery seller's multiple violations to be a single "continuing violation"—undermines Congress's intent to apply *different* amounts to the first and subsequent violations. If Congress had intended the provision to apply to a "continuing violation" as Defendants maintain, Congress would have included only a single amount for the delivery seller's "continuing violation" rather than *different amounts* for the first and subsequent violations.

Defendants' interpretation similarly does not square with the plain text of the 2% calculation. Congress provided that this alternate cap amount shall equal 2% of the delivery seller's gross sales "during the 1-year period ending *on the date of the violation*," in the singular. § 377(b)(1)(A)(ii) (emphasis added). There is no single "date of the violation" for a purported "continuing violation" that encompasses multiple violative shipments on multiple dates. Defendants contend that the one-year period precedes "the commencement" of the "continuing violation," which is the date of the first violation, Defs. Opening Br. at 10, but that is an arbitrary selection without any textual support in the statute. For that matter, why not choose the date of the second, third, or last violation? Defendants' arbitrary selection of the date of the first violation as the end of the one-year lookback period is merely an attempt to shoehorn their interpretation into a provision that simply does not contemplate application to multiple violations. The Court should decline to treat multiple violations as one "continuing violation," Defs. Opening Br. at 2, where the statutory text requires application on a per violation basis. *Lamie*, 540 U.S. at 538; *Cunha,* 2026 WL 1146044, at *8.

Moreover, the "per violation" application of the penalty provision is further "reinforced by the broader context and structure" of the penalty provision "in the overall statutory scheme." *United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016); *see also Cunha*, 2026 WL 1146044, at *14 (citing *Gundy v. United States*, 588 U.S. 128, 141 (2019)).

5

The PACT Act applies to each "delivery sale" of "cigarettes"[1] to a "consumer"[2] where "delivery sale" is defined as an "order for sale" that is submitted "by means of a telephone or other method of voice transmission, the mails, or the Internet or other online service, or the seller is otherwise not in the physical presence of the buyer when the request for purchase or order is made," or the e-cigarettes "are delivered to the buyer by common carrier, private delivery service, or other method of remote delivery, or the seller is not in the physical presence of the buyer when the buyer obtains possession of the" e-cigarettes. § 375(5).

With respect to "delivery sales," the statute imposes mandatory shipping requirements, including, among other things, that: (i) each "shipping package" contain a specific notice "on the bill of lading, if any, and on the outside of the shipping package" indicating that federal law requires payment of applicable excise taxes and compliance with applicable licensing and tax-stamping obligations; (ii) each "single sale or single delivery" not exceed 10 pounds; and (iii) the "purchaser placing the delivery sale order" or the person who signs "to accept delivery of the shipping container at the delivery address" provides verification that he/she is "at least the minimum age required for the legal sale or purchase" of e-cigarettes. § 376a(a). Based on the plain text of the statute, these labeling, weight, and age verification requirements apply to *each* "delivery sale" consisting of a single delivery sale shipment of e-cigarettes.

Under this statutory structure, a violation of the labeling, weight, or age verification requirements is assessed based on the facts surrounding each individual shipment. That is, for each shipment, did the delivery seller adhere to, or violate, the labeling, weight, or age verification

---

[1] The term "cigarette" includes an "electronic nicotine delivery system," which is defined to include e-cigarettes. § 375(2)(A)(ii)(II).

[2] A "consumer" is defined as "any person that purchases" e-cigarettes except those "lawfully operating as a manufacturer, distributor, wholesaler, or retailer of" e-cigarettes. § 375(4).

6

requirements under the statute? Contrary to Defendants' interpretation, the concept of a "continuing violation" based on the "same alleged course of conduct," Defs. Opening Br. at 10, is without support in the statute, and conflicts with the statutory structure that defines a violation based on discreet acts or omissions surrounding the delivery sale shipment to a consumer.

## II.    DEFENDANTS' CHALLENGES UNDER THE EXCESSIVE FINES AND DUE PROCESS CLAUSES ARE WITHOUT MERIT

Defendants contend that the State's interpretation would violate the Eighth Amendment's Excessive Fines Clause. Defs. Opening Br. at 2-3. Defendants' argument is based on a fundamental misconception of the purpose and effect of the 2% calculation, which is merely to establish a *ceiling* for the civil penalty the Court may impose and *not* to determine the actual amount of the penalty. *See UPS,* 942 F.3d at 599 (holding that the analogous PACT Act civil penalty provision for common carriers "caps the penalty" the district court may impose). Because the 2% calculation does not determine the actual penalty amount and the Court has yet to determine what the penalty amount will be, Defendants' challenge under the Excess Fines Clause is not ripe for adjudication. *See Farina v. Metro. Transportation Auth.*, 409 F. Supp. 3d 173, 195 (S.D.N.Y. 2019) ("[C]hallenges under the Excessive Fines Clause are . . . generally not ripe until the actual, or impending, imposition of the challenged fine.") (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995)); *accord Thomas v. Cnty. of Humboldt,* 124 F.4th 1179, 1188–89 (9th Cir. 2024) (same), *cert. denied sub nom. Thomas v. Humboldt Cnty*, 146 S. Ct. 27 (2025); *Duffner v. City of St. Peters*, 930 F.3d 973, 977 (8th Cir. 2019) ("Because it is unknown whether the City will impose sanctions on Duffner or, if sanctions are imposed, what they might be, Duffner cannot establish that her Eighth Amendment claim is "fit" for judicial decision."); *see also Stevens v. City of Columbus*, No. 21-3755, 2022 WL 2966396, at *12 (6th Cir. July 27, 2022) (excessive fines challenge not ripe because the City had not imposed or sought a fine); *Home for Aged of Little Sisters of the*

7

*Poor v. McDonald*, 711 F. Supp. 3d 81, 112–13 (N.D.N.Y. 2024) (holding that because an excessive fines claim is essentially a proportionality determination, it is not ripe prior to the fine being determined), *appeal withdrawn sub nom. Home for Aged of Little Sisters of Poor v. McDonald*, No. 24-387, 2024 WL 3803195 (2d Cir. Mar. 22, 2024).

Defendants' argument based on the Due Process Clause fares no better. Defendants rely on *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), which they contend addresses "the analogous context of jury awards of punitive damages." Defs. Opening Br. at 3. But punitive damages awarded by juries are *not* analogous to statutory civil penalties awarded by judges. The due process concerns in *State Farm* arose from the "purely discretionary" nature of the jury's punitive damages award. *United States ex rel. Bassan v. Omnicare, Inc.*, No. 15-cv-4179, 2025 WL 1865202, at *3 (S.D.N.Y. July 7, 2025). No such concern over a jury's discretion exists where, as here, a statutory penalty is determined by a judge. *See id*. (noting the due process concerns animating *State Farm* did not exist in a case involving statutory penalties).

Moreover, as applied to statutory civil penalties (as opposed to jury awards), the Due Process Clause affords only "the basic protections against 'judgments without notice.'" *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996); *see also City of New York v. Milhelm Attea & Bros.,* No. 06-cv-3620, 2012 WL 3579568, at *28 (E.D.N.Y. Aug. 17, 2012) (noting lack of authority holding that "it would violate due process for a federal statute to allow for civil penalties without prescribing a particular dollar range"). Here, there is no lack of notice; the PACT Act clearly provides for the imposition of civil penalties and, like many statutes, contains "an upper cap on penalties." *Milhelm*, 2012 WL 3579568, at *29; *see generally United States v. Complex Machine Works Co.,* 83 F.Supp.2d 1307, 1312–15 (C.I.T.1999) (surveying civil penalty provisions providing caps). Accordingly, "using the PACT Act calculations . . . for an award of

8

civil penalties . . . would not violate due process." *Milhelm*, 2012 WL 3579568, at \*33.

Defendants' reliance on the century-old decision in *St. Louis, I. M. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919), is also unavailing. To the extent *Williams* can be read to hold that in the context of statutory civil penalties the Due Process Clause affords protection from more than lack of notice, it is no longer good law in the wake of *Gore*.[3] Moreover, even if the Court were to conclude that a civil penalty is subject to a due process challenge as excessive (which is not the case after *Gore*), any such challenge would be premature—just as it is under the Excessive Fines Clause—since the PACT Act penalty provision merely sets a cap and does not determine the actual amount of the penalty. *See Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 304 (1981) (holding challenge to statutory penalty before fine had been collected or assessed was premature); *Presson v. Alamo Intermediate II Holdings, LLC*, No. 24-CV-170 (ER), 2025 WL 692123, at \*6 (S.D.N.Y. Mar. 4, 2025) (same); *Rodrigue v. Lowe's Home Centers, LLC*, No. 20-cv-1127, 2021 WL 3848268, at \*6 (E.D.N.Y. Aug. 27, 2021) (holding it was premature to assess whether a liquidated damages award that the court treated as a punitive damages award was excessive where the factual record had not yet been developed).[4]

---

[3]In any event, *Williams* is decidedly unhelpful to Defendants' due process challenge on its facts. In *Williams*, a railroad company charged each of two passengers 66 cents more than the prescribed statutory train fare, for which the company was held liable to pay a statutory penalty of $75 plus the costs of suit, including attorney's fees of $25. 251 U.S. at 64. Even though the penalty was more than *75 times* the total amount of the overcharged fare ($1.32), the Court nevertheless held that the penalty was not "so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable" when "considered with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need to securing uniform adherence to established passenger rates." *Id*. at 67. *Williams* can hardly be read to support a due process challenge to a statutory penalty provision that merely sets a cap on the penalty, as so many federal statutes typically do. *Milhelm*, 2012 WL 3579568, at \*29.

[4] To the extent *Hodel* holds that a party may bring a due process challenge to statutory penalties on grounds other than lack of notice, it was overruled *sub silencio* by the Court's later decision in *Gore*.

Finally, Defendants mention "Article III standing" and "zone of interests," but fail to articulate how these jurisdictional concepts have any bearing on the interpretation of the penalty provision. Defs. Opening Br. at 3-4. To the extent they are suggesting that "gross sales" cannot be interpreted to encompass sales outside of New York consistent with the State's standing and zone of interests, they are wrong. As the Supreme Court has made clear, "evidence describing out-of-state transactions" "may be relevant to the determination of the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 574 n.21 (citing *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462 n.28 (1993)). The Court should assume "that Congress was fully informed as to the state of the law" concerning the relevance of a defendant's out-of-state transactions when enacting the PACT Act and deciding to base the 2% calculation on "gross sales," a term commonly understood to reference total sales without adjustment for costs. *Alexander v. Sandoval*, 532 U.S. 275, 314 (2001); *see also* State Opening Br. at 3 (reviewing definitions of "gross sales").

In the end, Defendants' concerns about "double counting" and "shipment stacking," Defs. Opening Br. at 9, are unwarranted. The Court's determination of the penalties will be guided by traditional factors, "including the good or bad faith of the defendants, the injury to the public, and the defendants' ability to pay," to ensure that the penalties assessed will be reasonable and appropriate. *Advance Pharmaceuticals, Inc. v. United States,* 391 F.3d 377, 399 (2d Cir. 2004) (quoted in *Milhelm*, 2012 WL 3579568, at *33); *see also* State Opening Br. at Point III.

## CONCLUSION

For the foregoing reasons, the Court should hold that: (i) the term "gross sales" refers to each Defendant's nationwide gross sales; and (ii) the penalty provision, including the one-year lookback period for calculating 2% of gross sales, applies separately to each violation.

Dated: New York, New York
     May 26, 2026

                         LETITIA JAMES
                         Attorney General
                         State of New York

                         By: _*/s/ Andrew Amer*_
                         Andrew Amer
                         Leslieann Cachola
                         Colleen K. Faherty
                         Alex Finkelstein
                         Wil Handley
                         Joy K. Mele
                         Gena Miller
                         Darsana Srinivasan
                         Eve Woodin

                         Office of the New York State
                           Attorney General
                         28 Liberty Street
                         New York, NY  10005
                         (212) 416-6127
                         andrew.amer@ag.ny.gov

                         *Attorney for Plaintiff*

11